**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**

**CARLOS MONTEMAYOR,**

**Defendant.**

**1:09-cr-00551-WSD-2**

## OPINION AND ORDER

This matter is before the Court on Defendant Carlos Montemayor's

("Defendant") Motion to Recuse District Court Judge (the "Motion") [211].

## I.    INTRODUCTION

Defendant was charged in 2009 in a multi-count indictment alleging

Conspiracy to Possess with Intent to Distribute at Least Five Kilograms of

Cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(ii), and 18 U.S.C. § 2;

Conspiracy to Import at Least Five Kilograms of Cocaine, in violation of 21 U.S.C.

§§ 963, 960(b)(1)(B)(ii), and 18 U.S.C. § 2; Possession with Intent to Distribute at

Least Five Kilograms of Cocaine, in violation of 21 U.S.C. §§ 841(a) and

841(b)(1)(A)(ii); and Conspiracy to Commit Money Laundering, in violation of

1

18 U.S.C. § 1956(h) (the "2009 Action").[1]  Defendant was arrested in Mexico on November 23, 2010, and extradited to the United States on or about September 30, 2015.

The Court served as the United States Attorney in this district from November 2001 through June 30, 2004.  The Court was sworn in as a member of this Court on July 1, 2004.  It was the Court's service as the United States Attorney upon which Defendant bases his motion to recuse.

Defendant claims that the charges against Defendant resulted from the continuation of an investigation conducted in the 2002 to 2004 timeframe when the Court was the United States Attorney (the "2002 to 2004 Investigation").  Defendant cites to selected references from four documents to support his claimed connection between this case and the 2002 to 2004 Investigation.  The support includes (i) a January 14, 2008, press release, issued by the United States Attorney's Office for this district, announcing the jury verdict against co-defendants Flores and Lopez in a case indicted in 2005 (the "2008 Press Release");[2] (ii) an August 28, 2013, Presentence Investigation Report for a co-defendant of Defendant Montemayor who pled guilty in this action (the "2013

---

[1]    The case style is United States v. Edgar Valdez-Villareal, No. 1:09-cr-00551-WSD (N.D. Ga).

[2]    Defendant was a fugitive at the time.

2

PSR"); (iii) the Government's June 18, 2008, Answer to Defendant Arsenio Ramirez Santacruz's Section 2255 motion following his conviction in the case indicted in 2004 (the "Section 2255 Answer"); (iv) and the affidavit of Drug Enforcement Administration ("DEA") Special Agent Renita Hill in support of Title III wiretap application (the "Hill Affidavit").

The Government, in its response to the Motion, provided detailed information about the origins and the conduct of the 2004 to 2005 Investigation. The Court considers the facts set out by both parties.[3]

## II.   BACKGROUND

In September 2002, the Atlanta Office of the DEA commenced the investigation of a drug trafficking cell in Atlanta.  The investigation concerned the trafficking of cocaine, methamphetamine, and marijuana in the Atlanta area.  The investigation included intercepted communications, under Title III, during the period of June 2003 to May 2004.  On May 5, 2004, an indictment was returned as a result of the investigation ("2004 Action").  Judge Clarence Cooper of the Court presided over the case.  See United States v. Santacruz et al, No. 1:04-cr-00254-CC (N.D. Ga).[4]

---

[3]     The parties do not dispute the facts asserted but interpret them differently.

[4]     A superseding indictment was returned on June 1, 2004.  ([56]).  The Defendants charged were Arsenio Ramirez Santacruz, Beningo Ramires-Reyes,

On October 2004, after the Court was sworn in as a member of Northern District of Georgia bench, the DEA opened an investigation named Operation Multiplicity (the "Multiplicity Investigation"). The DEA case file for the investigation indicates the investigation commenced on October 15, 2004. A case file for the investigation was opened in the United States Attorney's office ("USAO") on June 3, 2005. The DEA and the United States Attorney's office considered the investigation one involving separate trafficking cells, and not a continuation of the 2002 to 2004 Investigation or the 2004 Action. The investigation focused on Edward Valencia-Gonzalez and his Mexico-based cocaine distribution organization.

