# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CARLOS MONTEMAYOR,                    1:09-cr-551-WSD

Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Carlos Montemayor's ("Defendant" or "Montemayor") Objections [257] to Magistrate Judge Janet F. King's Order [253] granting the Government's Motion to Disqualify [196] Richard A. Rice, Jr. ("Mr. Rice") as Defendant's attorney in this action.

## I.    BACKGROUND

Defendant was charged in 2009 in a multi-count indictment alleging Conspiracy to Possess with Intent to Distribute at Least Five Kilograms of Cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(ii), and 18 U.S.C. § 2; Conspiracy to Import at Least Five Kilograms of Cocaine, in violation of 21 U.S.C. §§ 963, 960(b)(1)(B)(ii), and 18 U.S.C. § 2; Possession with Intent to Distribute at Least Five Kilograms of Cocaine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(ii); and Conspiracy to Commit Money Laundering, in violation of

18 U.S.C. § 1956(h).  Defendant was arrested in Mexico on November 23, 2010, and extradited to the United States on or about September 30, 2015.

From the Spring of 2003 to February 2008, Mr. Rice served as an Assistant United States Attorney ("AUSA") for the Northern District of Georgia, in the Narcotics/Organized Crime and Drug Enforcement Task Force ("OCDETF").  The charges against Defendant are the result of an investigation conducted while Mr. Rice was an AUSA.  The Government argues that, although the investigation was led by AUSA John Horn ("Mr. Horn"), Mr. Rice was the lead AUSA on a simultaneous investigation that was, at the time, related.  The Government contends that the overlapping targets of, and the coordination between, the two investigations to determine the roles of the targets and prosecution strategy, exposed Mr. Rice to confidential information and strategy about the investigation of Montemayor.  The Government asserts further that Mr. Rice, as an AUSA, requested records related to evidence the Government intends to introduce against Montemayor at trial.  Because Mr. Rice played a personal and substantial role in the investigation that led to the indictment and prosecution of Montemayor, the Government argues that Mr. Rice is prohibited from representing Montemayor in this case.

A.    The Valencia Investigation

In October 2004, the United States Attorney's Office ("USAO") began investigating Edwar Valencia-Gonzalez ("Valencia") and his drug trafficking and money laundering organization ("Valencia DTO"). The investigation resulted in the indictment of Defendant Montemayor and others in this case.[1] Mr. Horn was the lead prosecutor assigned to the investigation and prosecution of the case.

On March 15, 2005, agents searched two stash houses associated with Valencia and seized funds and large quantities of cocaine.

In June 2005, a court authorized the first of eight (8) Title III ("TIII") wiretaps in connection with the Valencia DTO investigation. On June 10, 2005, a wiretap was authorized for a device associated with Valencia. This resulted in the identification of (1) a Mexican source of supply, Juan Montemayor ("Juan"), Carlos Montemayor's brother and a co-defendant in this case; and (2) Romero Roel Martinez ("Martinez"), an intermediary in the organization who was indicted in an earlier related case.[2] As a result of a July 15, 2005, wiretap order regarding devices associated with Valencia and Martinez, agents determined that Carlos

_____

[1]    Two cases resulted from the Valencia DTO investigation: an earlier case indicted in 2005, United States v. Flores, No. 1:05-cr-558-WSD; and this case, United States v. Valdez-Villareal, No. 1:09-cr-551-WSD, in which Montemayor is a defendant.

[2]    See United States v. Flores, No. 1:05-cr-558-WSD.

Montemayor and Juan together supplied drugs to the Valencia DTO and laundered funds accumulated in drug trafficking activity. (Order at 3-4).

B.    The Gotti Investigation

Beginning in April 2005, Mr. Rice was overseeing the investigation and prosecution of another drug trafficking organization ("Gotti DTO"), the primary target of which was Javier Alvarez-Lopez, a/k/a Gotti ("Gotti"). Mr. Rice was working with a group of Drug Enforcement Administration ("DEA") agents different from the group working on the Valencia DTO investigation.[3]

On May 10, 2005, Mr. Rice obtained the first TIII authorization in the Gotti DTO investigation. The affidavit in support of the application set out background information about the organization, including that agents had identified Valencia as a drug trafficker and had seized large quantities of drugs and funds associated with him in March 2005, and that a summary of telephone toll records showed a number of communications, the contents of which were unknown, between Valencia and Gotti in the Spring of 2005. Valencia was identified as a target of the Gotti DTO investigation. In the application, Mr. Rice stated, in pertinent part, that he had "discussed all of the circumstances of the [listed offenses] with [the affiant], who, along with other law enforcement officers, has conducted th[e] investigation[,]"

---

[3]    The Gotti Investigation resulted in an October 11, 2005, indictment and was prosecuted by Mr. Rice. See United States v. Alvarez-Lopez, No. 1:05-cr-477.

that he "also received the Affidavit of [the affiant,]" and "upon information and belief," that there was probable cause to believe the targets had committed the identified offenses, that the wire communications would produce evidence of those offenses, as specified, and that the "affidavit contains a full and complete statement" establishing necessity for the wire intercept being sought. Mr. Rice certified, under penalty of perjury, that the contents of the application he signed were true. (Id. at 5-6).

