# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Criminal Action No.** |
| **v.** | ) | **1:09-CR-551-WSD-JFK** |
| | ) | |
| **CARLOS MONTEMAYOR, et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S SUPPLEMENT TO PRELIMINARY MOTION TO SUPPRESS WIRETAPS

**COMES NOW** above named Defendant, by and through undersigned counsel, and moves to suppress any and all intercepted communications obtained as a result of the wiretaps utilized during the investigation of this case on "Target Telephones", (hereinafter "TT") #1, #3, #5, #6, #10, and #17 (Exhibits 1-6); and the seizure of Global Positioning information regarding tracked telephones. In support of this Motion, Defendant shows as follows:

## DISCUSSION

Defendant has standing to contest the legality of any and all interceptions of his wire/oral communications as he qualifies as an aggrieved person pursuant to 18 U.S.C § 2510 *es seq.*, particularly 18 USC 2511, because, his phones and/or he was the alleged subject of, an alleged participant in or a party to intercepted communications. See, *e.g.* H.Rep. No. 1549, 91s t Cong. 2n d Sess.;

United States v Tucker, 526 F.2d 279, 282 & N. 4  (5t h  Cir. 1976)

(a cognizable "claim" need be no more than a "mere assertion" provided that it is a positive statement that interception was illegal); United States v Pacella, 622 F.2d 640 (2d Cir. 1980); United States v Williams, 580 F.2d 578 (D.C. Cir. 1978).

Carlos Montemayor is a participant in multiple conversations recorded pursuant to these wiretaps. Defendant further has standing in regards to TT #3, #5, #6, #10, and #17 as he is a named intereceptee in all five applications specifically referred to as "John Doe a.k.a. "Licenciado" a.k.a. "The Director" (See ¶ 2 of each Application Affidavit). In addition to being a participant and a specifically targeted interceptee, there are sworn affidavits from individuals who identify Carlos Montemayor as a participant in conversations. (See Exhibits 7 and 8).

**ɪ.    Challenge as to extension of Target Telephone #1 and Target Telephones #2-20 Lacking Adequate Exhaustion**

Defendant contends that proper exhaustion has not occurred in regard to the wiretap application for TT #1.   Conventional methods in conjunction with the use of Confidential Informants ("CI") during the pre-wiretap investigation of this case led to a great deal of success both in gathering information for prosecutable cases as well as understanding the structure and functionality of the organization being investigated. Much of this success is not included in the Governments application

for TT #1 leading the authorizing judge to mistakenly believe that the agents'
efforts had been exhausted.

While defendant stands by his assertion that the application for TT #1 lacks
details to establish proper exhaustion, the application for TT #1 is the only
application where agents offer any information regarding the use of traditional
investigative techniques unrelated to investigating wiretap information.

When reviewing each of the applications subsequent to TT #1 it is clear that
the only traditional investigative efforts engaged in are those undertaken by agents
surveilling individuals based upon information obtained from the intercepted calls.
Not only did the agents preparing the wiretap applications subsequent to TT #1 fail
to exhaust traditional investigative techniques, they apparently never attempt to
utilize those techniques, or if they did, they failed to include them in their
affidavits for the Court's consideration.[1]

In comparing the applications to each other it becomes clear that agents
simply copy and pasted the language and actions from the previous application
onto their new application, simply adding one or two new actions taken by
agents subsequent to the previous application in furtherance of their
investigation. Those new actions however were solely the result of information

---

[1] The government's current position of two separate organizations must be considered in
reviewing the wiretap application because the conventional efforts for the wiretap on TT #1
pertain to the Valencia organization and there are no examples of conventional methods at all in
any of the applications for the Flores organization.

gained from the previous wiretaps and in no way establish exhaustion through traditional methods. Even when applications use affidavits from different agents those affidavits still use the exact same language when discussing necessity. (See Foster Aff. TT #10-11) (Exhibit 5) and (See Hadaway Aff. TT #5)(Exhibit 3).

Because no traditional investigative techniques were utilized in the instant investigation, it cannot be said that those techniques were exhausted.

a.  CS1

As early as the application for TT #1, the affiants sought to downplay and misrepresent the capability of their CI's to appear to satisfy the exhaustion requirement. CS1 was a CI who started work for the government as far back as May of 2004. In the exhaustion section for TT #1, Agent Foster describes CS1 as someone who:

> ...provided information regarding Edwar Valencia-Gonzalez, but the information has been very limited. CS1's relationship to Valencia-Gonzalez is not that of a trusted member of his organization....  CS1 does not know, nor is CS1 in a position to meet and have drug-related conversations with, the source of supply for Valencia-Gonzalez or any other high-level members of his organization.               ...CS1 currently has  no way to contact Valencia-Gonzalez and in fact doesn't even know where Valencia-Gonzalez is currently  located.

 (Foster Aff. TT #1. at ¶  50) (Exhibit 1).

Agent Foster contradicts herself with an earlier statement in the background section of her application concerning the investigation prior to the wiretap. As recently as January of 2005, Valencia- Gonzalez asked CS1 to rent an apartment for him for the purpose of using it to store large amounts of drugs and money. (Id. at ¶ 16)(Exhibit   1).

Obviously, CS1 had more to offer to the investigation of the Valencia-Gonzalez organization than the purely "historical information" set out in the application for  TT #1. CS1 was in a level of trust sufficient for Valencia-Gonzalez to ask him to acquire a stash house for the organization in the CI's name. A person in control of a stash house would likely have contacts with shipments of cocaine and proceeds, thus having access to Valencia-Gonzalez's various sources  of supply. However, the  government saw fit to ignore this critical link to the Valencia organization and downplay CS1's actual and potential results to acquire the wiretap

of TT #1.[2]

    b.  <u>CS/CS2</u>

Each affidavit provided in support of an application for a wiretap in this case stated that further use of confidential informant number two (CS2) would "not result in evidence of [redacted] drug activities" and that a "controlled delivery [...] would only identify those involved in delivering and accepting delivery of the load, which most likely would be 'mules'".