Two cases resulted from the Multiplicity Investigation. The first case was indicted on November 21, 2005, and assigned to this Court (the "2005 Action"). See United States v. Flores et al., No. 1:05-cr-00558-WSD (N.D. Ga).[5] The defendants were charged with trafficking in cocaine and ecstasy, and the possession of firearms in connection with drug offenses. Four years later, the

Juan Martinez, Luis Fernando Andarade, Renato Jiminez, Jose Gabriel Maldonado Ramirez, Eugenio Ochoa, Alfredo Hernandez, Genaro Herrera, Benjamin Odom, Randy Middlebrooks, Francisco Celis-Duarte, Felix Molina-Pichardo, Efrain Arroyo-Diaz, Julio Valdez-Olivares, and Jorge Montufar-Pascual.

[5]    A superseding indictment was returned on December 15, 2005. The Defendants charged were Jesus Hector Flores, Romero Roel Martinez, Luis Fernando Trevino, Joe Louis Lopez, Roberto Garcia, and Florentino Villanueva-Castillo.

second case was indicted on December 15, 2009 (the "2009 Action").  In the 2009

Action, Defendant Montemayor and co-defendants Edgar Valdez-Villareal, Ruben

Hernandez, Juan Montemayor, Roberto Lopez, and Jesus Ramos [1, 44] were

charged with a conspiracy to distribute cocaine and distribute cocaine, and

possession with intent to distribute cocaine, primarily in Atlanta and Memphis.

The Government does not have any evidence or other information that

Defendant Montemayor was related to or involved in the drug trafficking

organization that was the subject of the 2004 Action.  The Government relies on a

variety of documents to support that there was no connection between the 2002 to

2004 Investigation and the Multiplicity Investigation, or the 2005 and 2009

Actions.  (See No. 1:04-cr-00254-CC [211] at 10-14; [211] at 1; [211.2] at 4-6,

10-24, 31; [211.3] at 4-8; No. 1:05-cr-00558-WSD [343.2] at 5-13).

Defendant Montemayor relies on the 2008 Press Release, the 2013 PSR, the

2008 Answer, and the Hill Affidavit, (sometimes collectively referred to as the

"Documents") to support Defendant's claim that the 2009 Action was based on a

continuation of the 2002 to 2004 Investigation.  The references in the Documents

are described below.

      a.    The 2008 Press Release related to the conviction at trial of Defendants
                Flores and Lopez in the 2005 Action stated at the top of the release:
                "Evidence Showed Atlanta Cartel Operations Distribution 4,000
                Kilograms of Cocaine from 2002 to 2005."  (2008 Press Release at 1).

5

The press release stated further that "Flores served as the intermediary between the metro Atlanta distribution operations and a cocaine cartel based in Mexico and he managed the cartel's Atlanta activities from his home in Loredo, Texas.  Lopez and others distributed the cocaine to the cartel's customers in metro Atlanta."  (Id.).  The press release stated further:  "The evidence showed that Flores also distributed cocaine in Memphis, Tennessee.  In total, the operation distributed approximately 4,000 kilograms of cocaine in Georgia and Tennessee from 2002 to 2005.  (Id. at 2).

b.  In the 2013 PSR, Defendant references information in paragraph 11:

In the early to mid-2000's, [Defendant] Valdez-Villareal transitioned from being a local distributor of cocaine in his hometown of Laredo, Texas, and Nuevo Laredo, Mexico, to become the distributor of larger loads of cocaine to regional distributors in the United States.

. . .

During this period, Valdez-Villareal entered into an arrangement with Carlos Montemayor . . . who developed a network to transport the organization's cocaine across the border into Laredo and process cash proceeds that had been smuggled across the border into Mexico.  Carlos Montemayor eventually formed a loose partnership with Valdez-Villareal, in which they pooled their resources to buy cocaine in Mexico.