On June 8, 2005, and July 8, 2005, Mr. Rice submitted and obtained additional TIII wiretap applications and affidavits. These applications continued to identify Valencia as a target of Mr. Rice's Gotti DTO wiretap investigation.[4] (Id. at 6).

C.    Additional Wiretap Applications

1.    July 15, 2005, Valencia DTO Application

The Valencia DTO wiretap applications also identified Gotti as a target of the Valencia DTO investigation. Notably, the July 15, 2005, affidavit in support of a Valencia DTO wiretap application provided the prosecutors' and agents' understanding at that time of the relationship between the Valencia DTO and the Gotti DTO. The background section included the following information: although

---

[4]    Mr. Rice included this certification in each application.

the Valencia and Gotti DTOs each had their "own SOS [source of supply] and distribution channels," Valencia and Gotti communicated with each other, and had been intercepted on the TIII authorizations discussing drug distribution; the DTOs had at least one common SOS but also had separate SOS; the DTOs used some common resources, such as off-loading sites and drug stash houses; there appeared to be common targets, including "Ulysses;" and there was a "loose connection" between Valencia and Gotti, even though each was "operating independently." (Id. at 6-7).

### 2. July 27, 2005, Gotti DTO Application

In the July 27, 2005, affidavit in support of a further wiretap application in the Gotti DTO investigation, the affiant identified, in the "necessity" section of the affidavit, three (3) drug trafficking cells operating in the metropolitan Atlanta area, including the Gotti DTO and the Valencia DTO. The affidavit also stated that: in the past, the DTOs had a common SOS, but now, each had its separate SOS; there was "limited" communication between Gotti and Valencia when using the same SOS or when one DTO needed to "borrow" drugs from the other because of a shortage; the DTOs used some common resources, such as off-loading sites and

stash houses; and there appeared to be common targets, including "Ulysses."[5]  (Id. at 7).

The overlap in the investigations required discussion in the wiretap applications about the impact of each investigation on the necessity for the TIIIs for both the Valencia DTO and the Gotti DTO investigations.  Mr. Horn stated that the two DEA groups conducting the investigations disagreed about the relative roles of Valencia and Gotti, and whether one was the customer of the other, and, if so, should priority be given to the investigation of the DTO that included the source of supply.  (Horn Decl. ¶¶ 15-16).  Mr. Horn and Mr. Rice recall at some point attending a joint meeting of both DEA groups to discuss issues arising out of the investigations.  (Id. ¶ 18; Rice Decl. ¶ 28).  According to Mr. Rice, the meeting focused on whether the target Ulysses was the same individual in each investigation.  (Id.).  Mr. Rice states that he ensured that there would be no overlap in the investigations and he left before any substantive discussion about the investigations.  (Id.).

---

[5]     The DEA groups appeared to dispute whether "Ulysses" identified by both investigations was the same person.  Mr. Rice stated that the lead agent in the Gotti Investigation believed that Ulysses was the same person, while the lead agents in the Valencia investigation did not.  Ultimately, it was determined that there were two individuals identified as Ulysses.  Mr. Rice stated that the Ulysses issue was the only reason that the applications and affidavits for the Valencia DTO and Gotti DTO wiretaps referenced each other.  (Order at 7-8 n.8).

The August 4, 2005, September 2, 2005, September 16, 2005, and September 30, 2005, TIII applications and supporting affidavits in the Gotti DTO investigation continued to identify Valencia as a target of the Gotti DTO investigation. The August 12, 2005, August 26, 2005, September 14, 2005, October 9, 2005, and November 10, 2005, TIII applications and supporting affidavits in the Valencia DTO investigation continued to identify Gotti as a target of the Valencia DTO investigation. The affidavits in both investigations provided similar discussions of the linkage between the Valencia DTO and Gotti DTO. (Order at 8-9).

There were ongoing drug transactions and communications between Valencia and Gotti into the Fall of 2005. The October 9, 2005, TIII application and supporting affidavit in the Valencia DTO investigation for a new device obtained by Valencia relied, at least in part, on intercepts of Valencia who used the new device to communicate with Gotti. Those intercepts—obtained from monitoring a device used by Gotti—were the product of a wire intercept application presented by Mr. Rice. The last affidavit in support of a TIII application for the Valencia DTO investigation, dated November 10, 2005, referenced Gotti's arrest on October 12, 2005, and stated that the agents hoped to

interview him about Valencia, but noted that they did not expect Gotti would have information about Defendant Montemayor.  (Id. at 9).

D.     Pen Register Applications in the Valencia Investigation

In late July and early August, 2005, Mr. Horn asked Mr. Rice to assist with the Valencia DTO investigation while Mr. Horn was out of the office.  (Horn Decl. ¶¶ 36-41).  On July 27, 2005, Mr. Rice, on Mr. Horn's behalf, signed and submitted to the magistrate judge a request for a pen register on a device used by Martinez.  Mr. Horn prepared the pen register request.  (Order at 10).