The problem with this reference being included in any application for a wiretap other than application one, is that CS2 was only utilized in the investigation resulting in the application for wiretap one, where that informant was utilized with regard to a separate cartel to the one being investigated in the  instant  matter. Therefore, the reference to CS2 in the wiretap applications after application one does nothing to demonstrate the exhaustion of traditional techniques in this case, because, consistent with the government's current position, CS2 was

---

[2] This information was also omitted in every subsequent wiretap.

not a participant in the investigation of the Flores  organization.[3]

It is disingenuous for the government to impose the alleged

exhaustion factors of the Valencia investigation onto the members of

the "Flores Gang" just to get approval for the Flores wiretap

applications; and then, when it comes time to indict the participants

or limit their standing to challenge all of the wiretap applications, to

claim the two are wholly separate organizations.

In reviewing the Valencia DEA-6's and affidavits for the

wiretaps in the Flores investigation there appear to be similar results

from the information gathered from CS2 and CS, which would

suggest that the two informants might be the same person.[4]

If CS2 and CS are the same individual the affiants did not

disclose the extent of CS/CS2's activities in the exhaustion sections

of their wiretap applications. Two DEA-6's in May of 2005 revealed

---

[3] The government attempts to tie Valencia exhaustion to Flores exhaustion with regard to CS1 as well.

[4] Both CI's yielded information leading to a 1.3 million dollar seizure at the Gainesville airport in March 2005; the identification of several stash houses and the subsequent search warrants resulting in the seizure of $334,000 and multiple kilos of cocaine; and the supply of a cellular telephone used by CS2 and CS, along with the corresponding phone calls on May 18 that gave rise to probable cause to initiate the wiretap on TT #1.

conversations between CS/CS2 and Valencia-Gonzalez where he told CS/CS2 about his drug deliveries and seeking of new sources of supply. CS/CS2 responded he would find Valencia-Gonzales a good new supply source. (Zafra DEA-6 Report from Valencia Discovery May 9, 2005) (Exhibit 10). The full detail of the call between Valencia-Gonzales and CS/CS2 were revealed in a May 19 DEA-6 and was recorded on TT #1 on May 18, 2005. Valencia-Gonzalez told CS/CS2 the two of them could do business together any time. (Foster DEA-6, May 19, 2005) (Exhibit 11).

In July of 2005 CS/CS2 learned of drug lab activities and operations of the organization, supply methods for the sale of drugs, and CS discussed with Valencia-Gonzalez about a source of supply from Mexico. (Zafra DEA-6 July 18, 2005)(Exhibit 12). On July 14, 2005, a high-ranking member of the organization advised CS/CS2 that Juan Montemayor was Valencia-Gonzalez's source of cocaine for his Atlanta operations. (Zafra DEA-6)(Exhibit 12).

This fact is not mentioned anywhere in the exhaustion section for the application for wiretaps of TTs #1-4. According to the affiant,

CS/CS2 knew nothing of the source of cocaine and this was a stated reason why CS/CS2 would not be helpful for the investigation. (Foster Aff. For TT #1-4 at ¶ 52) (Exhibit 2). This information also does not appear in the affidavit for a wiretap on TT #5, (Hadaway Aff. TT #5) (Exhibit 3), or any of the subsequent wiretap applications.

CS/CS2 also stated that he purchased large quantities of cocaine from Martinez and Cain from October 2002 to September 2004. (Foster Aff. TT #17-20 ¶61) (Exhibit 6). Clearly CS/CS2 was able to establish a high level of trust with members of the Valencia organization and the alleged status of Valencia-Gonzales and Martinez, the success of CS in generating information, and the almost two-year period of drug exchanges between CS2 and the Flores defendants, it seems the government's investigation was flourishing with the use of conventional means and were not in need of wiretaps to further their investigation.

The absence of evidence regarding CS/CS2's involvement in the application for wiretaps reflects a serious and intentional

omission to the Court in an effort to obtain he wiretap authorization.[5]

c.  <u>T-CS</u>

T-CS first appeared in the application for the wiretap on TTs #10-11. The affiant invoked T-CS' knowledge that Martinez uses one telephone exclusively for drug activities. (Foster Aff. TT #10-11, ¶32)(Exhibit 5). Despite this, affiant later greatly understates T-CS' potential in the furtherance of her investigation, claiming the use of T-CS would not "provide information on the current activities of the organization's leadership." (<u>Id</u> at ¶ 60)(Exhibit 5).

However, when examining affiant's previous statements she contradicts herself, alluding to T-CS meeting with Martinez and observing him engaging in drug trafficking activities in the Memphis area. (<u>Id</u>.)(Exhibit 5). Clearly, someone who Martinez trusted to the point of meeting with and conducting drug transactions in his presence and who had enough alleged knowledge to detail Martinez's specific telephone habits, was in a position of influence and could have found out more than what the affiant lead the issuing judges to

---

[5] Defendant makes note that the omission of  CS/CS2 is throughout the remaining wiretaps, and Defendant asserts his argument regarding each of the remaining wiretap applications.

believe.

Affiant further states that she gave her affidavit before the government fully debriefed T-CS regarding his knowledge of the organization. (Id) (Exhibit 5).

The government continues to downplay of the nature of T-CS' potential and actual results in the furtherance of the investigation within the authorizations to tap TTs #17-20. Agent Foster depicts T-CS' ability to cooperate as limited to his expressed willingness to act as a courier for Martinez between Atlanta and Texas. Foster suggests in he affidavit that this effort was abandoned because, "no arrangements [could be] made for T-CS to do so." This information was offered to demonstrate that traditional means had been exhausted and nothing came of T-CS' offer to cooperate. (Foster Aff. TT #17-20, ¶ 71) (Exhibit 6).