. . .

In 2004, Carlos Montemayor arranged for Jesus Hector Flores . . . to oversee the domestic operations related to Carlos Montemayor's customers in the southeastern United States. . . . Carlos Montemayor started sending truckloads of cocaine to Flores' workers in Memphis, where the workers met the trucks at empty warehouses and stored the cocaine and drug proceeds in a rented stash house.

6

. . .

In the spring of 2005, Carlos Montemayor asked Flores to expand his operations to include the organization's customers in Atlanta, Georgia.

(2013 PSR at 4-5).

c.     In the 2008 Answer, Defendant Montemayor refers to two specific statements in support of the recusal argument:

Starting in September 2002, agents of the . . . [DEA] in Atlanta began an investigation of Mexican drug traffickers who were importing cocaine, methamphetamine, and marijuana from Mexico for distribution in the Atlanta area and elsewhere. . . . The investigation began with undercover purchases of cocaine and methamphetamine from street-level dealers, after which agents used Title III wiretaps to identify and investigate the highest-level managers of the drug organization.

(Answer at 3-4).  The upper level managers were not named.

Finally, Defendant points to information in the Hill Affidavit that discusses information provided by Confidential Source 1 ("CS1").  CS1 apparently identified Jose Martin Gomez and provided his phone number over which conversations had been intercepted pursuant to a Title III authorization in the 2004 Investigation. Defendant represents that Gomez admitted to CS1 that he had engaged in drug trafficking activity.  (Def.'s Mot. at 3).  Defendant represents further that Special

Agent Foster[6] stated that Gomez left Atlanta for Mexico in May 2004 and, in the agent's opinion, his departure was because the defendants in the 2004 Action were arrested and "3,000 pounds of marijuana" had been seized.

The Government also offers information in support of its opposition to the Motion.  Some of the information offered is in its Response to Defendant's Motion to Recuse District Court Judge ("Response") [226].  These facts, while not in the form of an affidavit, are offered by officers of the Court and the Court accepts them as credible for purposes of this Order.  The Government also relies on two attachments to its response.  The evidence on which the Government relies is set out below.

In its Response, the Government states, in support of the argument that the 2009 Action is not based on the 2004 Investigation or a continuation of it, that (i) the Multiplicity Investigation upon which the 2009 Action was based commenced on or about October 15, 2004, after the Court was sworn in as a District Judge; (ii) that the file in the USAO was opened on June 3, 2005; (iii) the DEA and the USAO considered the Multiplicity Investigation as a new investigation and not the continuation of the 2004 Investigation; (iv) the

---

[6]     The Court notes that Defendant refers to Special Agent Hill and Special Agent Foster as providing information.  The Court considers the information provided even if it came only from the agent.

Multiplicity Investigation focused on Edward Valencia-Gonzalez, an Atlanta area drug distributor and head of an organization that operated primarily in Atlanta and Memphis; (v) the "government has no evidence or information to believe that Defendant has any relationship to the polydrug distribution organization prosecuted in the 2002 Investigation;" (vi) there is no overlap of individuals involved in the 2002 Investigation with individuals targeted in the Multiplicity Investigation; (vii) no defendant prosecuted in the 2005 and 2009 Actions were held accountable for conduct investigated or known as a result of the 2002 Investigated; (viii) co-defendants Flores and Martinez distributed cocaine in Memphis on behalf of Defendant Montemayor's drug organization until 2005 when they migrated their operations to Atlanta; (ix) and there is no evidence that Defendant Montemayor's and Defendant Flores's distribution activities were with or for the organization that was the subject of the 2004 Investigation and the 2004 Action.