On July 28, 2005, Mr. Rice worked with agents to prepare and submit another pen register and cell site request for the same device used by Martinez. Together with the July 27, 2005, pen register, agents received information about calls between Martinez and Montemayor discussing drug activities, as reflected in a later TIII wire intercept application and supporting affidavit in the Valencia DTO investigation.  (Id.).

On August 4, 2005, Mr. Rice again worked with agents to prepare a pen register and cell site request for a device used by Valencia.  It appears that this

request was not submitted to the magistrate judge. In both applications, Mr. Rice

certified that he had discussed the applications with the investigating agent.[6]  (Id.).

E.    Attorney Declarations

Mr. Horn and Mr. Rice also provided declarations describing their roles in

the investigations and the Narcotics/OCDETF Section of the USAO.  Mr. Horn

stated that the Section held a weekly meeting of all its attorneys, which Mr. Rice

usually attended.  The attorneys discussed pending investigations and cases, and, in

2005, Mr. Horn "openly shared" information about the Valencia DTO

investigation.  (Horn Decl. ¶ 7).  Mr. Rice recalled that, at these weekly meetings,

the attorneys shared only "general information" that "generally consisted of basic

information . . . contained in discovery materials."  (Rice Decl. ¶¶ 33-34).[7]

---

[6]     In his Declaration, Mr. Rice explained that he provided a template for the
agent to use, reviewed the draft provided by the agent, and made any necessary
changes.  Mr. Rice asserts, however, that he did not discuss the Valencia DTO
investigation with the agents, except for the statement in each application showing
the facts supporting that application.  (Rice Decl. ¶ 41).  For the July 28, 2005,
application, that statement is one sentence that states that Martinez's
communications were intercepted discussing drug trafficking.  For the
August 4, 2005, application, the statement identifies Valencia, notes that he uses
the subject device for communications involving drug trafficking and money
laundering, and information about a traffic stop involving the seizure of a large
quantity of drugs intended for Valencia.  (Order at 10-11 & n.10).

[7]     The DEA agents working on the Gotti DTO investigation also held weekly
meetings to discuss, among others, investigative steps to be taken in the coming
week.  Mr. Rice tried to attend the meetings, but he does not recall any discussion
of the Valencia DTO investigation.  (Rice Decl. ¶ 31).

The attorneys also provide different accounts of their discussions about the investigations and preparing the TIII applications and supporting affidavits containing information about the other's investigation. Mr. Horn recalls talking with Mr. Rice about the tension between the DEA groups, whether targets were overlapping, and about the Valencia DTO investigation generally.[8] (Horn Decl. ¶¶ 6, 12, 14-19). Mr. Horn summarized an AUSA's responsibility when preparing a TIII application and the supporting affidavit, and supervising a wiretap investigation, including: ensuring the accuracy of the applications and supporting affidavits, complying with statutory requirements, and certifying under oath that he or she has reviewed and discussed the affidavit with the affiant. (Id. ¶¶ 11-12). Mr. Horn stated that, before including information about another AUSA's investigation in a TIII application and supporting affidavit, an AUSA discusses with the other AUSA the information to be included. He and Mr. Rice did so in the Valencia DTO and Gotti DTO investigations. (Id. ¶¶ 14, 19).

Mr. Rice stated that he prepared TIII applications and supporting affidavits, including those used in this case, based mostly on templates which were modified in the "prior applications" and "necessity" sections to fit the specific facts of the case. (Rice Decl. ¶ 6). Mr. Rice denied having any "strategic discussions" with

---

[8] Mr. Horn did not recall specific dates of these discussions.

Mr. Horn regarding the Valencia DTO and Gotti DTO investigations. Mr. Rice asserts Mr. Horn provided him with text concerning the Valencia DTO investigation, which Mr. Rice then simply "cut and pasted" into the Gotti DTO TIII applications and supporting affidavits. (Id. ¶¶ 21-23). For the discussion about the Gotti DTO's connection to the Valencia DTO included in the wiretap affidavits for the Valencia DTO, Mr. Rice stated that he "provided AUSA Horn with the text to be include in the . . . wiretap applications and affidavits." (Id. ¶ 21).

Mr. Rice denied receiving any information about telephone toll records obtained other than those included in the Gotti DTO wiretap applications and supporting affidavits. Mr. Rice denied being aware, at the time, of the defendants charged as a result of the Valencia DTO investigation and denied participating in, assisting with, or providing legal advice in the Valencia DTO investigation other than preparing the two pen register and cell site applications. (Id. ¶¶ 7-9, 12, 26-27, 29-32, 42-43).

F.    Procedural History

The first charges resulting from the Valencia DTO investigation were filed by criminal complaint on November 15, 2005. Jesus Flores was indicted on November 21, 2005. See United States v. Flores, 1:05-cr-558. On December 15,

2005, a superseding indictment was returned naming six (6) defendants, including

Martinez.  The prosecution was completed in July 2008.

On December 15, 2009, a federal grand jury returned the indictment in this

case, charging, among others, Montemayor and his brother, Juan.  Montemayor

was arrested in Mexico on November 23, 2010, and extradited to the United States

on or about September 30, 2015.  He made his initial appearance in this case on

October 9, 2015.