This assertion specifically contradicts Foster's affidavit for the continuance of an electronic tracking device on the Chevrolet Monte Carlo that T-CS was to drive to Atlanta for Martinez. In the affidavit Foster sets out that T-CS, acting in the capacity of a paid informant

for the DEA during their investigation of Martinez in fact drove to Monte Carlo from San Antonio to Atlanta on November 4, 2005. Foster also instructed T-CS to contact Martinez upon his arrival in Atlanta. The information in the tracking device affidavit was sworn to six days prior to advising in her wiretap application that nothing had come from T-CS' offers to act as a courier in a traditional undercover operation for the DEA. (Foster Aff. Tracking Device Monte Carlo, ¶ 11, 15) (Exhibit 9). Agent Foster omitted these efforts in order to satisfy the government's demonstration of exhaustion for the taps on TT #17-20.

d. <u>Other Traditional Investigative  Means</u>

Once the affiants obtained the initial wiretap on TT#1, no further traditional investigative methods were ever employed, except to investigate leads from previous wiretapped  conversations. Those leads resulted  in the subsequent search warrants, surveillances and arrests. All of these traditional methods of investigation would not have occurred without evidence from the post TT #1 wiretaps. (<u>See</u> Affs. TTs  #1-20, Exhaustion Sections) (Exhibits  1-6).

**II.** **CHALLENGE TO TARGET TELEPHONE #10 AS LACKING PROBABLE CAUSE**

The Foster affidavit contains the affiant's personal beliefs based on her interpretations of monitored conversations translated by other, oral and written reports, physical surveillance, toll records, pen registers, and debriefings of informants and witnesses. (Foster Aff. for TT #10-11 at ¶ 9) (Exhibit 5). There are no specific references to any of these items, it is simply a laundry list of sources without specific reference to assist in the probable cause analysis.

Paragraph ten contains the unparticularized source and "basis of knowledge" list, again without specifics to aid in establishing probable cause. The paragraph provides:

> Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by Special Agents of the DEA or other law enforcement officers. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (***who may have had either direct or hearsay knowledge of the statement***) to whom I have spoken or whose report I have reviewed....

(Id. at ¶ 10) (Exhibit 5)(emphasis added).

To further minimize the information the affiant contends the officers providing any statement or information relied up may have had direct knowledge

of the information or it is based on hearsay from undisclosed source(s). Nothing in either paragraph nine or ten is helpful in a totality of the circumstances analysis.

The only attempt to establish probable cause for the wiretap authorization of TT #10 can be found in paragraphs twenty-eight through thirty-three and thirty-eight through forty.

In paragraph twenty-eight through thirty-three, the affiant claims to identify the user of TT #10 as Martinez basing this conclusion on the cessation of use of TT #6 and the increased use of TT #10 according to pen toll analysis. (Id. at ¶ 28) (Exhibit 5). Affiant suggests the pen tolls of TT #10 reflect contact with the phone allegedly belonging to Valencia-Gonzalez, and others whom the user of TT #6 contacted and engaged in alleged drug activities. (Id. at ¶¶ 29-31) (Exhibit 5). This theory was the only basis in the application offered to establish probable cause. There is no evidence presented from which one would conclude that drug activities occurred as a result of TT #10's use. More importantly, however, the affiant argues that TT #10 was in contact with Valencia-Gonzales, drug discussions must be occurring on the target phone. What the affiant fails to include in her application is that Valencia-Gonzalez's phone was subject to a wiretap at the time the authorization for TT #10 was sought.[6]. Clearly, if Martinez was the user of TT #10 and used it to call Valencia-Gonzalez regarding drug activities, then the affiant

---

[6] At that time the tap on Valencia's phones, TTs #1 and #7 was in place.

should have been able to point to particular calls and conversations intercepted from the wiretap on Valencia-Gonzalez's telephone to substantiate or dispel her suspicions. There are no referenced telephone calls demonstrating such activity.

The affiant also claims, in attempting to establish probable cause for TT #10, that recorded calls and information provided by "T-CS" led her to believe that Martinez uses one designated "company" phone for his drug activities. (Id. at ¶ 32) (Exhibit 5). The affiant offers no specific conversations or information to support that conclusion nor does she attempt to establish T-CS' basis of knowledge for said information, or a level of reliability to establish T-CS' credibility as an informant. Nothing in this paragraph offers any evidence or information supporting the conclusion that Martinez specifically uses TT #10, let alone exclusively uses said phone for drug purposes.

There is nothing in the affidavit demonstrating how T-CS might have known Martinez's telephone habits.

In the exhaustion section of her affidavit, the affiant elaborates on T-CS as an informant working with agents out of Memphis, Tennessee. (Id. at ¶ 60) (Exhibit 5). T-CS told agents he met with Martinez and observed him engage in drug activities. (Id.) (Exhibit 5). There is no mention of the number of meetings

or interactions between the two, nor is there an offer of proof in the application to

demonstrate the truth of his assertion. At most, all the Court can assume is that T-

CS had only one meeting with Martinez[7], and there is no indication that a phone

was used on that occasion[8].

Paragraphs thirty-eight through forty attempt to further utilize toll analysis

to show Martinez as the user of TT #10. The affiant refers to nineteen calls

between TT #10 and Valencia-Gonzalez. (Id. at ¶ 38) (Exhibit 5). From those

calls between September 15 to October 4, however, the affiant offers no

reference to any intercepted calls from Valencia-Gonzalez's phone coming from

the use of TT #10 or that the phone was used for drug purposes.

Affiant can only point to two calls, based on the toll records, between TT

#10 and persons alleged to be involved in drug activity, however there in no

corroboration for these assumptions by affiant anywhere within the affidavit. (Id.

at ¶¶ 39-40) (Exhibit 5).

Affiant suggests that the volume of calls made from TT #10 might assist in

---

[7] "T-CS told agents that he met with Martinez while in Memphis…" (Foster Aff TTs #10-11)(Exhibit 5).
[8] It is inconceivable for probable cause to authorize a wiretap that T-CS is a deeply embedded informant in the Martinez Organization with vast knowledge of Martinez's telephone activities, while at the same time asserting that T-CS is incapable of producing tangible results as an informant for the government's investigation.

the probable cause analysis. There were 153 calls made to eleven different

numbers in the five days between September 15 through 19, 2005. (Id. at ¶ 28)

(Exhibit 5). Of those 153 calls nineteen of them were made to the target phone

related to Valencia-Gonzalez and the two calls referenced above, there is no

indication any of the remaining 132 calls were made to anyone in either of the

two suspected drug organizations. This would indicate that the overwhelming

majority of the calls placed on TT #10 had no relevance to the affiant's

investigation.