The Government also identifies facts showing the difference between the 2004 and 2005 Actions in two attachments to the Government's Response to the Motion.  First, it attaches the sentencing memorandum it submitted in the sentencing of Ramiro Martinez, a co-defendant in the 2005 Action.  In the

Chronology section, the government describes the evidence from the Multiplicity

Investigation that led to Martinez's prosecution:

> DEA initiated the first wiretaps in this case on June 15, 2005.  The
> first wiretap intercepted the cellular telephone conversations of
> Manuel Coronado Espindola, a.k.a. Edwar [sic] Valencia-Gonzalez,
> a.k.a. "84," a.k.a. "Viejon."  The wiretap immediately identified
> Martinez as the Atlanta point of contact for Coronado's Mexican
> source for cocaine. Indeed, on the first day of the wiretap, Coronado
> spoke with the cartel supervisor known as "El Director" about
> Martinez (referred to by his code name, "Cache") regarding the
> delivery of cocaine and money.  The following week, the wiretap
> yielded intercepted calls with Martinez himself, as he spoke with
> Coronado regarding a delivery of cocaine.
>
> The wiretaps show that, from July through September 2005, Martinez
> remained the primary Atlanta point of contact for the cartel
> supervisors in Mexico and the cartel's Atlanta customers.  When the
> cartel's customers needed a delivery of cocaine, the cartel supervisors
> called Martinez and provided him with the customer's code name,
> phone number, and quantity of cocaine to be delivered.  Martinez then
> reported his activities to Flores, who was in Laredo.  Martinez
> reported to the Mexican supervisors, as well as to Flores, the
> quantities of cocaine that were available in the stash house and how
> much money had been collected.  Although the wiretaps show that the
> cartel supervisors also contacted Trevino and Garcia after they arrived
> in Atlanta, they did so rarely and typically when Martinez was not
> available.

(Sentencing Mem. at 5-6 (internal citations omitted)).

The Government also attached to its response its brief in response to Flores's

appeal of his judgment and sentence in the 2005 Action.  The Government

explained the organization to the Eleventh Circuit in the Statement of Facts

section:

> This case involves a cocaine distribution organization led by Flores
> that began in 2001 in Memphis, Tennessee, and transitioned much of
> its operations in 2005 to Atlanta, Georgia.  In 2001, Flores and his
> brother, Marcos Flores, both from Laredo, Texas, operated separate
> drug rings in Memphis, with Hector Flores selling cocaine and
> Marcos Flores selling mostly marijuana.   In 2002, co-defendant
> Roberto Garcia began working for Hector Flores's cocaine operation
> in Memphis along with another co-defendant, Ramiro Roel Martinez.
> Both Garcia and Martinez worked for Flores intermittently, but they
> developed enough credibility with Flores that he returned to Laredo
> and left them in Memphis to handle the operations there.  In 2002 or
> 2003, Garcia introduced co-defendant Luis Trevino to Flores, and
> Trevino began working for Flores in Memphis as well.  Finally, Lopez
> worked in Memphis for a short period of time as well, but he left after
> a disagreement with Martinez.
>
> From 2002 until early 2005, Flores used his connections with a
> Mexican cocaine cartel to supply the operations in Memphis with
> tractor trailer trucks hauling loads of cocaine bricks from Mexico to
> Memphis.  The Memphis operation received deliveries of cocaine at
> least once a month, and more often several times a month, with each
> load containing a minimum of 100 kilograms of cocaine.  The workers
> met the trucks at warehouses to unload the cocaine, which they then
> stored in rented "stash houses."  At Flores's instruction, they delivered
> the cocaine bricks to Flores's customers and collected cash payments
> to process and send back to Laredo in the trucks.  Taken together, the
> Memphis operations received and distributed as much as 2,000
> kilograms of cocaine, resulting in proceeds of tens of millions of
> dollars.  Throughout the process, Flores provided daily, hands-on
> management, instructing his workers on all aspects of operations such
> as maintaining a low profile, securing the stash house, and even such
> minutiae as purchasing groceries.