On February 24, 2016, Mr. Rice filed his notice of appearance on

Montemayor's behalf.  Montemayor, through Mr. Rice, filed two motions to

suppress evidence, including a motion to suppress wiretap evidence.  ([198]).

Defendant argues that the applications and affidavits in support of the wiretaps did

not establish necessity for the wiretaps and that the affidavits relied on information

from "illegal" wiretaps or other unlawful sources.  (Id.).

On May 20, 2016, the Government moved to disqualify Mr. Rice from

representing Montemayor.[9]  The Government contends that 18 U.S.C. § 207(a)(1),

and Georgia Rules of Professional Conduct 1.7(a), 1.9(a), and 1.11(a), preclude

---

[9]     On August 17, 2016, Defendant filed his Motion to Recuse District Court
Judge [211], based on the Court's service as the United States Attorney in this
District, before the Valencia DTO investigation began.  On November 22, 2016,
the Court denied Defendant's motion, including because there was insufficient
evidence to show that the Valencia DTO investigation was a continuation of an
investigation conducted during the Court's service as the United States Attorney.

Mr. Rice's representation based on his supervision of the Gotti DTO investigation and involvement with the Valencia DTO investigation during his tenure as an AUSA.

On December 2, 2016, Magistrate Judge King conducted a hearing, under United States v. Garcia, 517 F.2d 272 (5th Cir. 1975), abrogated by Flanagan v. United States, 104 S. Ct. 1051, 1053 n.2 (1984); Fed. R. Crim. P. 44(c). At the hearing, Montemayor was advised of the potential conflict of interest. He waived any potential conflict. ([231]). The Magistrate Judge found that, although Defendant's waiver of any potential conflict of interest raises a presumption in favor of Mr. Rice representing him, "the court must determine whether that presumption is overcome by the Government's 'demonstration of an actual conflict or a serious potential for conflict.'" (Order at 2) (quoting United States v. Clark, 33 F. Supp. 2d 789, 793 (E.D. Wis. 2004)).

On April 6, 2017, Magistrate Judge King issued her Order granting the Government's Motion. Magistrate Judge King found that the evidence before the court establishes that Mr. Rice participated personally and substantially in the "particular matter" of the related drug trafficking investigations of the Gotti DTO and the Valencia DTO, and participated personally and substantially in the investigation of the Valencia DTO, which led to the charges in the indictment

returned against Mr. Rice's client, Montemayor.  (Order at 21).  Magistrate Judge

King concluded that, under 18 U.S.C. § 207(a)(1), Mr. Rice is disqualified from

representing Montemayor in this action.  Magistrate Judge King also found that the

matters being investigated in 2005 related to the Gotti DTO and Valencia DTO—

matters in which Mr. Rice personally and substantially participated, and thus were

substantially related to his current representation of Montemayor.  Magistrate

Judge King concluded further that Mr. Rice's disqualification also is required

under Rules 1.9(a) and 1.11(a) of the Georgia Rules of Professional Conduct.

On April 26, 2017, Defendant filed his Objections [253] to Magistrate Judge

King's April 6th Order.  In them, Defendant argues that the Valencia DTO

investigation and the Gotti DTO investigation were not related, and that there are

no facts in the record to support that Mr. Rice participated "personally and

substantially" in the Valencia DTO investigation.

## II.   STANDARD OF REVIEW

Under Rule 59(a) of the Federal Rules of Criminal Procedure, a magistrate

judge may rule on any matter referred by a district judge that does not dispose of a

charge or defense.  If any party files objections to a magistrate judge's order on

nondispositive matters, "the district judge must consider timely objections and

modify or set aside any part of the order that is contrary to law or clearly

erroneous." Fed. R. Crim. P. 59(a). "For a factual finding to be 'clearly erroneous,' the Court, after reviewing all of the evidence, must be left with a definite and firm conviction that a mistake has been committed." <u>United States v. Foster</u>, 155 F.3d 1329, 1331 (11th Cir. 1998). "Where the evidence has two possible interpretations, the . . . court's choice between them cannot be clearly erroneous." <u>Id.</u> "A ruling is contrary to law when the magistrate judge has misinterpreted or misapplied the applicable law." <u>In re Grand Jury Empaneled April 24, 2008</u>, 601 F. Supp. 2d 600, 603 (D.N.J.2008); <u>see also</u> <u>Pigott v. Sanibel Dev., LLC</u>, No. 07-0083-WS, 2008 WL 2937804, at *5 (S.D. Ala. July 23, 2008) ("An order is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure.") (citing <u>S.E.C. v. Cobalt Multifamily Investors I, Inc.</u>, 542 F. Supp. 2d 277, 279 (S.D.NY. 2008)).