## III. CHALLENGE AS TO TARGET TELEPHONES #17-19 LACKING PROBABLE CAUSE

Paragraphs twenty-seven through thirty-seven and forty-five through fifty-

two pertain solely to the probably cause to identify "Cain" (Flores) as the user of

TT #17 and "C-7" as the user of TTs #18 and 19. The only recorded telephone calls

summarized by the affiant to establish probable cause derive from the wiretap of

TT #10. (Foster Aff. TTs #17-20, ¶¶ 27-37, 45-52) (Exhibit 6).

Without the use of the information from TT #10, the authorization for

TTs #17-19 would result in their probable cause analysis being reduced to

one relying exclusively on pen register content. (Foster Aff. TTs #17-20, ¶¶

27-37, 45-52) (Exhibit 6). The Court should grant Defendant's motion to

suppress the authorization for TTs #17-20.

### Argument and Authority

**A.    The Constitution And Congress Require Strict Adherence To Title III's Requirement Of Forthright Governmental Disclosure.**

Wiretapping is an "extraordinary investigative device." United States v.
Giordano, 416 U.S. 505, 527 (1974).   Unlike other searches, it is conducted
without notice.   Berger v. New York, 388 U.S. 41, 60 (1967).   It places an
"invisible policeman" "in the bedroom, in the business conference, in the social
hour," at the dinner table, and "in the [doctor]'s office" for weeks and months on
end.  Id. at 64-65 (Douglas, J., concurring).  The wiretap intrudes upon the privacy
of not just the named target, but each of the numerous 100 individuals with whom
Ms. Flores conversed and for whom the government makes no claim of probable
cause.  Because the wiretap, by its nature, "sweep[s] in all conversations within its
scope - without regard to the participants or the nature of the conversations," it
"intrudes upon the privacy of those not even suspected of crime and intercepts the
most intimate of conversations."  Id. at 65.   Accordingly, only "special facts"
showing "exigency," Id. at 60, can create a "genuine need" for government
officials to secretly intercept private conversations, Dalia v. United States, 441
U.S. 238, 250 (1979).

Moreover, because that exceptional intrusion is triggered by the government's use of an *ex parte* application process, interposing a neutral and independent decision maker between the individual and the "officer engaged in the often competitive enterprise of ferreting out crime," Johnson v. United States, 333 U.S. 10, 14 (1948), is imperative.  "[B]ypassing a neutral predetermination of the scope of a [wiretap] search," the Supreme Court has stressed, would "leave[] individuals secure from Fourth Amendment violations only in the discretion of the police."  Katz v. United States, 389 U.S. 347, 358-59 (1967) (internal quotation omitted).  Impartial and fully informed "antecedent justification" by a court is thus "a constitutional precondition of ... electronic surveillance."  Id. at 359.

Title III's requirement that the government provide the authorized court with a "full and complete statement of the facts and circumstances" establishing probable cause and a "full and complete statement" of the other "investigative procedures [that] have been tried" and the reasons that other measures would "be unlikely to succeed," 18 U.S.C. § 2518(1)(b),(d), are the backbone of the statute's requirement that "[t]he district judge, not the agents, must determine whether the command of Congress has been obeyed."  United States v. Spagnuolo, 549 F.2d 705, 711 (9th Cir. 1977).  Unless the government sets forth the relevant facts and circumstances comprehensively and candidly, the court cannot make the "independent evaluation of the matter" that both Title III and the Fourth

Amendment require.  Franks v. Delaware, 438 U.S. 154, 165 (1978); see United States v. Gigante, 538 F.2d 502, 503 (2d Cir. 1976) (Title III was designed "to ensure careful judicial scrutiny"); see United States v. Ferguson, 758 F.2d 843, 848-49 (2d Cir. 1985)(applying Franks to wiretap affidavit).  And, of course, "when the Fourth Amendment" and Title III "demand[] a factual showing," the "obvious assumption is that there will be a *truthful* showing" by the government. Franks, 438 U.S. at 164-165 (quotation omitted)(emphasis in original).  The use of intentionally or recklessly false statements – including sins of omission – in wiretap affidavits is "an unthinkable imposition" on the ability of the court to "determine independently whether there is probable cause." Id. at 165.[9]

To enforce Title III's stringent requirements, Congress enacted a distinct statutory rule of suppression that supplements the "judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights." Giordano, 416 U.S. at 524.  Title III's statutory suppression rule mandates the exclusion in court proceedings of "the contents of any [wiretap], or evidence derived therefrom" if the wiretap evidence "was unlawfully intercepted," 18

---

[9]     The "bulwark of Fourth Amendment protection, of course, is the Warrant Clause." Franks, 438 U.S. at 164.  In deciding that "a challenge to a warrant's veracity must be permitted" the Franks court stated: "we derive our ground from language of the Warrant Clause itself, which surely takes the affiant's good faith as its premise: '[N]o Warrants shall issue but on probable cause, supported by Oath or affirmation.'" Id.

U.S.C. § 2518(10)(a)(i), <u>i.e.</u>, "where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."   <u>Giordano</u>, 416 U.S. at 527.  Because the "full and complete statement" provisions "play a central role in the statutory scheme," suppression "must follow when," as here, those provisions "ha[ve] been ignored" by the government.  <u>Id.</u> at 528.