11

In early 2005, police arrested one of Flores's primary customers in Memphis, and business there slowed. Flores therefore struck an agreement with the Mexican cartel that he would establish operations in Atlanta to receive truckloads of cocaine there, distribute the cocaine to the cartel's customers, collect and process the cash payments, and deliver the proceeds to trucks heading back to Mexico. Flores first dispatched Martinez to Atlanta to establish the operations, and later Trevino and Garcia moved from Memphis as well. In addition, Martinez asked Flores for help, and Lopez arrived from Texas to join the Atlanta operation.

The Atlanta operations closely resembled those in Memphis, except for the fact that Flores and his workers now directly served the cartel. Moreover, the trucks contained more cocaine than before, typically more than 100 kilograms and sometimes up to 300 kilograms. The Atlanta workers distributed the cocaine according to instruction from Flores and the cartel supervisors, and then picked up, counted, and packaged the bulk currency paid by the cartel's customers for transportation by the truck drivers as they returned to Mexico. The Atlanta operations received truckloads of cocaine as often as three times each month for a total of approximately 1,500 kilograms of cocaine in just six months.

Flores was the primary intermediary for the cartel supervisors and managed the operations from his house in Laredo. Martinez served as Flores's lieutenant, and had primary responsibility for communicating with Flores and the cartel representatives in Mexico. Lopez held the primary responsibility to meet the trucks delivering the cocaine and to deliver the drugs to the customers, while Garcia and Trevino counted and processed the currency that Lopez collected from the customers. In fact, Lopez made most of the deliveries of cocaine and pick-ups of cash. Lopez, Martinez, Garcia, and Trevino all mixed their responsibilities, however.

(Response, Ex. 2 at 17-20 (internal citations omitted).

## III.   DISCUSSION

28 U.S.C. § 455 states the criteria for the disqualification of federal judges. Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a). "The test under Section 455(a) is whether an objective, disinterested, lay observer fully informed of the facts on which recusal was sought would entertain a significant doubt about the judge's impartiality."  United States v. Chandler, 996 F.2d 1073, 1104 (11th Cir. 1993); United States v. Miller, 221 F App'x 182, 185 (4th Cir. 2007).  "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  Liteky v. United States, 510 U.S. 540, 555 (1994).

To satisfy the requirements of Section 455(a), a party seeking recusal must offer facts, and not merely allegations, that evidence partiality.  United States v. Cerceda, 188 F.3d 1291, 1292 (11th Cir. 1999); Weatherhead v. Globe Int'l, Inc., 832 F.2d 1226, 1227 (10th Cir. 1987) ("Allegations under [Section 455] need not be taken as true.").  Recusal is measured against a heightened standard because:

> [T]he disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also*

13

> the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.

In re Bulger, 710 F.3d 42, 47 (1st Cir. 2013) (quoting In re Allied-Signal Inc., 891 F.2d 967, 970 (1st Cir. 1989)).

Section 455(b) lists specific circumstances requiring recusal, including where the judge "has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding." 28 U.S.C. §§ 455(b)(1), (3). Section 455(b)(3) generally requires a judge who previously served in government to recuse only if the judge actually participated in the case. See Magnum v. Hargett, 67 F.3d 80, 83 (5th Cir. 1995). "[T]he same rule applies to former supervisors in the United States Attorney's office; § 455(b)(3) requires recusal only when the supervisor actually participated in a case." United States v. Champlin, 388 F.Supp.2d 1177, 1181 (D. Haw. 2005); see also United States v. Scholl, 166 F.3d 964, 977 (9th Cir. 1999); see also United States v. Di Pasquale, 864 F.2d 271, 279 (3d Cir. 1988).