## III. DISCUSSION

### A.  <u>Disqualification under 18 U.S.C. § 207(a)(1)</u>

Congress enacted § 207(a) "to protect the public from an individual attempting to use not the expertise, but the specific knowledge obtained while serving as a public servant. Among other things, the statute seeks to prevent such knowledge from being used against the government itself." <u>United States v. Clark,</u>

333 F. Supp. 2d 798, 793 (E.D. Wis. 2004). Section 207(a)(1) provides in

pertinent part:

> Any person who is an officer or employee . . . of the executive branch
> of the United States . . ., and who, after termination of his or her
> service or employment with the United States . . ., knowingly makes,
> with the intent to influence, any communication to or appearance
> before any . . . court . . . of the United States . . . on the behalf of any
> other person . . . in connection with a particular matter - -
>
> (A) in which the United States . . . is a party . . . ,
>
> (B) in which the person participated personally and substantially as
> such officer or employee, and
>
> (C) which involved a specific party or specific parties at the time of such
> participation [is restricted from representation of the private party].

18 U.S.C. § 207(a)(1). Section 207(a) disqualifies a former AUSA if (1) the

particular matter involves the same "specific party or parties," and (2) if, while

formerly employed as an AUSA, the attorney participated in the matter "personally

and substantially." See id.

      1.    Same matter involving specific parties

      "Although the statute defines 'particular matter' broadly to include 'any

investigation, . . . charge, accusation, arrest, or judicial or other proceeding,' . . .

only those particular matters that involve a specific party or parties fall within the

prohibition of section 207(a)(1)." 5 C.F.R. § 2641.201(h)(1). While "[t]he

particular matter must involve specific parties both at the time the individual

participated as a Government employee and at the time the former employee makes the communication or appearance, . . . the parties need not be identical at both times." 5 C.F.R. § 2641.201(h)(3). "The same particular matter may continue in another form or in part. In determining whether two particular matters involving specific parties are the same, all relevant factors should be considered, including the extent to which the matters involve the same basic facts, the same or related parties, related issues, the same confidential information, and the amount of time elapsed." 5 C.F.R. § 2641.201(h)(5).

Magistrate Judge King found that Mr. Rice participated personally and substantially not only in the "particular matter" of the related drug trafficking investigations of the Gotti DTO and the Valencia DTO, but that he participated personally and substantially in the investigation of the Valencia DTO, which provided the facts on which the charges against Defendant were based.

To apply for the first wiretap authorized in the Gotti DTO investigation, Mr. Rice used information developed during the early stages of both the Valencia DTO and Gotti DTO investigations. The affidavit supporting the application for an intercept order on a device used by Gotti included background information about the Gotti organization and facts about Valencia, including that agents identified Valencia as a drug trafficker and had in March 2005 seized large quantities of

drugs and funds associated with Valencia. A summary of telephone toll records showed a number of communications, between Valencia and Gotti in the Spring of 2005. Valencia was identified as a target of the Gotti DTO investigation. (Order at 24). Mr. Rice continued to apply for wiretap authorizations in the Gotti DTO investigation and these applications continued to identify Valencia as a target. (Id.). Mr. Rice did not deny that he read the affidavits that were prepared and discussed them with the affiant who signed them under oath.

The wiretap applications in the Valencia DTO investigation also identified Gotti as a target of the investigation because Gotti and Valencia were intercepted discussing drug transactions. Determining the roles of the participants in both investigations, including whether one DTO was the source of supply for the other, resulted in discussions among the agents and, as stated by Mr. Horn, he and Mr. Rice, to evaluate whether the investigations were related and resolve disputes among the investigating agents. The July 15, 2005, affidavit in support of the wiretap application in the Valencia DTO investigation provided the prosecutors' and agents' understanding, at that time, of the relationship between the Valencia DTO and the Gotti DTO. The affidavit provided that each DTO had its "own SOS and distribution channels;" Valencia and Gotti communicated with each other, and had been intercepted discussing drug distribution; the DTOs had at least

one common SOS but also had separate SOS; the DTOs used some common resources, such as off-loading sites and drug stash houses; there appeared to be common targets, including "Ulysses;" and there was a "loose connection" between Valencia and Gotti, even though each was "operating independently." (Id. at 25).

The July 27, 2005, Gotti DTO wiretap application supporting affidavit included the following information about the two DTOs: in the past they had a common SOS but now, each had separate SOS; there was communication, albeit limited, between Gotti and Valencia when using the same SOS or when one DTO needed to "borrow" drugs from the other DTO, due to a shortage of drugs; the DTOs used some common resources, such as off-loading sites and stash houses; and there appeared to be common targets, including Ulysses. (Id. at 26). It is self-evident that the overlap in the investigations required discussion, among the prosecutors and investigators about the impact of each investigation on the necessity for the TIIIs for both the Valencia DTO and the Gotti DTO. Mr. Rice's claim there was no discussion of substance is not credible.

That the two investigations continued to overlap is further supported by the October 9, 2005, application and supporting affidavit for the TIII intercept in the Valencia DTO investigation on a new device obtained by Valencia. The affidavit relied, at least in part, on intercepts of Valencia using that new device to

communicate with Gotti. Those intercepts—obtained from monitoring a device utilized by Gotti—were the product of a wire intercept application presented by Mr. Rice. (Id. at 27).