**B.      The Wiretaps Should Be Suppressed Because The Government Failed To Establish Necessity.**

Undoubtedly, "it would be in some sense more efficient to wiretap whenever a telephone was used to facilitate the commission of a crime."   <u>United States v. Concepcion</u>, 579 F.3d 214, 218 (2d Cir. 2009) (quoting <u>United States v. Lilla</u>, 699 F.2d 99, 105 n.7 (2d Cir. 1983)).  But Congress, actuated by the Constitution, determined that the "cost of such efficiency in terms of privacy interests is too high," <u>id.</u>, and accordingly confined the use of wiretaps to an enumerated list of "serious crimes," <u>Gelbard</u>, 408 U.S. at 46.  Even for the specified crimes, wiretaps may only be used when truly "necessary to assist in law enforcement," <u>Concepcion</u>, 579 F.3d at 218.  And for those crimes for which Congress withheld wiretap authority completely Congress has already made the categorical judgment that wiretaps are not necessary as a matter of law.

To enforce these important limitations, Title III requires that the government provide the authorizing court with a "full and complete statement as to whether or not other investigative procedure have been tried" or "why they reasonable appear to be unlikely to succeed if tried." 18 U.S.C. § 2518(d). That full and complete disclosure is indispensable if courts are to assess independently whether resort to the extraordinary intrusion of a wiretap is genuinely necessary in a particular case.

To that end, Section 2518(d) requires that the government's affidavit "disclos[e] ... the use, success and potential success of other investigative techniques," including in particular a canvas of "what, if any, investigative techniques were attempted prior to the wiretap request." United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997) (quoting Lilla, 699 F.2d at 104). "[T]he affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail." United States v. Robinson, 698 F.2d 448, 453 (D.C. Cir. 1983)(per curiam); see United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1985)(same).

Where the affidavit does not refer to any alternative investigative means either undertaken or considered by the police, exhaustion has not occurred. . United States v. Mondragon, 52 F.3d 291, 293 (10th Cir. 1995). Also, where the exhaustion section contains merely facts concerning the probably cause mentioned in preceding wiretap applications, there will me no finding of exhaustion either. Id

at 293. Further, "other investigative procedures" fails to include other electronic surveillance. United States v. Bianco, 998 F.2d 1112, 1127 (2d Cir. 1993).

In United States v. Carneiro, 861 F.2d 1171 (9th Cir. 1988), in an opinion authored by Circuit Judge Alarcón, who frequently sits by designation in the Eleventh Circuit, the Court of Appeals held that the district court had abused its discretion because the disputed wiretap applications failed to establish necessity. In Carneiro, DEA was investigating a drug distribution ring involving a number of particular individuals and obtained wiretaps on the telephones of three of these individuals.   In pertinent part, the defendants challenged the wiretaps on the ground that the applications failed to establish necessity for the wiretaps.   Id. at 1175.   The court began by noting that a "district court must reject a wiretap application if law enforcement officers have not first attempted, without success, traditional investigative methods that 'easily suggest themselves and are potentially productive and not unduly dangerous.'" Id. at 1176 (quoting United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1985)).   Additionally, sections 2518(1)(c) and (3)(c) require a necessity showing, whose purpose "is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."   Id. (citing United States v. Kahn, 415 U.S. 143, 153 n.12 (1974)).

Important to the present case, the Court of Appeals held that "[e]ach wiretap application, standing alone, must satisfy the necessity requirement." Id. (Italics in original) (citations omitted); see United States v. Abascal, 564 F.2d 821, 826 (9th Cir. 1977) (the government must do more than show that the telephone subscribers they wish to tap are all part of one conspiracy). "'The government may not dispense with the statutory mandated showing of necessity to obtain a wiretap [of one conspirator's] telephone despite the validity of the wiretap of his co-conspirator's telephone.'" Id. at 1177 (quoting United States v. Brone, 792 F.2d 1504, 1507 (9th Cir. 1986)).

After finding that the government's application had established necessity for the first wiretap on co-defendant McNeil's telephone, the court held that the government had failed to establish necessity for two subsequent wiretaps and one extension of one of the subsequent wiretaps. The first wiretap struck down was the Harty wiretap. Id. at 1180. The Court held that necessity had not been demonstrated because, in part, the affidavit "failed to tell the issuing court that the DEA did not conduct a traditional investigation of Harty's criminal activities before applying for the wiretap on his telephone lines." Id. Further, even though an earlier application had established necessity to intercept co-defendant McNeil's telephone, "[t]here [was] no indication in the application that the DEA attempted

an investigation of Harty to discover [Harty's source and the scope of his drug operation] before applying for the wiretap." Id.

Moreover, the affidavit incorrectly implied that DEA already "had utilized traditional methods of investigation before seeking the Harty wiretap," such as attempting surveillance and searching for informants. Id. at 1180-81.

The government in Carneiro sought to save the Harty wiretap by arguing that necessity had been established for the McNeil wiretap and, therefore, for many of the same reasons, necessity was established for the Harty wiretap. The court flatly rejected this argument: "The fact that the government adequately exhausted traditional investigative techniques before seeking an order to tap McNeil's telephone is irrelevant." Id. at 1181; see also Brone, 792 F.2d at 1507 (the government may not dispense with the necessity showing with regard to one conspirator simply because it has proved necessity in the case of another). "Rather, the government must satisfy the necessity requirement every time that it seeks a wiretap." Id. (emphasis supplied) (quoting Abascal, 564 F.2d at 826 (government must show that each wiretap separately satisfies the necessity requirement).

The Carneiro court similarly struck down the Boyd wiretap for failure to establish necessity. "The government's earlier investigations of Weeks, McNeil, and Harty are irrelevant to the question of whether the government adequately

investigated Boyd to identify his cocaine source and the scope of his drug operation before resorting to electronic surveillance to acquire that information." Id. at 1181-82.  Putting a fine point on the lack of necessity, the court found that "[i]n this case, the government failed to investigate Boyd before seeking the wiretap on his telephone."  Id. at 1182.  This, of course, proved fatal because "'there must be a showing of necessity with respect to each telephone and conspirator.'"  Id. (quoting Brone, 792 F.2d at 1507; citing United States v. Santora, 600 F.2d 1317, 1321 (9th Cir. 1979) and Abascal, 564 F.2d at 826).  See United States v. Landeros-Lopez, 2010 WL 2347025, *4 (D.Ariz. June 9, 2010) ("The government must investigate each conspirator before seeking to wiretap that individual's telephone.").   "Less intrusive procedures may succeed with one putative participant while they may not succeed with another."  United States v. Santora, 600 F.2d 1317, 1321 (9th Cir. 1979) (quoting Abascal, 564 F.2d at 826).