The rule for former United States Attorneys is, in some jurisdictions, more strict. Two Circuits, the Ninth and the Seventh, have held that actual participation in a matter is not required for recusal of a former United States Attorney. See United States v. Arnpriester, 37 F.3d 466, 467 (9th Cir. 1994); United States

v. Ruzzano, 247 F.3d 688, 695 (7th Cir. 2001), overruled on other grounds by

Fowler v. Butts, 829 F.3d 788 (7th Cir. 2016); see also United States v. Champlin,

388 F. Supp. 2d 1177, 1179 (D. Haw. 2005).  These circuits appear to be of the

view that the nature of the position of the United States Attorney and the

requirement of impartiality, supports that the participation of others in the United

States Attorney's office be imputed to the United States Attorney.  The Eleventh

Circuit has not addressed what standard must be met for a Court to recuse based on

work done by the staff of a United States Attorney while the Court served as the

United States Attorney.[7]  For the purposes of this Order only, the Court assumes

that recusal is required under Section 455(b)(3) if the 2004 Investigation was

uninterrupted and was continued as Operation Multiplicity.

Defendant Montemayor argues here that the Court is required to recuse

(i) under Section 455(b)(3) because, in his prior government service, the Court

participated in the investigation of the 2009 case, and (ii) under Section 455(a),

because the Court's impartiality might reasonably be questioned in this case.  The

Court starts with its evaluation under Section 455(b)(3).

---

[7]    There is further uncertainty whether recusal is necessary under
circumstances like those here where a United States Attorney was unaware of the
commencement of arguably related further investigation after the conclusion of an
investigation that may require a recusal.

A.    Section 455(b)(3) Analysis

Defendant first argues that recusal of the Court is mandatory because the Court, while United States Attorney, was "serv[ing] in government employment and in such capacity participated as counsel . . . concerning the proceeding."  (Mot. at 11).  Defendant argues the circumstances here mandate the Court's recusal under Section 455(b)(3).  Defendant contends that Operation Multiplicity, which led to the indictment in this case, was a continuation of the 2004 Investigation conducted by the DEA while the Court served as the United States Attorney.  This argument is factually and legally flawed.

Here, the great weight of the information presented to the Court is that the 2004 Investigation was separate and distinct from the investigation conducted in Operation Multiplicity that resulted in the 2005 Action, and the 2009 Action which resulted in Defendant Montemayor's indictment.  In representations made to this Court and the Eleventh Circuit, the Government represented the relevant facts.

The facts show that any cocaine transactions in the early 2000s timeframe in which Defendant Montemayor or his associates in Mexico were involved, involved transactions with Defendant Flores's organization to distribute cocaine in Memphis, a geographic area in which the organization prosecuted in the 2004 Action did not operate.  That the Defendants in the 2004 Action were distributing

16

methamphetamine, marijuana, and cocaine in Atlanta in the early 2000s, and the

Defendant organizations alleged in the 2005 and 2009 Actions were distributing

drugs in the early 2000s in Memphis, does not support that the organization in the

2005 and 2009 Actions and the 2004 Action were associated or related drug

organizations.  The "time period overlap" showing that the 2004, 2005, and 2009

Action organizations engaged in drug trafficking during the 2002 to 2004

timeframe does not support that the 2004 Investigation was simply a continuation

of a different organization or organizations.  The Government provided further

information to discredit Defendant Montemayor's argument that the distribution

period "overlap" shows a continuation of the 2004 Investigation.  In its appeal

brief to the Eleventh Circuit, the Government represented to the Court that the

organization targeted in the 2005 Action began trafficking in Memphis in 2001 and

moved its operations to Atlanta in 2005.  Hector Flores, the head of the

organization prosecuted in the 2005 Action, mainly sold cocaine in Memphis in the

early 2000s.  His brother mainly sold marijuana during this period.  Certain of

Flores's co-defendants joined in his Memphis operation.  The Flores organization

was supplied from Mexico and, when business in Memphis slowed in early 2005

as a result of the arrest of a Memphis customer, Flores entered into an agreement

with his Mexico cartel supplier to establish an operation in Atlanta.  As the

Government represented in its Response, "the Atlanta operation closely resembled those in Memphis, except for the fact that Flores and his workers directly served the cartel."  (Resp. Ex. 2 at 7).  "Flores was the primary intermediary for the cartel supervisor and managed the operation from his house in Laredo."  (Id. at 8).