Magistrate Judge King found that these simultaneously conducted investigations involved the same parties—Gotti and Valencia—who jointly and separately were involved in overseeing drug trafficking organizations, using at times the same SOS and sharing resources, including drugs, off-loading sites and stash houses, which all occurred within the metropolitan Atlanta area. Magistrate Judge King also found that the same issues confronted the prosecutors and agents involved in the investigations, including because they were required to address the overlap in the investigations and the targets of the investigations in preparing and submitting wiretap applications and affidavits. (Id. at 27). For these reasons, Magistrate Judge King concluded that the same particular matter is now before the court in the form of the charges pending against Defendant.

The evidence in the record substantially supports these findings and Mr. Rice's claim that his involvement reviewing TIII application affidavits by cutting and pasting, without discussing the investigation with affiants, counsel and investigators involved in each investigation belies belief. The Court finds no clear error in the Magistrate Judge's findings.

Mr. Rice contends that the Gotti and Valencia DTOs, and thus the investigations and cases, are separate matters and that he did not participate in a "particular matter" that involved his client Montemayor. Defendant relies on: (1) Juan Montemayor's presentence report, which does not identify the Gotti case as a related case and indicates that the Valencia DTO cooperating defendants have denied that the Gotti DTO "defendants were part of the Valencia conspiracy;" and (2) a 2010 TIII application to intercept a device used by the brother of one of the named defendants in this case, which, unlike the 2005 Valencia DTO TIII applications, does not include the Gotti DTO TIII wiretaps in the "prior applications" section. ([208] Exs. 3, 4). Singling out these two examples does not refute that Mr. Rice was involved as an AUSA in a particular matter concerning Montemayor. The relevant time for determining the matter in which Mr. Rice was involved and which concerned his client is Spring, Summer and Fall of 2005—the time period when these investigations were being conducted. The evidence shows that, at that time, the prosecutors and agents involved in the investigations were dealing with overlapping and related targets, facts and issues, including because these issues were, and had to be, addressed in the simultaneous wiretap applications and affidavits.[10] The investigations were interrelated and connected,

_____

[10] In his Objections, Montemayor repeats his assertion that the two

22

and Mr. Rice was involved in various important aspects of them both, including discussing with Mr. Horn a matter in which Montemayor was investigated. To claim he was not involved in a matter involving his now client is unconvincing. Defendant's objection to the Magistrate Judge's findings is overruled.

## 2. Personal and substantial participation

The next question is whether Mr. Rice personally and substantially participated in the matter involving his client. The regulations describe what personal and substantial participation means:

> (1) Participate. To "participate" means to take an action as an employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or other such action . . . . An employee does not participate in a matter merely because he had knowledge of its existence . . . . An employee does not participate in a matter within the meaning of this section unless he does so in his official capacity.
>
> (2) Personally. To participate "personally" means to participate:
>
> (i) Directly, either individually or in combination with other persons . . . .
>
> (3) Substantially. To participate "substantially" means that the employee's involvement is of significance to the matter. Participation

investigations were not related because there was no mention of Gotti's October 12, 2005, arrest in the October 13, 2005, Valencia DTO wiretap application. ([250] at 3-4; Objs. at 3-4). The Court notes that, although the file stamp on the front of the application is dated October 13, 2005, the signature pages of the affidavit, and the Order, show that they were executed on October 9, 2005, three (3) days *before* Gotti's arrest.

may be substantial even though it is not determinative of the outcome
of a particular matter. However, it requires more than . . . knowledge,
perfunctory involvement, or involvement on . . . [a] peripheral issue.
A finding of substantiality should be based not only on the effort
devoted to a matter, but also on the importance of the effort. While a
series of peripheral involvements may be insubstantial, the single act
of approving or participating in a critical step may be substantial.
Provided that an employee participates in the substantive merits of a
matter, his participation may be substantial, even though his role in
the matter, or the aspect of the matter in which he is participating,
may be minor in relation to the matter as a whole. . . .

5 C.F.R. § 2641.201(i). "'Substantially' means that the lawyer's involvement was

of significance to the matter, or sufficient to create a 'reasonable appearance' of

such significance." Clark, 333 F. Supp. 2d at 794.

Magistrate Judge King concluded that Mr. Rice participated "personally and

substantially" "in a particular matter," whether viewed as the related investigations

of the Gotti DTO and the Valencia DTO, or in the investigation of the Valencia

DTO. Although Mr. Rice denies being involved in any discussions of the matters

arising out of Gotti's and Valencia's ongoing communications and the interaction

between the DTOs with either Mr. Horn or even with the agents working on the

Gotti DTO investigation, Magistrate Judge King found that Mr. Rice's version of

how he conducted himself "does not comport with the type of interaction with

investigating agents and the scope of knowledge the court would expect of an

experienced and highly competent AUSA overseeing a wiretap investigation."

(Order at 28-29).  The Magistrate Judge found that, independent of what the affiant or the case agents may know, the AUSA is expected to know all of the facts and circumstances of the investigation to ensure that the affidavit he is submitting to the Court does not contain material false information or omit material information, that probable cause exists based on all the facts and circumstances—not just what the agents may decide is significant—and that, given all the facts and circumstances, there is necessity to obtain the warrant.  (Id. at 32).