In Landeros-Lopez, the district court held that the government had not established necessity for a wiretap of Juan's telephone even though the government previously had established necessity to intercept co-conspirator and co-defendant Harper's telephone, to whom Juan (Landeros-Lopez) supplied drugs.[10]  "The

---

[10]  The six-month "substantial" investigation that had been conducted prior to applying for a wiretap of Harper's telephone "included use of the following investigative techniques: queries into the identity and history of suspected traffickers through the National Crime Information Center database, Phoenix Police Department arrest records the Phoenix Police Department PACE system,

government must investigate each conspirator before seeking to wiretap that individual's telephone.  The government cannot piggy-back a subsequent wiretap on the necessity established for a previous wiretap." Id. at *4.

Similar to the present case, the government in Landeros-Lopez sought to justify the Juan wiretap because traditional methods of investigation had not and would not have achieved the broad objectives of the overall investigation, i.e., "to identify all participants in Juan's criminal activity enterprise, all locations and methods used by his organization, all transportation routes, and to gather sufficient evidence to indict and convict members of the organization." Id. at *7.  Title III, however, does not allow the government to effectively negate the necessity requirement by articulating broad objectives.  Id. ("The Ninth Circuit has held, however, that broad objectives cannot be used to uphold what would otherwise be an unnecessary wiretap.")(quoting United States v. Blackmon, 273 F.3d 1204, 1210 (9th Cir. 2001)).  This practice of defining broad objectives in an attempt to create necessity is insufficient because the generic descriptions of investigative futility that then find their way into the affidavit are nothing more than platitudes

---

social security records, Arizona driver's license records, Arizona Public Service records, and Arizona Department of Motor Vehicle records; ... use of a confidential informant; substantial surveillance of the residence of several of the suspected traffickers; surveillance of facilities from which the suspected traffickers made shipments; examination of shipping records; issuance of administrative subpoenas to shipping companies ...." Id. at *1.

that are "true of most or all drug conspiracy investigations" and "are unsupported by specific facts relevant to the particular circumstances of this case." <u>Blackmon</u>, 273 F.3d at 1210-11.  Boilerplate assertions that "are unsupported by specific facts relevant to the particular circumstances of [the] case" are not sufficient to establish that traditional methods of investigation would not be likely to succeed.  <u>Id.</u> at 1210. Difficulties "germane to most forms of criminal activity that involve more than one willing participant and require some degree of planning" do not amount to necessity.  <u>Lilla</u>, 699 F.2d at 105 n.7.

In <u>United States v. Santora</u>, 600 F.2d 1317 (9th Cir. 1979), the court emphasized that necessity is participant/telephone specific.  Just because "the Government has established the inadequacy of investigative alternatives relating to certain suspects, [this does not mean that] it may then dispense with the required showing when applying to tap the telephones of other conspirators."  <u>Id.</u> at 1321.  Simply stated, "[i]t is not enough that the agents believe the telephone subscribers they wish to tap are all part of the one conspiracy.  Less intrusive investigative procedures may succeed with on putative participant while they may not succeed with another."  <u>Id.</u> (internal quotations and citation omitted).

Although the initial wiretap of Santora's telephone was legal, the subsequent wiretaps of two of his co-conspirators were not.  <u>Id.</u> at 1322.  The government in <u>Santora</u>, much like in the present case, relied on the necessity claims from an

earlier wiretap, which focused on another part of the alleged conspiracy, and then added that the additional wiretaps were necessary to "fully identify the conspirators taking part in the violations alleged" and surveillance had been "insufficient" "to identify the nature of the conversations and transactions which have taken place." Id. Because "[l]ess intrusive investigative procedures may succeed with one putative participant while they may not succeed with another," Id. at 1321, the court held that necessity had not been demonstrated for the telephones in the subsequent orders.   Id. at 1322.

In the present case, the Government has not established "necessity" for each of the wiretaps. Instead, the Government has simply repeated the same boilerplate language used in previous applications. Similarly, the Government has failed to adequately account for the investigation and intercepts in a prior period of interceptions and to justify why new or continued interceptions are needed. The Government's stock reliance on the "goals of the investigation" is simply inadequate to justify the significant intrusion of a wiretap. Accordingly, the wiretaps and evidence derived therefrom should be suppressed. The Government in this case does not establish necessity for each individual wiretap requested instead they rely on the initial investigation and attempt to piggyback each subsequent request onto that claim of necessity.

The government failed to show a necessity for the post-TT #1 wiretaps, routinely discounting the potential of using informants such as CS1, CS/CS2, and T-CS. Going so far as to actually conceal the continued success of their informants in order to attempt to satisfy the necessity requirement.

The government cannot show it "fully" disclosed all of its attempted investigative alternatives. <u>Mondragon</u>, *supra*. The concealment of the activities and success of the informants in this case seriously discredits any finding of necessity for the use of wiretaps.

The government cannot point to any instance where traditional means alone were utilized, and the government therefore fails to demonstrate the required necessity under 18 U.S.C. 2518(1)(c). None of the alternative investigative techniques undertaken in this case were conducted without the accompanying use of wiretap evidence or derived from their use. Therefore, the Court must discount any of these techniques in applying the totality of the circumstances to the issue of exhaustion. <u>Bianco</u>, *supra*.

A frequently asserted failure in the traditional investigative techniques is the inability to obtain information or testimony from informants because of fears of reprisal. This assertion, standing alone, may not be a sufficient showing of the inadequacy of alternatives. <u>United States v. Kalustian</u>, 529 F.2d 585, 589 (9th Cir. 1975).