These facts support that the Operation Multiplicity investigation begun in late 2004 was part of an organization being newly established in Atlanta following its migration from Memphis and was not the replacement of an organization dismantled as a result of the 2004 Investigation and Action.[8]  The investigation of the 2005 and 2009 Action organizations and their activities in Memphis and later Atlanta support the Government's representation that the Operation Multiplicity Investigation was a new investigation initiated by the DEA and USAO and not a continuation of the 2002 to 2004 Investigation that led to the 2004 Action.

The Court also considered Defendant Montemayor's interpretation of the 2008 Press Release and the statements Defendant references in the 2013 PSR background section.  The Government noted, and the Court finds, that there is no

---

[8]     Though the Hill Affidavit states that CS1 identified Valencia-Gonzalez as a replacement for Gomez, ([212.1] at 535), the Government points out that (i) the affidavit does not state that agents believed Gomez was a part of the organization prosecuted in the 2002 Investigation; (ii) Gomez was not a target of the 2002 Investigation and was not identified during that investigation; and (iii) to this day, agents have no evidence or information that Gomez was a member of the organization prosecuted in the 2002 Investigation.  (Resp. at 6-7).

credible or persuasive evidence that Defendant Montemayor's and Defendant Flores's trafficking activities were with or for the organization that was the subject of the 2002 to 2004 Investigation and the 2004 Action.  This includes Defendant's reference to the Hill Affidavit and the use of an intercepted conversation from a wiretap in the 2002 to 2004 Investigation to corroborate statements made by CS1. A plain reading of the affidavit language cited by Defendant does not show, and does not credibly suggest, that the 2002 to 2004 Investigation was continued in Operation Multiplicity.

The Court concludes that there is insufficient evidence to show that the 2002 to 2004 Investigation was continued by the Multiplicity Investigation, and the evidence thus does not show that the Court's prior government service was related, in any way, to the investigation that led to either the 2005 or 2009 Action.

B.    Section 455(a) Analysis

Defendant next argues that, even if Section 455(b)(3) does not require recusal, "[t]he 'appearance' prong of section 455 requires recusal because an objective observer would have significant doubts about the Judge's impartiality given the Judge's prior involvement in the 2002-2004 investigation."  (Mot. to Recuse at 12).  The Court disagrees.  First, as discussed above, there is no factual connection between the two investigations and prosecutions.  Second, there is no

support that objective observers would believe there was one.  This is a case where Defendant Montemayor seeks to exploit various references by interpreting them to support his allegation that the 2004 Investigation was continued.  The "facts" cited by Defendant do not evidence that the Court served as United States Attorney during the investigation that led to the 2005 and 2009 Actions.  See United States v. Cerceda, 188 F.3d 1291 (11th Cir. 1999).  The fact is the Court does not recall any fact or circumstance to connect the 2002 to 2004 investigation with the investigation that led to the 2004 and 2009 Actions.  The 2004 and 2005 Actions mentioned in Defendant's motion are but two of numerous investigations into, and prosecutions of, Mexico-based drug trafficking organizations operating in Atlanta. The fact that two Mexico-based drug trafficking organizations operated in Atlanta is not a relationship that requires recusal in this or any other district.

Finally, the Court presided over the prosecution of six defendants in the 2005 Action and six defendants in the 2009 Action.  During the eleven years over which the Court has presided over these actions, there has not been any motion for the Court to recuse and no suggestion that the Court has been impartial in its opinions, decision-making, or management in these actions.  The Court is not required to recuse pursuant to Section 455(a).

20

IV.   **CONCLUSION**

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendant's Motion to Recuse District

Court Judge [211] is **DENIED.**

**SO ORDERED** this 22nd day of November, 2016.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

21