In view of the interrelatedness of the two drug trafficking investigations, Magistrate Judge King found credible Mr. Horn's testimony about (i) how he and Mr. Rice satisfied their responsibilities, before including any information about the other AUSA's investigation in the TIII applications and supporting affidavits, and (ii) that the AUSAs discussed the information to be included and that he and Mr. Rice, in fact, did so to draft the applications and affidavits that supported them. (Id. at 33).  Despite Mr. Rice's careful crafting of his involvement and attempt to limit it, he does not deny that he read the affidavits prepared for TIII applications for which he was required and does not deny discussing with the law enforcement affiants the affidavits or the applications prepared based on them.

Based on Mr. Horn's statements, Magistrate Judge King concluded that Mr. Rice was personally involved in discussing and deciding how the related

investigations would be coordinated and handled by the investigating agents and concluded that Mr. Rice participated in determining how the overlap in the two investigations would be addressed in the wiretap applications for both the Gotti and Valencia DTOs. Magistrate Judge King determined that the wiretap applications and evidence gathered as a result of those intercept authorizations constituted a significant investigative tool in the investigations and were crucial to the ultimate success of the investigations. (Id.). This conclusion is self-evident.

Even if the Court relies on Mr. Rice's statements describing his claimed limited involvement in how the information required to be included in the wiretap affidavits was exchanged, Mr. Rice does not deny that he participated in preparing the Valencia DTO wiretap affidavits, necessarily meaning that his involvement was indeed substantial and personal, making his involvement in the particular matter of the Valencia DTO investigation substantial and personal. Mr. Rice stated that he "provided AUSA Horn with the text to be included in the . . . wiretap applications and affidavits" which was "cut and pasted" into the affidavit's necessity section. (Rice Decl. ¶¶ 21-23). This would mean that Mr. Rice, apparently based on conversations with the agents conducting the Gotti DTO investigation, reviewed the available information about the two investigations, determined what information was required to satisfy the necessity finding, drafted

that language, and sent it to Mr. Horn to include in the Valencia DTO wiretap affidavits.  For example, the July 15, 2005, Valencia DTO wiretap affidavit referenced the Gotti DTO investigation and included information about the intercepted communications between Gotti and Valencia, the use of common resources and potential overlapping targets in the investigation, but noted that the organizations had different SOS and distribution chains.  The affidavit also discussed the potential impact on the Valencia DTO investigation if search warrants in the Gotti DTO investigation were executed, and included, in the background section, details about the Gotti DTO investigation and its relationship to the Valencia DTO investigation.  (Order at 34-35).  The October 9, 2005, Valencia DTO wiretap application for a new device obtained by Valencia relied on intercepts of Valencia using that device to communicate with Gotti about drug transactions.  These intercepts were obtained from a Gotti DTO wiretap.  (Id. at 35).  Based on Mr. Rice's account of the process, Mr. Rice prepared and emailed to Mr. Horn the language regarding the Gotti DTO investigation and intercepts included in the Valencia DTO wiretap affidavits.

In addition to his role in preparing the wiretap affidavits, Mr. Rice, at Mr. Horn's request, worked with agents in the Valencia DTO investigation to prepare and submit a pen register and cell site request for a device used by

Martinez. This data, with the July 27, 2005, pen register Mr. Rice signed on

Mr. Horn's behalf, yielded information on calls between Martinez and Defendant

Montemayor discussing drug activities as reflected in a later TIII wire intercept

application and supporting affidavit in the Valencia DTO investigation. (Id. at 37).

Mr. Rice later worked with agents again to prepare a pen register and cell site

request for a device used by Valencia.[11] In both applications, Mr. Rice certified

that he discussed the applications with the investigating agent. Magistrate Judge

King concluded that Mr. Rice's participation in preparing the wiretap applications

and supporting affidavits, and the pen register and cell site requests, for the

Valencia DTO investigation support that Mr. Rice's participation in the Valencia

DTO investigation was personal and substantial. (Id.).

The Court finds no error in the Magistrate Judge's findings. In his

Objections, Defendant argues that "[m]uch of the error in the Order stems from the

fact that the Order simply attributes information that the DEA investigative groups

shared amongst each other with AUSA Rice and/or Horn." (Objs. at 14). In each

of his wiretap applications, Mr. Rice, under penalty of perjury, certified that he had

"discussed *all of the circumstances* of the [listed offenses] with [the affiant], who,

along with other law enforcement officers, has conducted th[e] investigation" and

---

[11] This request was never submitted to a magistrate judge.

that he "also reviewed the Affidavit of [the affiant] . . .[,]" and, "upon information and belief[,]" Mr. Rice certified to the Court that there was probable cause to believe the targets had committed the identified offenses, that the wire communications would produce evidence of those offenses, and that the "affidavit contains a full and complete statement" establishing the necessity for the wire intercept being sought." (Order at 31). This certification severely undercuts Mr. Rice's claim now, in response to the Government's Motion to Disqualify, that he did not receive any information about the Valencia DTO investigation beyond what was included in the wiretap application and supporting affidavit. The evidence shows that, although Mr. Rice was not the lead AUSA on the Valencia DTO investigation and he may not have participated in every decision made about the investigation and prosecution, Mr. Rice's involvement in the wiretap applications and the pen register and cell site requests, constitutes personal and substantial participation in the Valencia DTO investigation sufficient to require his disqualification under Section 207(a)(1). Defendant's objection to the Magistrate Judge's findings is overruled.