Another factor to consider in exhaustion is whether conducting traditional investigative means would "too dangerous." §2518(1)(c). If the targets have a reputation for violence, this fat should be included in the application, with corroboration if possible. United States v. De La Fuente, 548 F.2d 528, 537-38. (5th Cir. 1977).

Nowhere in the affidavits for the wiretaps in this investigation do the affiants mention particular examples of danger of violence perpetrated by the Flores gang in the past or at the time of the applications. At most, Agent Foster contends that, in genera, Mexican traffickers are usually involved with family members and this makes them reluctant to aid government agents because of safety fears. (Foster Aff. TT #17-20, ¶ 79) (Exhibit F).

Mere conclusions by the affiant are insufficient to justify a wiretap search. See Aguilar v. Texas, 378 U.S. 108 (1964). Only facts, not conclusory assertions, enable the judge to "determine whether other …investigative procedures exist as a viable alternative." Kalustian, 529 F.2d at 590; Accord United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989).

Most of the assertions pertaining to CI's are not only "conclusory assertions," they involve material omissions and/or misrepresentations. Without the full knowledge of the extent of the CI's and their basis of knowledge, the issuing judge is not able to determine "whether other investigative procedures"

were available to the investigating agents at the time of application. <u>Kalustian</u>,

*supra.*

**C.    The Wiretaps Should Be Suppressed Because The Government Misrepresented and Omitted Relevant Information.**

Routinely, the affiants misrepresented and omitted the full nature and

success, potential and realized, of the CI's throughout this case. Agents

downplayed the potential success of CS1 and CS/CS2 to obtain the initial wiretaps

on TT #1. The affiant further omitted the continued use and success of the CS/CS2

in subsequent wiretap applications regarding the ability to CS/CS2 to discover the

organizations' sources of supply as well as CS/CS2's actual involvement with

Martinez and Cain.

The information regarding T-CS involves the most serious omissions and

misrepresentations of all the CI's. Agent Foster downplayed T-CS' actual and

potential capabilities.

Foster omitted and misrepresented the past performance of T-CS in the

exhaustion section for TT #17-20.    Foster stated in her application that no

arrangements could be made for T-CS to transport the Monte Carlo for Martinez,

while in her affidavit for the tracking device on the same vehicle, which was

submitted six days earlier, she states clearly that T-CS obliged himself to transport

the subject vehicle and left on November 4, 2005. This was a vehicle she alleged

served as means to transport narcotics and drug proceeds. (Foster   Aff.   Tracking Device Monte Carlo, ¶ 16) (Exhibit H).

Obviously, the issuing judges were not advised of the full amount of success, potential and realized, of the CI's in this case and their authorizations were not granted based upon a totality of the circumstances at the time.

Material falsehoods in a wiretap's affidavit may render the exhaustion argument unfounded.   Some examples include misstating the degree of information the informant gave the affiant; misstating events to which the informant observed; and misstating the inability of informants to assist in the investigation. United States v. Milton, 153 F.3d 891, 896 (8th Cir. 1998)(informant had seen drugs, when she had not); United States v. Aviles, 170 F.3d 863, 868-69 (9th Cir. 1999) (affiant stated informant had not provided substantive information when, in fact, he had); Ippolito, 774 F.2d at 1483 (misstatement about informants being unable to penetrate conspiracy). Additionally, where the affiant obscures the degree of an informant's actual involvement, so that a misleading impression is created, the statement of exhaustion of investigative alternatives should be found insufficient, thereby invalidating the surveillance application.

**D.    The Wiretaps Should Be suppressed Because Information From Illegal Wiretaps was Used In The Investigation And To Obtain The Wiretaps.**

Title III commands in plain and unqualified terms that "no part of the contents of [an intercepted] communication and no evidence derived therefrom

may be received in evidence in any trial ... before any court ... if the disclosure of that information would be in violation of" Title III.  18 U.S.C. § 2515.  The Supreme Court has held that Title III, 18 U.S.C. § 2518(10)(a), "require[s] suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device," Giordano, 416 U.S. at 527.

Accordingly, if the investigation utilized any such information, the electronic surveillance derived therefrom would be inadmissible. As discussed at length above every application for wiretap subsequent to the application for TT #1 contained no new investigatory information except for that which was obtained by the previous wiretap. Therefore, if one of the applications is deemed to be illegal then all subsequent applications must be deemed to have relied on information illegally obtained.

**E.  The Wiretaps Are Subject To Statutory Suppression Under Title III a/k/a The Leon Good Faith Exception Does Not Apply To Title III.**

Although United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988), often is cited for the holding that the Leon good faith exception applies to Title III, the Malekzadeh Court did not so hold and, had it, the Court got it wrong. In short, the Leon implications of the Malekzadeh applied only to the 1980 search warrant, not to the 1986 wiretap.  Id. at 1497.

Title III commands in plain and unqualified terms that "no part of the contents of [an intercepted] communication and no evidence derived therefrom may be received in evidence in any trial ... before any court ... if the disclosure of that information would be in violation of" Title III. 18 U.S.C. § 2515. The Supreme Court has held that Title III, 18 U.S.C. § 2518(10)(a), "require[s] suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device," Giordano, 416 U.S. at 527. The requirement of a full and complete - and forthright - statement of the material facts establishing necessity directly and substantially implements Title III's "stringent conditions" on wiretap authority, Gelbard v. United States, 408 U.S. 41, 46 (1972), and is indispensable to ensuring the independent judicial review of *ex parte* wiretap applications the is essential to vindicate Congress's "overriding" concern with privacy, Id. at 48.

"In contrast to the law governing probable cause under the Fourth Amendment, the law governing electronic surveillance via wiretap is codified in a comprehensive statutory scheme providing explicit requirements, procedures, and protections. *** The statute is clear on its face and does not provide for any exception. Courts must suppress illegally obtained wire communications." United

<u>States v. Rice</u>, 478 F.3d 704 (6th Cir. 2007).   As the <u>Rice</u> Court so eloquently

explained,

> the Senate Report discussing Title III indicates no desire "to press the scope of the suppression role beyond present search and seizure law." S.Rep. No. 90 1097 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2185 (emphasis supplied). Title III was passed in 1968; <u>Leon</u> was decided in 1984. Congress obviously could not know that Fourth Amendment search and seizure law would embrace a good faith exception sixteen years after the passage of Title III, and the language from the Senate Report indicates a desire to incorporate only the search and seizure law that was in place at the time of the passage of Title III.
>
> Finally, as mentioned, the Supreme Court's <u>Leon</u> decision is the product of judicial balancing of the social costs and benefits of the exclusionary rule. The judicial branch created the exclusionary rule, and thus, modification of that rule falls to the province of the judiciary. In contrast, under Title III, Congress has already balanced the social costs and benefits and has provided that suppression is the sole remedy for violations of the statute. The rationale behind judicial modification of the exclusionary rule is, thus, absent with respect to warrants obtained under Title III's statutory scheme. <u>See</u> <u>United States v. Spadaccino</u>, 800 F.2d 292, 296 (2d Cir.1986) (using this same rationale and reaching the same conclusion in analyzing whether the <u>Leon</u> good-faith exception applied to a state wiretapping statute).

<u>Id.</u> at 713.

**F.    GPS Information Also Was Unlawfully Obtained.**

Additionally, the orders authorizing the interception of the Target Telephones, specifically TT #1, TTs #2-4, TT #5 and TT #6, also improperly allowed law enforcement to obtain GPS information for every device contacting or contacted by the Target Telephone, without regard to the nature and substance of the contact. (See Exhibits 1-4 at ¶ 2). This amounts to a "general warrant" and thus violates the Fourth Amendment.

"General warrants, of course, are prohibited by the Fourth Amendment. [T]he problem (posed by the general warrant) is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings ... [The Fourth Amendment addresses the problem] by requiring a 'particular description' of the things to be seized. This requirement makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken; nothing is left to the discretion of the officer executing the warrant." Andresen v. Maryland, 427 U.S. 463, 480 (l976) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971) and Stanford v. Texas, 379 U.S. 476, 485 (1965)).

The discovery reviewed to date does not allow the defense to determine whether GPS information was obtained for which telephone numbers, how many times a telephone was pinged, when the telephone was pinged, by whom the

telephone was pinged, and what information was obtained. The total number of recorded calls is listed in the interim reports. However, the discovery provided does not evidence how many of the "calls" are GPS pings.

Since the order purports to authorize GPS information for all calls/contacts, it is an unconstitutional general warrant. For instance, if the user of the Target Telephone spoke with his/her attorney concerning a legal matter, even though the call is privileged, this order allows the Government to obtain the GPS information for the attorney. Likewise, if the user of the Target Telephone called to wish his/her grandmother a happy birthday, then the Government may obtain the grandmother's location. Making matters even worse, there is no temporal connection to the intercepted call and when the Government could obtain the GPS information. So, the Government could intercept the call and then three weeks later obtain grandma's GPS information, even though grandma (and her telephone) presumably has moved in the three weeks since the call was intercepted.

Furthermore, the seizure of such prospective cell site data from the cellular service provider changes the cell phone from a mere phone into a tracking device as defined by 18 U.S.C. § 3117(a). The portion of the wiretap authorizations allowing the interception of data giving the position of the cell phones in the present case, as well as any information derived therefrom constitutes an illegal search, and therefore must be suppressed.

Title III does not authorize the interception of the type of information sought by the wiretap applications in the present case. Warrants for the use of pen register or trap/trace devices and authorizations for the interception of phone communications do not cover global positioning information or cell site data. Pen register/trap devices can only collect call-identifying information (i.e. incoming and outgoing numbers) and the information gathered cannot "include any information that may disclose the physical location of the subscriber (except to the extent that the location may be determined from the telephone number)." 47 U.S.C. § 1002(a)(2)(B).

Furthermore, cell site data and global positioning information are not communications as defined by Title III, 18 U.S.C. § 2510 (9) ("with respect to any wire, oral, or electronic communication, any information concerning the substance, purport, or meaning of that communication"). This definition does not include cell site or GPS data, nor is such data covered under subscriber records as defined under 18 U.S.C. § 2703 (c). Time and time again, warrant applications seeking cell site data have been consistently denied. See In re Application for Pen Register and Tap/Trace Device with Cell Site Location Authority, 396 F.Supp.2d. 747 (W.D. Texas, 2005); In the Matter of an Application of the United states for an Order (1) Authorizing the Use of a Pen Register and a Trap and Trace Device and (2) Authorizing Release of Subscriber Information and/or Cell Site Information, 384

F. Supp. 2d 562 (E.D.N.Y. 2005), <u>reconsideration denied</u>, 396 F. Supp. 2d 294 (E.D.N.Y. 2005); <u>In the Matter of the Application of the United States of America for an Order Authorizing the Disclosure of Prospective Cell Site Information</u>, 412 F. supp. 2d 947 (E.D. Wisc. 2006).

The request for GPS information was granted, despite the absence of any statutory authority under Title III or any actual finding of probable cause related to the GPS information. Accordingly, any GPS information obtained was done so unlawfully, without any basis or authority under Title III, and in violation of the Fourth Amendment.

## <u>CONCLUSION</u>

Accordingly, the defense respectfully requests that the Court grant this motion to suppress the wiretaps and all evidence derived therefrom or, in the alternative, to conduct an evidentiary hearing on the matter.

Respectfully submitted on this the 22nd day of September, 2017.

THE SYLVAN FIRM, LLC

<u>**/S/W. Coleman Sylvan**</u>
W. Coleman Sylvan
Georgia Bar No. 971299

3495 Piedmont Rd NE
Building 10 Suite 110
Atlanta, Georgia 30305
(770) 322-4348
(770) 674-8886 (fax)
coleman@sylvanfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing, which was prepared using Times New Roman 14-point font, was served electronically by operation of the Court's CM/ECF system, which will automatically send notice of such filing to all counsel of record.

This 22nd day of September, 2017.

<u>**/S/ W. COLEMAN SYLVAN**</u>
W. Coleman Sylvan