B. <u>Georgia Rules of Professional Conduct</u>

It is well-settled that "attorneys are bound by the local rules of the court in which they appear. The Georgia Rules of Professional Conduct, contained in the

Rules and Regulations of the State Bar of Georgia, and judicial decisions

interpreting those rules and standards, govern the professional conduct of members

of the bar of the United States District Court for the Northern District of Georgia."

Herrmann v. Gutterguard, Inc., 199 F. App'x 745, 752 (11th Cir. 2006).

Rule 1.9(a) of the Georgia Rules of Professional Conduct provides:

> A lawyer who has formally represented a client in a matter shall not
> thereafter represent another person in the same or a substantially
> related matter in which that person's interests are materially adverse
> to the interests of the former client unless the former client gives
> informed consent, confirmed in writing.

Ga. R. Prof. Conduct 1.9(a). Rule 1.11(a) provides: "Except as law may otherwise

expressly permit, a lawyer shall not represent a private client in connection with a

matter in which the lawyer participated personally and substantially as a public

officer, unless the appropriate government entity gives informed consent,

confirmed in writing." Ga. R. Prof. Conduct 1.11(a).

Under Rule 1.9(a), "an attorney owes a duty of loyalty not only to his

current clients, but also to his former clients, and has an obligation to decline

subsequent representations involving positions adverse to those clients if they arise

in substantially related matters." Adkins v. Hospital Auth. of Houston Cnty.,

2009 WL 3428788, at *11 (M.D. Ga. Oct. 20, 2009). "The question of whether to

disqualify an attorney for violation of this rule is answered in a relatively simple

two-step inquiry: '(1) was there a previous attorney-client relationship, and if so, (2) did that relationship involve a matter substantially related to the current proceeding?'" Id. (citation omitted).

Magistrate Judge King found that Mr. Rice participated personally and substantially in the Gotti DTO and Valencia DTO investigations in 2005, and this involvement is substantially related to his representation of Defendant Montemayor in this case. (Order at 41). Magistrate Judge King found further that Mr. Rice participated "personally and substantially" in the Valencia DTO investigation, and that alone is substantially related to his representation of Monetmayor. Magistrate Judge King found on the record here that Mr. Rice assisted Mr. Horn with preparing a number of wiretap applications submitted to the Court, including by providing text to be inserted into the wiretap affidavits to satisfy the necessity requirement, and he prepared applications for pen registers in the Valencia DTO investigation, including by certifying that the records being sought were relevant and material to the ongoing Valencia DTO investigation. (Id. at 41-42).

The Magistrate Judge concluded that Rules 1.9(a) and Rule 1.11(a) require Mr. Rice's disqualification, and the Court finds no error in this finding and conclusion of the Magistrate Judge. See Adkins, 2009 WL 3428788 at *11;

Registe, 697 S.E.2d at 809-10 (finding that Rule 1.9(a) required a former ADA's disqualification because he "took action in court by filing an application to obtain search warrants, and that is enough[;]" "'it would be serious error to permit [counsel] to continue in the case, unless it should appear that he took no action in the case while counsel for the opposing party . . .'"); Registe, 697 S.E.2d at 810-11 (finding that Rule 1.11(a) also required former ADA's disqualification, stating that the standard "'participated personally and substantially[,]' is not hard to apply . . . where a prosecutor applied on behalf of the State for three criminal search warrants and certified as an officer of the court that the warrants were justified because they were 'relevant and material' to the State's 'ongoing criminal investigation' to locate a fugitive wanted for murder and that the requested information would 'provide leads which will aid in locating and apprehending the fugitive.'").[12, 13]

---

[12]     In his Objections, Defendant asserts only that "[f]or the same reasons that the Magistrate Judge's findings and conclusions under § 207(a) were flawed, its [sic] findings and conclusions under the Georgia Rules of Professional Conduct are also flawed." (Objs. at 19). To the extent this constitutes a proper objection, it is overruled.

[13]     Magistrate Judge King did not address the Government's additional basis for disqualification under Rule 1.7 of the Georgia Rules of Professional Conduct. Having overruled Defendant's objections, and having concluded that Mr. Rice is disqualified from representing Defendant Montemayor in this case under 18 U.S.C. § 207(a)(1) and Rules 1.9 and 1.11 of the Georgia Rules of Professional Conduct, the Court does not reach the merits of the Government's argument under Rule 1.7.

### III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Carlos Montemayor's Objections [257] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Magistrate Judge Janet F. King's Order [253] is **AFFIRMED**.

**IT IS FURTHER ORDERED** that the Government's Motion to Disqualify [196] Richard A. Rice, Jr., is **GRANTED**.

**SO ORDERED** this 2nd day of June, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE