# TARGET TELEPHONE #1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE COMMUNICATIONS TO AND FROM ANY CELLULAR TELEPHONES BEARING INTERNATIONAL MOBILE SUBSCRIBER IDENTITY NUMBER 316010100290072, CURRENTLY ASSIGNED TO TELEPHONE NUMBER (951) 492-5203, AND URBAN FLEET MEMBER NUMBER 126*69*17714 ("TARGET TELEPHONE #1") | : CRIMINAL ACTION<br>: NO.: 1:05-MJ-759-TWT<br>: UNDER SEAL<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## APPLICATION FOR INTERCEPTION OF WIRE COMMUNICATIONS

John Horn, an attorney of the United States Department of Justice, states:

1.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in Section 2516 of Title 18, United States Code.

2.  This application is for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception of the wire communications of Jose Alfredo VELASQUEZ, a.k.a. "ALFREDO," Jose Martin GOMEZ, a.k.a. "GORDO," Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY,"

Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO," JOHN

DOE, a.k.a. "FIDEL," JOHN DOE, a.k.a. "EL CHAVO," and others yet unknown,

collectively referred to as the NAMED INTERCEPTEES, over telephone number

(951) 492-5203 and Urban Fleet Member Number[1] 126*69*17714, which is a

Nextel cellular telephone bearing International Mobile Subscriber Identity

("IMSI") Number 316010100290072, subscribed to Samuel ESPINDOLA, P.O.

Box 55026 Irvine, California 92619-5026 ("Target Telephone #1"), and for global

positioning system ("GPS") information for GPS-capable Target Telephones,

concerning offenses enumerated in Section 2516 of Title 18, United States Code,

that is:

    a.  possession with intent to distribute cocaine, a Schedule II controlled

    substance, in violation of Title 21, United States Code, Section 841(a)(1);

    b.  conspiracy to distribute cocaine, in violation of Title 21, United States

    Code, Section 846;

---

1   Nextel Direct Connect Service provides instant two-way radio communication (a.k.a. "Push-to-Talk") to any other Nextel Customer. All direct connect subscribers are also provided a unique number to identify them within their dispatch subsystem. This unique number is comprised of the Urban ID, Fleet ID, and Fleet Member ID, similar to a phone number, and is referred to as the UFMI number.

c. the unlawful use of communication facilities in committing or facilitating the commission of a Title 21, felony offense, in violation of Title 21, United States Code, Section 843(b);

d. money laundering and conspiracies to commit money laundering, in violation of Title 18, United States Code, Sections 371, 1956, and 1957; and

e. aiding and abetting the above offenses, in violation of Title 18, United States Code, Section 2.

3. There is probable cause to believe that the above offenses have been and are continuing to be committed by Jose Alfredo VALASQUEZ, a.k.a. "ALFREDO," Jose Martin GOMEZ, a.k.a. "GORDO," Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPITO," a.k.a. "LUPILLO," JOHN DOE, a.k.a. "FIDEL," JOHN DOE, a.k.a. "MARTIN," JOHN DOE, a.k.a. "SOBRINO," JOHN DOE, a.k.a. "JUAN," JOHN DOE, a.k.a. "CARLOS," SERVANDO FERNANDEZ-MARTINEZ, JESUS PEREZ-VENTIES, LAURA CASTELON-PEREZ, JOHN DOE, a.k.a. "EL CHAVO," and others as yet unknown (hereafter referred to as the Target Subjects).

4. Pursuant to Section 2516 of Title 18, United States Code, the Attorney General of the United States has specially designated the Assistant Attorney

3

000508

General in charge of the Criminal Division and any Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by Section 2516 of Title 18, United States Code, to authorize this Application. Under the power designated to him or her by special designation of the Attorney General pursuant to Order Number 2758-2005 of February 24, 2005, an appropriate official of the Criminal Division has authorized this Application. Attached to this Application as Attachment A are copies of the Attorney General's order of special designation and the Memorandum of Authorization approving this Application authorizing the interception of wire communications.

5.    I have discussed all of the circumstances of the above offenses with Special Agent Renita D. Foster of the DEA, who, along with other law enforcement officers, has conducted this investigation. I have also reviewed Special Agent Foster's affidavit, which is attached to this Application as Attachment B and is incorporated herein by reference. Based upon that affidavit, your applicant states upon information and belief that:

    (A)    There is probable cause to believe that the Target Subjects, have committed, are committing, and will continue to commit the Title 18 and Title 21 violations set forth above;

4

(B)     There is probable cause to believe that the particular wire communications of the Named Interceptees, and other persons as yet unknown, concerning the above-described offenses will be obtained through the interception of wire communications over Target Telephone #1.  In particular, the communications to be intercepted will concern activities of the Target Subjects in furtherance of the enumerated Title 21 and Title 18 violations.  The conversations will likely provide evidence of (i) the nature, scope, extent and methods of operation of the money laundering and controlled substance business of the Target Subjects and others yet unknown; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators and other participants in their illegal activities; (iii) the distribution and transfer of the contraband and money involved in those activities; (iv) the existence and location of records; (v) the existence, location and source of resources used to finance their illegal activities; (vi) the location and disposition of proceeds from those activities; and (vii) the locations and items used to further those activities;

5

(C)     There is probable cause to believe that Target Telephone #1 will be
used by the Named Interceptees in connection with the commission
of the above-described offenses; and

(D) There is probable cause to believe that the Target Telephone #1 is, or
may be, equipped with GPS technology.  DEA will obtain the GPS
information sporadically through specific queries of the Service
Provider, as opposed to continuous monitoring and receipt of the GPS
information.  Relevant information on the location and travel of the
Target Telephone, its user, and the user's co-conspirators will be
obtained by use the GPS information and material to the ongoing
investigation being conducted by the DEA; and

(E) The attached affidavit contains a full and complete statement explaining
why normal investigative procedures have been tried and have failed,
reasonably appear to be unlikely to succeed if tried, or are too
dangerous to employ.

6.   The attached affidavit contains a full and complete statement of facts
concerning all previous applications which are known to have been made to any
judge of competent jurisdiction for approval of the interception of the oral, wire,

6

or electronic communications of any of the same individuals, facilities, or premises specified in this Application.

WHEREFORE, your applicant asserts that there is probable cause to believe that the Target Subjects, and others as yet unknown, are engaged in the commission of offenses involving violations of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 2, 371, 1956 and 1957, and that the wire communications of the Named Interceptees, and others as yet unknown, regarding these offenses will be intercepted over Target Telephone #1.

Based on the allegations set forth in this application and in the attached affidavit of Special Agent Foster, the applicant requests this Court to issue an order pursuant to the power conferred upon it by Section 2518 of Title 18, United States Code, authorizing DEA, local law enforcement, and individuals operating under a contract with the government and acting under the supervision of the DEA, to intercept wire communications to and from Target Telephone #1 such communications are intercepted that reveal the manner in which the Target Subjects and others unknown participate in the specified offenses and reveal the identities of co-conspirators, places of operation, and nature of the conspiracy, or for a period not to exceed thirty days, measured from 10 days from the date on

000512

which the Court's order is entered or when interception begins, whichever occurs first.

IT IS REQUESTED FURTHER THAT, the authorization apply not only to Target Telephone #1, but also to any changed telephone numbers subsequently assigned to or accessed through the above-referenced IMSIs and to any other IMSI or ESN assigned to or accessed through the Target Telephone #1, and any background conversation intercepted while the instrument is otherwise in use.

IT IS REQUESTED FURTHER THAT, in the event that the service provider changes during the course of the interception, interception may continue with the new service provider without further order of this court.   The United States will advise the court of the change of service provider in the periodic progress reports submitted to this court.

IT IS REQUESTED FURTHER THAT, should the agents of the DEA determine that, due to a pattern of inactivity during certain hours of the day, they do not wish to intercept during certain hours on any given day or days, they may do so; this shall not, however, impact the period of interception authorized herein.

IT IS REQUESTED FURTHER THAT, for purposes of Title 18, United States Code, Section 2518(3), in the event that Target Telephone #1 are transported outside the territorial jurisdiction of this Court, interception may take place in any other jurisdiction within the United States.

8

IT IS REQUESTED FURTHER THAT, based upon the request of the Applicant pursuant to Sections 2703(c) and 2703(d) of Title 18, United States Code, that Sprint Spectrum PCS, Virgin Mobile, Cingular Wireless, Celco Partnership d/b/a as Verizon Wireless, T-Mobile USA, Nextel, BellSouth Cellular Corporation, BellSouth Telephone Company, Preferred Network, Inc., and any other provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15) shall furnish the DEA with records (including call detail records), cellular site information, and information pertaining to the subscribers to, or customers of, electronic communication service for telephone numbers dialed to or from Target Telephone #1, as well as to any changed telephone numbers subsequently assigned to or accessed through the above-referenced IMSIs and to any other IMSI or ESN assigned to or accessed through the Target Telephones #1. The government has set forth specific articulable facts showing that there are reasonable grounds to believe that the requested subscriber/customer information and records are relevant and material to the ongoing criminal investigation of the listed targets as outlined in Special Agent Foster's affidavit.    It is also requested that any provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15), shall promptly notify the DEA of any changes to the Target Telephones' number or IMSIs.

9

IT IS REQUESTED FURTHER THAT, based upon the request of the Applicant pursuant to Section 2518(4) of Title 18, United States Code, that Sprint Spectrum PCS, Virgin Mobile, Cingular Wireless, Celco Partnership d/b/a Verizon Wireless, T-Mobile USA, Nextel, BellSouth Cellular Corporation, BellSouth Telephone Company, Preferred Network Incorporated and any other provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15) shall furnish the DEA with all technical information concerning facilities and all technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting wire communications over Target Telephone #1. The service provider shall be compensated for reasonable expenses incurred in providing such facilities or assistance.

IT IS FURTHER REQUESTED THAT, Cingular Wireless, Virgin, Celco Partnership d/b/a as Verizon Wireless, T-Mobile USA, Nextel, Sprint Spectrum PCS, BellSouth Cellular Corporation, BellSouth Telephone Company, Preferred Network, Inc., and any other provider of electronic communications services as defined in Title 18, United States Code, Section 2510(15), shall furnish the DEA with global positioning system (GPS) information on Target Telephone #1.

10

000515

Because the GPS information will be used to identify locations used by the targets of the investigation in connection with their illegal drug activities, the undersigned requests that the Court's Order authorize the acquisition and use of the GPS information whether the Target Telephone is located in a public place or on private property. Applicant further requests that the Order authorize that monitoring agents, in the event that the Target Telephone travels outside the territorial jurisdiction of this Court, be allowed to continue to obtain the GPS information in any jurisdiction within the United States.

IT IS REQUESTED FURTHER THAT, to avoid prejudice to this criminal investigation, the Court order the providers of the wire communication service and their agents and employees not to disclose or cause a disclosure of this Court's Order, the request for information, facilities, and assistance by the DEA or the existence of the investigation to any person other than those of their agents and employees who require this information to accomplish the services requested. In particular, said providers and their agents and employees should be ordered not to make such disclosure to a lessee, telephone subscriber, or any interceptee or participant in the intercepted communications.

IT IS REQUESTED FURTHER THAT, this Court direct that its Order be executed as soon as practicable after it is signed and that all monitoring of wire

11

communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. The interception of wire communications authorized by this Court's Order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days, as measured from the date on which the Court's order is entered, whichever occurs first.

Monitoring of conversations will immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Special attention will be paid to minimizing privileged communications.

IT IS REQUESTED FURTHER THAT, the Court order that John Horn, or any other Assistant United States Attorney familiar with the facts of the case,

12

000517

provide the Court with a report on or about the fifteenth (15th) day following the date of commencement of interception pursuant to this Order showing what progress has been made toward achievement of the authorized objectives and the need for interception.

IT IS REQUESTED FURTHER THAT, pursuant to section 2518(5) of Title 18 of the United States Code, in the event the intercepted communication is in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

IT IS REQUESTED FURTHER THAT, the Court order that its Order, this application and its attachments, and all interim reports filed with the Court with regard to this matter, be sealed until further order of this Court, except that copies of the Order, in full or redacted form, may be served on the DEA and the service providers as necessary to effectuate the Court's Order as set forth in the proposed order accompanying this application. Moreover, the Government hereby requests authorization to disclose the existence of the Interception Orders and the contents of pertinent intercepted communications, pursuant to Title 18, United States Code, Sections 2517(2) and (3), as appropriate for the purposes of providing relevant facts to a Court in support of any complaints, arrest warrants or search warrants.

13

In addition, the Government requests authorization to disclose facts, pursuant to Title 18, United States Code, Sections 2517(2) and (3), as necessary to provide relevant testimony at any preliminary hearings, detention hearings, grand jury proceedings and other proceedings pertaining to the Target Subjects and others as yet unknown.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Atlanta, Georgia, on June ___10___ , 2005.

DAVID E. NAHMIAS
UNITED STATES ATTORNEY


JOHN HORN
ASSISTANT U.S. ATTORNEY
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
404-581-6118 (voice)
404-581-6171 (facsimile)
Ga. Bar No. 361205

000519



**U.S. Department of Justice**

Criminal Division

_Washington, D.C. 20530_

JUN - 9 2005

<u>**MEMORANDUM**</u>

TO:      Maureen H. Killion, Director
         Office of Enforcement Operations
         Criminal Division

FROM:    John C. Richter
         Acting Assistant Attorney General
         Criminal Division

SUBJECT: Authorization for Interception Order Application

     This is with regard to your recommendation that
I, an appropriately designated official of the Criminal Division,
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period the
interception of wire communications occurring to and from the
cellular telephone bearing the number (951) 492-5203, subscribed
to by Samuel Espindola, P.O. Box 55026, Irvine, California, and
accessed through international mobile subscriber identity number
316010100290072, in connection with an investigation into
possible violations of Title 21, United States Code, Sections
841, 843, and 846; and Title 18, United States Code, Sections 2,
371, 1956, and 1957, by Jose Alfredo Velasquez, Jose Martin
Gomez, Edwar Valencia-Gonzalez, Jorge Arturo Mendoza-Vasquez,
"Fidel," "Martin," "Sobrino," "Juan," "Carlos," Servando
Fernandez-Martinez, Jesus Perez-Venties, Laura Castelon-Perez,
"El Chavo," and others as yet unknown.

     By virtue of the authority vested in the Attorney General of
the United States by Section 2516 of Title 18, United States
Code, the Attorney General has by Order Number 2758-2005, dated
February 24, 2005, designated specific officials in the Criminal
Division to authorize applications for court orders authorizing
the interception of wire or oral communications.  As a duly
designated official in the Criminal Division, this power is
exercisable by me.  WHEREFORE, acting under this delegated power,
I hereby authorize the above-described application to be made by



GOVERNMENT'S
EXHIBIT

A

000520

any investigative or law enforcement officer of the United States
as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the
target telephone number listed above, but also to any other
telephone numbers or telephones accessed through the
international mobile subscriber identity number used by the
target telephone, and to any other international mobile
subscriber identity number accessed through the target telephone
number referenced above, within the thirty-day period.  The
authorization is also intended to apply to the target telephone
number referenced above regardless of service provider, and to
background conversations intercepted in the vicinity of the
target telephone while the telephone is off the hook or otherwise
in use.

John C. Richter
Acting Assistant Attorney General
Criminal Division

JUN - 9 2005
Date

**Joseph F. Bianco**
**Deputy Assistant Attorney General**
**Criminal Division**



**Office of the Attorney General**
Washington, D.C. 20530

ORDER NO. 2758-2005

SPECIAL DESIGNATIONS OF THE ASSISTANT, ACTING ASSISTANT,
ANY DEPUTY ASSISTANT, AND ANY ACTING DEPUTY ASSISTANT ATTORNEY
GENERAL OF THE CRIMINAL DIVISION TO AUTHORIZE APPLICATIONS FOR
COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS
UNDER CHAPTER 119, TITLE 18, UNITED STATES CODE

By virtue of the authority vested in me by 28 U.S.C. §§ 509 and 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in full recognition that 18 U.S.C. § 2516(1) empowers the Attorney General, Deputy Attorney General, and Associate Attorney General to authorize applications to a Federal judge of competent jurisdiction for orders authorizing the interception of wire and oral communications, and in order to preclude any contention that the designations by the prior Attorney General have lapsed, I hereby specially designate the Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred by Section 2516(1) of Title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation or a Federal agency having responsibility for the investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in Section 2516 of Title 18, United States Code.

Attorney General Order No. 2407-2001 of March 8, 2001, is revoked effective at midnight of the day following the date of this order.

**2/24/05**
Date

Albert R. Gonzales
Attorney General

FILED IN CHAMBERS
THOMAS W. THRASH JR.
U. S. D. C.  Atlanta

JUN 1 0 2005

LUTHER D. THOMAS, Clerk
By: _Sewell_
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | : | CRIMINAL ACTION |
| OF THE UNITED STATES OF AMERICA | : | NO.: 1:05-MJ-759-TWT |
| FOR AN ORDER AUTHORIZING THE | : | UNDER SEAL |
| INTERCEPTION OF WIRE | : | |
| COMMUNICATIONS TO AND FROM | : | |
| ANY CELLULAR TELEPHONES BEARING | : | |
| INTERNATIONAL MOBILE SUBSCRIBER | : | |
| IDENTITY NUMBER 316010100290072, | : | |
| CURRENTLY ASSIGNED TO TELEPHONE | : | |
| NUMBER (951) 492-5203, AND URBAN FLEET | : | |
| MEMBER NUMBER 126*69*17714 ("TARGET | : | |
| TELEPHONE #1") | : | |

AFFIDAVIT

I, Renita D. Foster, a Special Agent ("SA") with the Drug Enforcement

Administration ("DEA"), United States Department of Justice, being first duly

sworn, depose and state under oath as follows:

INTRODUCTION

1.     I am an investigative or law enforcement officer of the United States within

the meaning of Title 18, United States Code, Section 2510(7), and am empowered

by law to conduct investigations of, and to make arrests for, offenses enumerated in

Title 18, United States Code, Section 2516.



GOVERNMENT'S
EXHIBIT
B

1

2.    I am a Special Agent with DEA and have been so employed since January of 2002. I am currently assigned to the Atlanta Field Division, Enforcement Group Two. Prior to my employment with DEA, I was employed by the Fort Worth Police Department in Fort Worth, Texas from 1995 to 2002, and from 1993 to 1995 I was employed by the Baylor University Medical Center Department of Public Safety in Dallas, Texas.  During my law enforcement career, I have written and/or executed numerous search, seizure and arrest warrants pertaining to the seizure of all types of criminal evidence such as illegal drugs, drug paraphernalia, drug records, drug proceeds and evidence of other types of crimes. I have received specialized training in the enforcement of drug laws, with an emphasis on drug trafficking and drug organizations. I have participated in more than 100 investigations involving drug trafficking activities and have become familiar with the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal drug dealings. I have participated in several wiretap investigations conducted under Title III. I have received specialized training in the use of electronic surveillance, including wiretaps.

3.    Based on my training and experience in the investigation of drug traffickers, and based upon interviews I have conducted with defendants, informants, and other witnesses, and participants in drug trafficking activity, I am familiar with the ways

2

in which drug traffickers conduct their business. My familiarity includes: the various means and methods by which drug traffickers import and distribute drugs; their use of cellular telephones, digital display paging devices, and calling cards to facilitate drug activity; and their use of numerical codes and code words to conduct drug transactions. I also am familiar with the ways that drug traffickers conceal, convert, transmit, and transport their drug proceeds, including but not limited to, the use of carriers to transport currency and proceeds, the use of third parties to purchase or hold title to assets, and the use of off-shore accounts.

4.     I am currently participating in an investigation of cocaine and methamphetamine including Jose Alfredo VELASQUEZ, a.k.a. "ALFREDO," Jose Martin GOMEZ, a.k.a. "GORDO," Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPITO," a.k.a. "LUPILLO," JOHN DOE, a.k.a. "FIDEL," JOHN DOE, a.k.a. "MARTIN," JOHN DOE, a.k.a. "SOBRINO," JOHN DOE, a.k.a. "JUAN," JOHN DOE, a.k.a. "CARLOS," SERVANDO FERNANDEZ-MARTINEZ, JESUS PEREZ-VENTIES, LAURA CASTELON-PEREZ, JOHN DOE, a.k.a. "EL CHAVO," and others yet unknown (collectively referred to as the "Target Subjects"). The above-referenced investigation, which targets cocaine and methamphetamine trafficking activities in and around Atlanta, Georgia, California,

3

and other unidentified areas, has identified an organization which is actively engaged in distributing cocaine and methamphetamine in Atlanta, Georgia.

5.    This affidavit is submitted in support of an application for an order authorizing the interception of wire communications concerning federal felony offenses enumerated in Title 18, United States Code, Section 2516, and specifically the following violations:

a.    Possession with intent to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

b.    Conspiracy to possess with intent to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846;

c.    The use of a communication facility, to wit, a telephone, to commit, facilitate or further the commission of a Title 21, United States Code, felony offense, in violation of Title 21, United States Code, Section 843(b);

d.    Money laundering and conspiracies to commit money laundering, in violation of Title 18, United States Code, Sections 371, 1956, and 1957; and

e.    Aiding and abetting the above offenses, in violation of Title 18, United States Code, Section 2.

6.    I believe there is probable cause to establish that these offenses have been committed, are being committed, and will continue to be committed by Jose Alfredo VELASQUEZ, a.k.a. "ALFREDO," Jose Martin GOMEZ, a.k.a.

000526

"GORDO," Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY,"
Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO,"
JOHN DOE, a.k.a. "FIDEL," JOHN DOE, a.k.a. "EL CHAVO," (collectively
referred to as the "Named Interceptees"), and other persons as yet unknown, and
that wire communications concerning the above offenses will be obtained through
interception of such communications over: (1) telephone number (951) 492-5203
and Urban Fleet Member Number 126*69*17714, which is a Nextel cellular
telephone bearing International Mobile Subscriber Identity ("IMSI") Number
316010100290072, [1] subscribed to Samuel ESPINDOLA, P.O. Box 55026 Irvine,
California   92619-5026   ("Target   Telephone   #1").   In   particular,   these
communications are expected to relate to the above-described offenses, including:
(1) the nature, extent, and methods of the drug importation and distribution
activities of the Target Subjects and others; (2) the nature, extent, and methods of
operation of the drug trafficking business of the Target Subjects and others; (3) the
identities and roles of accomplices, aiders and abettors, co-conspirators, and
participants in their illegal activities, including sources of supply for the narcotics;
(4) the distribution and transfer of funds and contraband involved in these

---

[1] Target Telephone #1 contain a removable computer chip that is encoded with the
IMSI number. This chip may be removed from the telephone and inserted into
another phone in order to operate that phone. Each IMSI number thus is unique to
each subscriber.

5

activities; (5) the existence and location of records; (6) the location and source of resources used to finance their illegal activities; (7) the location and disposition of the proceeds from those activities; and (8) the identification of locations and items used in furtherance of those activities. In addition, these wire communications are expected to constitute admissible evidence of the commission of the above-described offenses.

7.     The requested order is sought for a period of time until the interceptions fully reveal the manner in which the Target Subjects and their confederates participate in the above-described offenses, or for a period of thirty (30) days, whichever is earlier.

## PRIOR APPLICATIONS FOR INTERCEPTION

8.     ELSUR checks of FBI, DEA, and Bureau of Immigration & Customs Enforcement databases having been conducted on June 10, 2005, I am not aware of any applications other than those set forth below that have been made to any federal court or other court in the United States of America for authorization to intercept wire, oral, or electronic communications involving any of the same persons, facilities, or places specified in this application:

a.     On April 28, 2004, United States District Judge J. Owen Forrester of the Northern District of Georgia issued an Order authorizing the interception of wire communications occurring to and from: telephone number (404) 247-5120, which

6

is a prepaid T-Mobile USA cellular telephone bearing IMSI Number 310260701263811, with no subscriber information on file with T-Mobile; and telephone number (239) 287-1348, which is a Sprint PCS cellular telephone bearing ESN 38251F2A, subscribed to by Francisco LUVIANO, 27625 Shriver Ave, Bonita Springs Florida, 34135. The Named Interceptees identified in this Order included JOHN DOE, a.k.a. "GUERO," BENIGNO RAMIRES-REYES, a.k.a. "EL GRANDE," a.k.a. "BENINO," RENATO JIMENEZ, a.k.a. "ANDREA," a.k.a. "RJ," JESSICA RODRIGUEZ, BERNADINO RAMIRES, a.k.a. "NINO," and others yet unidentified. It is believed that Target Subject

REDACTED was intercepted during this wiretap. The interceptions of wire communications ended at the conclusion of the 30-day period.

**b.** On April 29, 2005, Judge G. Conley Ingram of the Cobb County, Georgia, Superior Court issued an Order authorizing the interception of wire communications for a period of 30 days to and from: telephone number   REDACTED

REDACTED

7

000529

subscribed to by

telephone   number

a   Nextel   Communications

telephone  assigned  to  IMSI                       , subscribed  to

and telephone number (

a  Nextel  Communications  telephone  assigned  to  IMSI                       and

subscribed  to  by

The Named Interceptees of this Order included

(                              and   others   yet   unknown.   The   interception   of   wire

communications pursuant to this Order ended on May 22, 2005.

## BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

000530

9.    I make this affidavit, in part, on personal knowledge derived from my participation in this investigation and, in part, upon information and belief. The sources of my information and belief are:

    i.  consensually monitored and recorded communications;

    ii.  oral and written reports about this and other investigations that I have received, directly or indirectly, from state and local officers and detectives, and agents of the DEA;

    iii.  physical surveillance conducted by State and local officers, or other federal agents, which has been reported to me either directly or indirectly;

    iv.  a review of telephone toll records and pen register information;

    v.  independent investigation by the DEA and State and local task forces;

    vi.  debriefings of confidential informants and other witnesses; and

10.  Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by Special Agents of the DEA or other law enforcement officers.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have

9

read and reviewed. Such statements are among many statements made by others, and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance, except where otherwise indicated, does not set forth my personal observations, but rather has been provided directly or indirectly through other law enforcement officers who conducted such surveillance.

11. Because this affidavit is being submitted for the limited purpose of seeking authorization for the interception of wire communications, I have not set forth each and every fact learned during the course of this investigation. I have set forth only those facts that I believe are necessary to establish the required foundation for an order authorizing the interception of wire communications. I do not rely upon facts not set forth herein in reaching my conclusion that an order should be issued, nor do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of the application for the interception of wire communications.

## BACKGROUND INVESTIGATION

12. I and other agents of the Atlanta Field Division and DEA offices in Tyler, Texas, acting in conjunction with the Gwinnett County Georgia Narcotics Task Force, are currently investigating a large-scale drug trafficking organization responsible for the distribution of cocaine in Atlanta, Georgia, Laredo, Texas,

000532

Costa Mesa, California, and other yet-to-be identified locations. This organization is believed to be responsible for the importation and distribution of multi-kilogram quantities of cocaine to Atlanta, Georgia and other yet-to-be identified cities in the United States. Currently, the Atlanta DEA office is conducting two investigations by two separate enforcement groups. The two Atlanta investigations are related to each other. However, I further believe that each investigation is focusing on independently operating "cells" of a large-scale international cocaine distribution organization.[2]

## ATLANTA, GEORGIA
## CONFIDENTIAL SOURCE #1 INFORMATION

13. In October 2004, I began to receive information from a Confidential Source, hereafter referred to as "CS1," regarding a drug trafficking organization based in Mexico. CS1 is a paid informant with no criminal history. CS1 has provided information in the past regarding other drug trafficking organizations that has been corroborated, and the information provided regarding this investigation

---

2 Based on my experience and training, Mexican-based organizations will commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell. In addition, members of one cell are commonly provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization that these members can provide if they are arrested.

000533

has also been corroborated as described in this affidavit. I therefore believe that CS1's information regarding this investigation is reliable.

14.    CS1 specifically identified                      as a large-scale drug trafficker responsible for the distribution of drugs in the Atlanta area, and CS1 provided a telephone number used by    REDACTED    I know that the telephone number provided by CS1 was intercepted in a court-authorized wiretap in May 2004. The May 2004 wiretap was conducted by DEA agents in Atlanta, who were investigating a cell of Mexican narcotics traffickers who were importing and distributing large quantities of cocaine, methamphetamine, and marijuana. Pursuant to the earlier investigation, agents seized 50 kilograms of cocaine on June 23, 2003, approximately 50 kilograms of cocaine on September 3, 2003, and approximately 3,200 pounds of marijuana on May 10, 2004. The earlier investigation resulted in the indictment of 16 individuals, nine of whom have been arrested and prosecuted and the remaining seven are fugitives. As part of the earlier investigation, DEA agents monitored several conversations in May 2004 during which    REDACTED   , using the telephone identified by CS1, discussed the collection of drug proceeds. Furthermore, CS1 said that in May 2004, he/she found a large amount of currency, totaling approximately $300,000, in a residence occupied by    REDACTED   . According to CS1, he/she further observed a handgun and an electronic money counter in the residence. CS1 said that

12

REDACTED   eventually became aware that CS1 had found the currency, gun and money counter, and   REDACTED   moved the curreny to another location.   CS1 further stated that upon confronting   REDACTED   about the large amount of currency, '   REDACTED   admitted to CS1 that he was involved in the distribution of narcotics.

15. CS1 stated that in May 2004,   REDACTED   returned to Mexico and has remained there since then. I believe based on my training and experience that   REDACTED   returned to Mexico to avoid detection after agents arrested the subjects of the May 2004 wiretap investigation and seized approximately 3,200 pounds of marijuana in connection with the arrests.

16. During a later debriefing in October 2004, CS1 identified Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," as a multi-kilogram cocaine distributor operating in the metro-Atlanta area. According to CS1, VALENCIA-GONZALEZ arrived in Atlanta shortly after the departure of , and CS1 further stated that VALENCIA-GONZALEZ had been sent to Atlanta as a replacement for   REDACTED   According to CS1, VALENCIA-GONZALEZ has approximately (20) individuals that work under his direction in furtherance of the distribution of cocaine. One of these individuals has been identified by CS1 as Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO." According to CS1,

13

MENDOZA-VASQUEZ works for VALENCIA-GONZALEZ and that VALENCIA-GONZALEZ and MENDOZA-VASQUEZ are often seen in each other's company. CS1 stated that $500,000.00 recently was stolen from VALENCIA-GONZALEZ by his girlfriend. According to CS1, in January 2005, VALENCIA-GONZALEZ asked him/her to rent an apartment for him and specifically told CS1 that he wanted an apartment that had a garage. CS1 stated that VALENCIA-GONZALEZ was planning on using the apartment and garage to store large quantities of drugs and money.

17. In January 2005, based on information provided by CS1, Detective Mark Lester of the Gwinnett County Police Department was able to locate a black Lincoln Navigator identified as a vehicle used by Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL" a.k.a. "SAMMY." It was learned at that time that the vehicle was registered to VALENCIA-GONZALEZ at 571 Thornbush Trace, Lawrenceville, Georgia.

18. Agents began to conduct surveillance during January, February, and March 2005 at 572 Thornbush Trace, Lawrenceville, Georgia. During one such surveillance on March 8, 2005, agents observed the previously described Lincoln Navigator travel from 571 Thornbush Trace to 1732 Paladin Drive, Lawrenceville, Georgia.

000536

## $ 1.3 MILLION SEIZURE

19. In March 2005, DEA S/A Robert Zafra of the DEA office in Tyler, Texas was working with a Confidential Source (hereafter referred to as CS2), who, at S/A Zafra's direction, traveled to Atlanta to meet with an Atlanta-based cocaine trafficker. CS2 set up the meeting with S/A Zafra's guidance in order to learn more about the trafficker's organization and see if CS2 could identify facts that would assist in building a case against the trafficker. CS2 is further identified as a defendant informant who was arrested in 2002 in Tyler, Texas for his/her involvement in the delivery of 100 pounds of marijuana. CS2 is providing this information to agents for consideration in his/her pending sentence. As described further in this affidavit, agents have been able to corroborate much of the information provided by CS2 in connection with this investigation. I therefore believe that the information provided by CS2 is reliable.

20.     On March 11, 2005, CS2 was to be picked up by the trafficker after arriving in Atlanta. Upon arrival in Atlanta CS2 was directed by the trafficker to a Best Buys parking lot on Pleasant Hill Road, in Northeast Atlanta. Agents conducted surveillance and identified the trafficker who met CS2 at the Best Buys store as Jose Alfredo VELASQUEZ. VELASQUEZ picked CS2 up in a white Ford Explorer and was accompanied by JOHN DOE, a.k.a. "MARTIN," who was operating the vehicle. VELASQUEZ took CS2 to a local hotel and

15

then showed CS2 around the area. VELASQUEZ drove CS2 to Gainesville, Georgia (approximately 40 miles north of Atlanta) and showed CS2 the airport there. This airport is a relatively small airport, but can accommodate small jets. Surveillance was terminated in the late afternoon because VELASQUEZ began driving erratically, in an apparent effort to conduct countersurveillance.

21.    At approximately 6:30 p.m. on Saturday, March 12, 2005, CS2 notified DEA that an aircraft was en-route to the Gainesville airport and was to arrive within 40 minutes. CS2 said that the plane was to pick up currency to transport to Laredo, Texas. Agents responded and established surveillance, but the agents initially were not able to identify an aircraft due to the configuration of the terminal and tarmac. At night the terminal and tower are unmanned. At approximately 8:30p.m., agents observed the white Ford Explorer (also observed during the previous night's surveillance), in the area of the airport occupied by three Hispanic males. At approximately 9:00 p.m. agents saw a red Pontiac Grand Prix arrive and a Hispanic male exit carrying two (2) black suitcases. The Hispanic male was then observed passing off the suitcases to a white male. The white male rolled the suitcases to an aircraft. After the Grand Prix left agents approached the pilot, Kevin FELTS, and passenger Nora AGUIAR. AGUIAR claimed ownership of the aircraft and signed permission to search the aircraft and luggage. The suitcases contained U.S. Currency, heat

16

sealed in clear plastic and marked with amounts that totaled $1.3 million. The U.S. currency was subsequently counted by a bank and totaled approximately $1.3 million. Both FELTS and AGUIAR initially cooperated and they admitted purchasing the plane two months earlier. FELTS and AGUIAR told the agents that they understood that the $1.3 million consisted of drug proceeds. They said they had made two (2) previous trips to Gainesville, Georgia, two (2) trips to Cleveland, Ohio, one (1) to Dallas, Texas, and two (2) to Memphis, Tennessee. FELTS and AGUIAR said that the purpose of all of these trips was to pick up currency. AGUIAR said that she is working for JOHN DOE, a.k.a. "CARLOS," a.k.a. "EL CAPTAIN," and JOHN DOE, a.k.a. "TIO," who are based in Monterrey, Mexico. AGUIAR said that the currency was to travel to Laredo, Texas, and from there it would be placed into vehicles to cross into Mexico.

22.     After the seizure, CS2 spoke with Alfredo VELASQUEZ, who advised CS2 a phrase in Spanish that translates into English as "they may have won the battle, but they didn't win the war." VELASQUEZ advised CS2 that his coworkers earlier had collected $3.5 million, but the police had seized only $1 million.

000539

## SEIZURE OF $334,000 AND 17 KILOGRAMS OF COCAINE

23.      CS2 advised that during the weekend of March 13, 2005, CS2 was at the house located at 571 Thornbush Trace, Lawrenceville, Georgia, which agents earlier identified as being connected to Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL" a.k.a. "SAMMY." CS2 said that CS2 saw VELASQUEZ at this residence, and that VELASQUEZ advised CS2 that this residence was used to store money. VELASQUEZ told CS2 that he has another residence that he uses to store the drugs. CS2 observed a safe approximately five (5) feet tall in this residence.

24.      On March 15, 2005, DEA Enforcement Group 2 and Task Force Group 2 executed two Federal search warrants at 571 Thornbush Trace and 1732 Paladin Drive, both in Lawrenceville, Georgia. Agents found Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," Jesus PEREZ-VENTIES, and Laura CASTELON-PEREZ present inside 571 Thornbush Trace, and seized approximately $334,000 dollars from a safe within the residence. Because the investigation was ongoing, agents did not arrest VELENCIA-GONZALES or any of the others at the residence.

25.      During the search at 1732 Paladin Drive, agents found Servando FERNANDEZ-MARTINEZ and Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO," present inside the location. Agents also seized

18

000540

approximately 17 kilograms of cocaine from an upstairs bedroom. After waiving their Miranda rights both FERNANDEZ-MARTINEZ and MENDOZA-VASQUEZ denied any knowledge of the cocaine.

## POST SEIZURE INVESTIGATION TO DATE

26.     Based on an Administrative Subpoena served on Gwinnett Place Nissan, I learned that on March 18, 2005, Edwar VALENCIA-GONZALEZ purchased a 2005 Nissan Armada. The records provided by Gwinnett Place Nissan reveal that VALENCIA-GONZALEZ paid $44,712.70 in U.S. Currency for the vehicle. Additionally, VALENCIA-GONZALEZ listed in the purchase records a new address of 3078 Meadow Wood Court, Lawrenceville, Georgia 30044. It should be noted that VALENCIA-GONZALEZ made this purchase a few days after the search warrants were conducted at 571 Thornbush Trace and 1672 Paladin Drive in which approximately $344,000.00 and 17 kilograms of cocaine were seized.

27.     According to CS2, on March 16, 2005, Jose Alfredo VELASQUEZ traveled to Atlanta, Georgia to meet with Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY." According to CS2, VELASQUEZ intended to talk with VALENCIA-GONZALEZ about the $344,000 that had been seized by law enforcement from 571 Thornbush Trace. CS2 stated that once VELASQUEZ arrived in Atlanta, VELASQUEZ received instructions from

19

000541

JOHN DOE, a.k.a. "SOBRINO," not to meet with VALENCIA-GONZALEZ because it was believed that VALENCIA-GONZALEZ may be cooperating with the police. CS2 described SOBRINO as a source of supply and a boss of VELASQUEZ. CS2 further stated that VELASQUEZ suspects that VALENCIA-GONZALEZ stole a large amount of money from the organization and is lying about the amount of money that was seized from 571 Thornbush Trace Drive. Additionally CS2 stated that, because of the seizure, VALENCIA-GONZALEZ owed VELASQUEZ approximately $1 million.

28.     CS2 said that shortly after March 16, 2005, CS2 received a telephone call from Edwar VALENCIA-GONZALEZ. CS2 cannot remember the exact date of the telephone call but reported that during the conversation, VALENCIA-GONZALEZ told him/her that he was residing in Costa Mesa, California. Additionally, CS2 reported that VALENCIA-GONZALEZ invited CS2 to come and see him in Costa Mesa. VALENCIA-GONZALEZ advised CS2 to either call him or his partner, identified by CS2 as JOHN DOE, a.k.a. "LUPITO." VALENCIA-GONZALEZ provided CS2 with Nextel Direct Connect number 157*688*1728 as a contact number for LUPITO.

### USE OF VALENCIA TELEPHONE #1

29.     CS2 reported that in late March 2005, Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," provided CS2 with telephone number (678)

20

000542

330-4267 and Urban Fleet Member Number 157*688*4220, which is a Nextel cellular telephone bearing IMSI Number 316010102505357, subscribed to Ricky Son, 1200 Preston Park Drive, Duluth, Georgia 30096 ("Valencia Telephone #1") as his new telephone number. According to CS2, VALENCIA-GONZALEZ instructed CS2 to use Valencia Telephone #1 when contacting him. On March 25, 2005, CS2 placed a recorded telephone call to VALENCIA-GONZALEZ on Valencia Telephone #1. During this phone conversation, CS2 advised VALENCIA-GONZALEZ that Jose Alfredo VELASQUEZ asked CS2 to call VALENCIA-GONZALEZ and ask about the money ($1 million) that VALENCIA-GONZALEZ owed VELASQUEZ.  CS2 stated that VALENCIA-GONZALEZ told CS2 that he didn't have any money because all of it had been seized during the March 15, 2005 search of 571 Thornbush Trace. VALENCIA-GONZALEZ also told CS2 that the police seized over $600,000[3] from one of the houses and 17 kilograms of cocaine from the other house. VALENCIA-GONZALEZ told CS2 that he would not conduct any future business with VELASQUEZ and that he was very mad at VELASQUEZ for not meeting with him in Atlanta on March 16, 2005.  VALENCIA-GONZALEZ told CS2 that, although he had moved to Costa Mesa, California, after the March 15, 2005,

---

3 Based on the context of this conversation and other conversations involving VALENCIA-GONZALEZ, I believe that VALENCIA-GONZALEZ is exaggerating the amount of money seized by law enforcement in an effort to steal

000543

search, he would continue conducting drug business in Atlanta and that he had left two workers in Atlanta who have not been identified by the police. Additionally, VALENCIA-GONZALEZ told CS2 that he had recently received 100 kilograms of cocaine in Atlanta and further stated that his drug business would continue to grow.

30.     I believe based on the previously described $334,000.00 seizure, 17 kilogram cocaine seizure, and information received from CS2 that the relationship between Jose Alfredo VELASQUEZ and Edwar VALENCIA-GONZALEZ has soured, and that they are now operating independently. VELASQUEZ is the target of a separate DEA investigation being conducted by the Atlanta DEA Task Force.

31.     On April 22, 2005, at approximately 12:18 p.m., CS2 placed a recorded telephone call to VALENCIA-GONZALEZ at Valencia Telephone #1 using the Nextel Direct Connect service. During this telephone call, CS2 and VALENCIA-GONZALEZ discussed their whereabouts, and VALENCIA-GONZALEZ told CS2 that he was in Costa Mesa, California. CS2 asked VALENCIA-GONZALEZ how the work was in Costa Mesa, and VALENCIA-GONZALEZ responded that it was good and that last week they had sent him a "glass" which was already gone. VALENCIA-GONZALEZ went on to tell CS2

this $300,000 from VELASQUEZ.

that something else was supposed to arrive tomorrow and that things were good right now. CS2 asked VALENCIA-GONZALEZ if he could do something else. VALENCIA-GONZALEZ responded that he was starting with "1 or 2 centuries a week." CS2 then told VALENCIA-GONZALEZ that CS2 would like to go over there and discuss the "numbers" and see what they could do. CS2 then asked VALENCIA-GONZALEZ if "it" could go to the "A," to which VALENCIA-GONZALEZ responded yes. VALENCIA-GONZALEZ then told CS2 to "go over there" so they could talk. CS2 then asked VALENCIA-GONZALEZ if he had gone to Atlanta lately and VALENCIA-GONZALEZ told CS2 that he had been there four or five days ago. Additionally, VALENCIA-GONZALEZ told CS2 that when he goes to Atlanta, he only stays for a couple of days in order to meet with people and to pick the "envelopes." VALENCIA-GONZALEZ further told CS2 that he "does not like to get to close to the kitchen." CS2 then asked VALENCIA-GONZALEZ if he knew anything about "the other guy," referring to VELASQUEZ. VALENCIA-GONZALEZ responded by telling CS2 that he didn't know what happened to him. CS2 then told VALENCIA-GONZALEZ that VELASQUEZ was very upset with VALENCIA-GONZALEZ about the money. CS2 then asked VALENCIA-GONZALEZ about LUPITO, to which VALENCIA-GONZALEZ responded that he was "over there." CS2 asked VALENCIA-GONZALEZ if there was an

23

airport in Costa Mesa or if CS2 would have to fly to Los Angeles when CS2 came to see VALENCIA-GONZALEZ. VALENCIA-GONZALEZ told CS2 that there was an airport nearby. CS2 then told VALENCIA-GONZALEZ that CS2 would call him back soon, and the conversation ended. I believe this recorded telephone conversation between CS2 and VALENCIA-GONZALEZ is drug-related. I know based on my training and experience that it is common practice for Mexican drug traffickers to make use of code words when communicating over a telephone. This tactic is commonly used in an attempt to disguise the true nature of the conversation. For example, when CS2 asked VALENCIA-GONZALEZ about "the work over there," VALENCIA-GONZALEZ stated that it was good and further stated that he had just received a "glass," which was already gone. Based on my training and experience, I believe that when VALENCIA-GONZALEZ told CS2 he had just received "glass" he was referring to an unknown quantity of drugs. I further believe that when VALENCIA-GONZALEZ told CS2 that "it was already gone," VALENCIA-GONZALEZ was telling CS2 that the drugs had already been distributed. Furthermore, I believe that when VALENCIA-GONZALEZ told CS2 that something else was supposed to arrive tomorrow, he was referring to another unknown quantity of drugs. During the conversation, VALENCIA-GONZALEZ told CS2 that he was starting with "1 or 2 centuries a week."

24

According to CS2, this statement referred to 100 to 200 kilograms of cocaine being distributed a week. Additionally, when VALENCIA-GONZALEZ told CS2 that he comes to Atlanta for very short periods of time for the purpose of meeting people and "picking up envelopes," I believe based on my training and experience that VALENCIA-GONZALEZ is in fact talking about picking up money that has been collected from the sale of drugs.

## 3078 MEADOW WOOD COURT

32.     On April 27, 2004, based on the information learned from the Administrative Subpoena served on Gwinnett Place Nissan on April 25, 2005, TFA David Noe conducted surveillance at 3078 Meadow Wood Court, Lawrenceville, Georgia. TFA Noe observed a silver Mercedes Benz SUV in the driveway of the residence. This vehicle was previously observed at 1673 Paladin Drive on March 15, 2005, during the search warrant conducted at that location. TFA Noe further observed the very same white Ford Explorer bearing the same tag number that was observed during the seizure of the $1.3 million on March 12, 2005.

## IDENTIFICATION AND USE OF TARGET TELEPHONE #1

32.     On May 17, 2005, CS2 traveled to Atlanta, Georgia to meet with agents regarding the Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY" organization. While meeting with agents on May 17, 2005, CS2

placed a recorded telephone call to Valencia Telephone #1 and spoke to VALENCIA-GONZALEZ.   During this call, CS2 advised VALENCIA-GONZALEZ that CS2 was coming to Atlanta possibly on May 18, 2005, and that CS2 may need to borrow a car while in Atlanta. VALENCIA-GONZALEZ advised CS2 that he could loan CS2 a car and instructed CS2 to call VALENCIA-GONZALEZ when CS2 arrived in Atlanta. VALENCIA-GONZALEZ further stated that he would have someone pick CS2 up from the airport.

33.   On May 18, 2005, at approximately 10:55 a.m., CS2 placed a recorded telephone call to Valencia Telephone #1. During this call, CS2 spoke with Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL'" a.k.a. "SAMMY." During this call, CS2 told VALENCIA-GONZALEZ that he/she had just arrived in Atlanta and was at the airport. VALENCIA-GONZALEZ told CS2 that he would have someone call CS2 and make arrangements to have CS2 picked up.

34.   On May 18, 2005, at approximately 11:27 a.m., CS2 received an unrecorded incoming call from Nextel Urban Fleet Member Number 155*154192*1. The caller was identified by CS2 as a Hispanic male working for the VALENCIA-GONZALEZ organization. According to CS2, during this telephone call, the unidentified Hispanic male stated that he was

26

000548

on his way to the airport to pick CS2 up. According to CS2, at approximately 12:00 p.m., he/she was picked up by the previously mentioned Hispanic male and driven to a restaurant located in Lawrenceville, Georgia. According to CS2, once he/she arrived at the restaurant, the unidentified Hispanic male placed a telephone call to Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO." CS2 stated that MENDOZA-VASQUEZ arrived at the restaurant a few minutes later operating a silver Mercedes Benz SUV.

35.    According to CS2, he/she was then driven to a house later identified as 3078 Meadow Wood Court, Lawrenceville, Georgia. CS2 stated that while inside the house he saw a money counter and an undetermined amount of U.S. Currency that was being counted by Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO." CS2 further stated that MENDOZA-VASQUEZ told him/her that the residence was used primarily as a money stash house and that the organization maintained another location to store drugs.

36.    CS2 was subsequently provided with a white Ford Explorer to use for the day. This is the very same Ford Explorer identified in paragraphs 20-21. Once CS2 took possession of the vehicle, I obtained a court order granting permission to install a tracking device on the vehicle. After the installation

27

of the tracking device, CS2 returned the vehicle to Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO."

37.     While CS2 was with MENDOZA-VASQUEZ at 3078 Meadow Wood Court, he/she received an incoming unrecorded telephone call from Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," using Target Telephone #1. A review of telephone toll records shows that, at 5:55 p.m. on May 18, 2005, Target Telephone #1 contacted CS2's telephone number. During this telephone call, CS2 thanked VALENCIA-GONZALEZ for taking care of him/her while CS2 was in Atlanta. VALENCIA-GONZALEZ then told CS2 not to give out Target Telephone #1 to anyone and further stated that Target Telephone #1 was another number that he was using.

**PEN REGISTER/TOLL ANALYSIS FOR VALENCIA TELEPHONE #1**

38.     Between the dates of May 3, 2005, and May 20, 2005, Valencia Telephone #1 has been in contact with Nextel Urban Fleet Member Number # 157*688*1728 a total of fifty-five (55) times, with the most recent call occurring on May 11, 2005. Urban Fleet Member Number 157*688*1728 has been identified as a Nextel cellular telephone subscribed to Ray Kim, P.O. Box 55026, Irvine, California 92619-5026. Urban Fleet Member Number 157*688*1728 has been identified in this investigation as a telephone used by Jorge Arturo MENDOZA-VASQUEZ, a.k.a.

28

000550

"LUPILLO," a.k.a. "LUPITO."   MENDOZA-VASQUEZ has been specifically identified by CS1 and CS2 as a narcotics distributor working under the direction of Edwar VALENCIA-GONZALEZ. Based on these facts, I believe that MENDOZA-VASQUEZ uses Urban Fleet Member Number 157*688*1728 in furtherance of drug trafficking activities.

39.   Between the dates of April 20, 2005, and April 26, 2005, Valencia Telephone #1 was in contact with Nextel Urban Fleet Member Number 155*154192*1 a total of six (6) times with the most recent call occurring on April 26, 2005. Urban Fleet Member Number 155*154192*1 is a Nextel Cellular telephone subscribed to Raul Levia, 1125 Preston Park Drive, Duluth, Virginia. I have also learned that the telephone number belonging to this Nextel account is (678) 273-7026.   I know based on information provided by CS2 that Nextel Urban Fleet Member Number 155*154192*1 belongs to an unidentified Hispanic male who works for the Edwar VALENCIA-GONZALEZ drug trafficking organization. According to CS2, on May 18, 2005, the user of Nextel Urban Fleet Member Number 155*154192*1 picked CS2 up from the airport as directed by VALENCIA-GONZALEZ. I further learned that on April 14, 2005, Daniel Barahona was arrested by the Shawnee County, Florida Sheriff's Office after a traffic stop. Barahona was found to be in possession of 22 kilograms of cocaine. Nextel

29

Urban Fleet Member Number 155*154192*1 was stored in the cellular telephone being carried by Barahona. Additionally, the subscriber information for Urban Fleet Member Number 155*154192*1 shows an address of Duluth, Virginia, which is a city that does not exist. Furthermore, the telephone number identified as (678) 273-7026 associated with this cellular telephone is a Georgia area code. This account has also been identified as a prepaid phone account which enables the account holder to provide false information for the subscriber of the telephone. I know that this is a practice commonly used by drug traffickers to avoid the detection of law enforcement. Based on these facts, I believe that the user of Urban Fleet Member Number 155*154192*1 is a narcotics trafficker and uses this phone in furtherance of drug trafficking activities.

40.    Between the dates of May 4, 2005, and May 15, 2005, Valencia Telephone #1 was in contact with telephone number (678) 314-3857 a total of twenty-three (23) times with the most recent call occurring on May 15, 2005. Telephone number (678) 314-3857 is a Cingular Wireless telephone subscribed to Jose GONZALEZ, 300 Carpenter Drive, Atlanta, Georgia. The user of telephone number (678) 314-3857 has further been identified during a court-authorized wiretap conducted in Cobb County, Georgia, as a.k.a. "JUAN." Specifically, on May 3, 2005, JUAN was

30

000552

intercepted using telephone number (678) 314-3857. During this intercepted telephone call, JUAN spoke with _____ a.k.a. "FIDEL." FIDEL is further identified as the target of a separate Title III investigation being conducted by the Atlanta DEA HIDTA. During this call, FIDEL and JUAN discussed the distribution and prices of cocaine. Based on the above, I believe that JUAN will continue to use telephone number (678) 314-3857 in furtherance of drug trafficking activities.

## PEN REGISTER/TOLL ANALYSIS FOR TARGET TELEPHONE #1

41.    Between the dates of May 4, 2005 and June 7, 2005, Target Telephone #1 has been in contact with Nextel Urban Fleet Member Number # 157*688*1728 a total of three hundred and twelve (312) times, with the most recent call occurring on June 7, 2005. Urban Fleet Member Number 157*688*1728 has been identified as a Nextel cellular telephone subscribed to Ray Kim, P.O. Box 55026, Irvine, California 92619-5026. Urban Fleet Member Number 157*688*1728 has been identified in this investigation as a telephone used by Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO."   MENDOZA-VASQUEZ has been specifically identified by CS1 and CS2 as a narcotics distributor working under the direction of Edwar VALENCIA-GONZALEZ.   Based on these

31

facts, I believe that MENDOZA-VASQUEZ uses Urban Fleet Member Number 157*688*1728 in furtherance of drug trafficking activities.

42.    Between the dates of May 13, 2005 and May 23, 2005, Target Telephone #1 was in contact with telephone number (770) 354-1363 a total of fifteen (15) times, with the most recent call occurring on May 23, 2005. Subscriber information has been requested for this telephone number but has not been received as of the date of this affidavit. Telephone number (770) 354-1363 has been identified as a cellular telephone used by John Doe, a.k.a. "EL CHAVO." Specifically, EL CHAVO provided this telephone number to CS2 as EL CHAVO's cellular telephone. CS2 has further identified EL CHAVO as the person who delivered the money to the airport prior to the $1.3 million seizure on May 12, 2005 (see paragraphs 19-22 above). EL CHAVO also was a passenger in the red Grand Prix identified in paragraph 21 earlier. Based on these facts, I believe that EL CHAVO uses telephone number (770) 354-1363 in furtherance of drug trafficking activities.

43.    Between the dates of May 10, 2005 and May 24, 2005, Target Telephone #2 was in contact with telephone number (678) 314-3857 a total of nine (9) times with the most recent call occurring on May 24, 2005. Telephone number (678) 314-3857 is a Cingular Wireless telephone subscribed to Jose GONZALEZ, 300 Carpenter Drive, Atlanta, Georgia. The user of telephone

000554

number (678) 314-3857 has further been identified during a court-authorized wiretap conducted in Cobb County, Georgia, as             a.k.a. "JUAN." Specifically, on May 3, 2005, JUAN was intercepted using telephone number (678) 314-3857.   During this intercepted telephone call,   REDACTED spoke with              a.k.a. "FIDEL."  FIDEL is further identified as the target of a separate Title III investigation being conducted by the Atlanta DEA HIDTA. During this call, FIDEL and JUAN discussed the distribution and prices of cocaine. Based on the above, I believe that JUAN will continue to use telephone number (678) 314-3857 in furtherance of drug trafficking activities.

## ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED AND FAILED, OR APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS

44.    Based upon my experience and training as a Special Agent, as well as the experience of other federal law enforcement agents with whom I have consulted, and based upon all the facts set forth in this affidavit, I believe that the interception of wire communications over Target Telephone #1 is necessary to accomplish the objectives of this investigation. Traditional methods of investigation will not work to accomplish these goals, which include (but are not limited to) discovering: (a) the identities of all the

33

individuals involved in this organization; (b) the current locations of Jose Alfredo VELASQUEZ, a.k.a. "ALFREDO," Jose Martin GOMEZ, a.k.a. "GORDO," Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO," and other high-level members of this drug distribution organization; (c) the present operations and scope of the drug trafficking activities of this organization in Atlanta, California, Texas and Mexico; (d) the methods of supplying and transporting narcotics from Mexico through Texas and to Atlanta; (e) the methods of disposing of the bulk currency that constitutes the proceeds of this drug trafficking; (f) the current significant customers of this organization in Atlanta and elsewhere; (g) the locations where members of this organization store their narcotics; and (h) dismantling the organization by convicting its members of narcotics and money laundering offenses and seizing all assets of the organization and its members. The following is a list of investigative techniques used or considered thus far and an explanation why these techniques are not likely to succeed in accomplishing the investigation's goals or are too dangerous to employ.

45.   Based upon the investigation to date, I have learned that the Target Subjects are affiliated with a national drug transportation and distribution

000556

network that transports and distributes cocaine to Atlanta, Georgia, Costa Mesa, California, and other cities. Based on my investigation too date, I believe that Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," is a high-level supervisor and distributor of cocaine. My investigation has revealed that VALENCIA-GONZALEZ lives in Costa Mesa, California from which he coordinates the importation of cocaine from Mexico to the United States and further manages the transportation and ultimate distribution of the cocaine in Atlanta, Georgia and other cities. Information provided by CS2 and pen register records suggests that VALENCIA-GONZALEZ communicates by phone with other organizational members in Atlanta. I believe based on information provided by CS1 and CS2 as well as pen register information that VALENCIA-GONZALEZ and others are currently engaging and will continue to engage in conversations with their supervisors, sources of supply, customers, distributors, couriers, and co-conspirators to discuss the transportation and distribution of cocaine and methamphetamine, and will use Target Telephone #1 and other as-yet-unidentified telephone numbers to do so.

46.   The investigation to date has not developed any prosecutable cases against Jose Alfredo VELASQUEZ, a.k.a. "ALFREDO," Jose Martin GOMEZ, a.k.a. "GORDO," Edwar VALENCIA-GONZALEZ, a.k.a.

"SAUL," a.k.a. "SAMMY," Jorge Arturo MENDOZA-VASQUEZ, a.k.a. "LUPILLO," a.k.a. "LUPITO," or other members of this organization. The objective of this investigation is to arrest and prosecute the highest-level organization members both in the United States and in Mexico and elsewhere. The monitoring of Target Telephone #1 is necessary to obtain the information needed to identify, prosecute and convict the highest level members of this organization.

47.   I believe that the monitoring of Target Telephone #1 is necessary to allow law enforcement to identify the sources of supply for cocaine to Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," including the supervisors and wholesalers located in Mexico as well as coordinators of shipments of cocaine from Mexico. I believe the interception of Target Telephone #1 also will identify the amounts of cocaine and any other drugs being brought into Atlanta and the methods of transporting, storing, and delivering the drugs.

48.   Notwithstanding the fact that the investigation to date has featured the seizures of $1.3 million, $334,000, and 17 kilograms of cocaine, the investigative techniques have not been successful in identifying the methods used by the organization to accomplish the importation and distribution of cocaine and the laundering of drug proceeds.

36

000558

49.    The objectives of this investigation are to identify and gather evidence to successfully prosecute not only the Target Subjects but also the highest-level supervisors and leaders of this drug distribution network, Mexican sources of supply, local distributors, transportation operatives, and substantial customers who conspire with this organization to further facilitate the distribution of cocaine. Furthermore, this investigation's objectives include the identification of other cells associated with this organization operating within the United States and to coordinate the initiation of investigations targeting these individuals.   As set forth more specifically below, normal investigative techniques have been tried and have failed, appear reasonably unlikely to succeed if tried, or are too dangerous to employ.   In fact, as described below, the use of traditional investigative techniques could be detrimental to the success of this investigation.

### Use of Confidential Sources/Undercover Agents/Interviews of Cooperating Individuals

50.    During the initial phases of this investigation, the use of informants was successful, but only to a limited degree.   Early in this investigation, a confidential source (CS1) provided information regarding Edwar VALENCIA-GONZALEZ, but the information has been very limited. CS1's relationship to VALENCIA-GONZALEZ is not that of a trusted member of his organization, so the information provided by CS1 has only revealed

37

general facts about VALENCIA-GONZALEZ and other organizational members and no details about the methods used by the organization to import, transport, and distribute cocaine in Atlanta and other cities.    CS1 does not know, nor is CS1 in a position to meet and have drug-related conversations with, the source of supply for VALENCIA-GONZALEZ or any other high-level members of this organization. Although CS1 knows VALENCIA-GONZALEZ and has had several conversations in the past with VALENCIA-GONZALEZ, CS1 currently has no way to contact VALENCIA-GONZALEZ and in fact doesn't even know where VALENCIA-GONZALEZ is currently located.

51.   CS2 also has been helpful in identifying Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," and Jose Alfredo VELASQUEZ and has provided information leading to the seizures of $1.3 million, $334,000, and 17 kilograms of cocaine. CS2 has also provided information regarding the telephones being used by VALENCIA-GONZALEZ. Although CS2's information has been very helpful in identifying certain members of this organization and leading agents to seize drugs and money, it has been limited in that CS2 has been unable to provide enough detailed information to identify the methods being used by VALENCIA-GONZALEZ to distribute cocaine. For example, CS2 knows

38

nothing about the specific duties and or positions held by other members of this organization. CS2 does not know the identity of VALENCIA-GONZALEZ' source of supply and is also unaware of the infrastructure of the distribution network VALENCIA-GONZALEZ has established in Atlanta. Finally, CS2 is not located in close proximity to VALENCIA-GONZALEZ and therefore is unable to observe the activities of VALENCIA-GONZALEZ on a daily basis.

52.  Although it may be possible for CS2 to introduce an undercover agent to VALENCIA-GONZALEZ, I believe the introduction of an undercover agent alone would not produce prosecutable cases against the other high-ranking members of this organization and may in fact be detrimental to the investigation as a whole. Based on my experience investigating Mexican drug trafficking organizations, the undercover agent likely would be allowed to purchase drugs only from VALENCIA-GONZALEZ and would not be introduced to other organization members in order to limit the exposure of the organization as a whole. Consequently, this method would lead only to the arrest of VALENCIA-GONZALEZ, while leaving the remaining portion of the organization in place. I know based on the actions of VALENCIA-GONZALEZ that members of his organization have more than one source of supply and can easily establish new sources of supply when one is disrupted.

000561

53.   Two other individuals have cooperated during this investigation revolving around the previously noted seizure of $1.3 million. Both Nora AGUIAR and Kevin FELTS were identified as the transporters of the $1.3 million and both agreed to talk to investigators. Although AGUIAR provided information about Jose Alfredo VELASQUEZ, JOHN DOE, a.k.a. "CARLOS," and JOHN DOE, a.k.a. "EL CAPTAIN," neither AGUIAR nor FELTS has provided any information regarding Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY." Although this information is somewhat pertinent regarding VELASQUEZ and other members of his organization in Mexico, it does not help agents in the identification of current members of Edwar VALENCIA-GONZALEZ' organization. Additionally, this information does not identify the methods and/or any locations associated with VALENCIA-GONZALEZ' cocaine distribution network. Furthermore, it has been established that, after their initial cooperation, AGUIAR and FELTS warned members of the VELASQUEZ organization of the existence of the investigation. I believe that if agents specifically ask AGUIAR and FELTS about VALENCIA-GONZALEZ and/or other members of his organization, they may report these questions to their co-conspirators and drive VALENCIA-GONZALEZ further underground.  FELTS recently indicated that he wishes to cooperate once

again, but given his and AGUIAR's willingness to convey this information to co-conspirators, agents presently are reluctant to pursue additional interviews of FELTS, but have not ruled out doing so.

54.   To the extent that any other members of this organization are positively identified, I believe that the use of historical interviews of these members would be of limited use to this investigation.   First and foremost, my experience with members of Mexican drug trafficking organizations shows that many of these members refused to participate in debriefings. Based on .nd training, I know that Mexican narcotics traffickers are usually involved with family members or persons from their home cities in Mexico in the narcotics trafficking business, and these relationships make them reluctant to cooperate with or provide to the government truthful information about other family members' involvement in the drug trafficking organization.   In fact, such cooperation often would jeopardize the safety of family members in the defendant's home city, who risk being harmed by other drug organization members operating there.

55.   Furthermore, even if successful such historical interviews may not identify and uncover the entire organization. Depending upon the witness's involvement with the organization, he or she may be able to identify only one compartmentalized portion of the organization.  A potential witness who

41

000563

is approached also may report this contact to other organization members. Those involved in the illegal activities cannot be approached at this time for interviews without risking the integrity of this investigation.

56.    Finally, for the same reasons as set forth earlier, interviews of Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," or any other members of this organization after an arrest are unlikely to be productive.

**Grand Jury**

57.    Based upon my experience, and upon conversations with the Assistant United States Attorney assigned to this investigation who possesses experience in prosecuting drug organizations through the use of the grand jury, I believe that the use of grand jury subpoenas to call witnesses who are believed to be involved in this organization to testify before the grand jury would not be successful in achieving the stated goals of this investigation. Subjects of the investigation, should they be called to testify, would most likely be uncooperative and/or invoke their Fifth Amendment privilege. Moreover, it would be unwise to seek grand jury immunity for any of these subjects, as it might foreclose prosecution of the most culpable participants in the organization and compromise the investigation.  Moreover, any grand jury inquiries at this time would be likely to drive the operation further

000564

underground, might well lead to the destruction of key records and evidence, and might lead to flight of the organization's members from the Atlanta area.

58.     The Assistant United States Attorney assigned to this investigation and I anticipate the issuance of grand jury subpoenas for records relating to any meetings, trips, or events that may have generated receipts, invoices, or any other type of accounting records. However, these records will only serve to corroborate historical facts related to past events, and will not likely identify any higher-level members of this organization or the sources of supply for illegal narcotics.

59.     Finally, the service of grand jury subpoenas to apparent "custodians of records" for businesses associated with the sale or issuance of the telephone numbers described in this affidavit likely would not lead to the identification of the actual users of such telephones. Based on my experience, I know that drug traffickers often obtain cellular telephones in fictitious names or the names of third parties, or they obtain prepaid calling cards without any corresponding subscriber information in an effort to conceal their drug trafficking activities from law enforcement. In addition, the use of such an approach could result in having individuals employed at such locations notify members of the drug trafficking organization about law enforcement's interest in the telephone numbers.

000565

## Search Warrants, Consent Searches, and Trash Pulls

60.   As outlined earlier in this affidavit, two search warrants have been conducted in which $334,000.00 and 17 kilograms of cocaine was seized. In addition, agents performed a consent search of an airplane and seized $1.2 million. Although the searches were productive in seizing money and drugs, they were limited in identifying the upper echelon members of this organization. The search warrants further caused VALENCIA-GONZALEZ to relocate in an attempt to thwart the efforts of law enforcement and also replace members of his organization with new workers that have yet to be identified by law enforcement.

61.   The execution of search warrants, consent searches, and the performance of trash pulls do not at this time appear to be feasible alternatives to electronic surveillance. It is my experience that some organization members refuse to provide consent to perform any searches of locations associated with drug trafficking activity.  It also has been my experience that some members do provide such consent, and I also note that this investigation has identified facts that arguably establish probable cause to obtain warrants for these locations.  However, for the reasons set forth below, I believe that the execution of searches at this stage of the investigation would be counterproductive to the ultimate goals of the investigation.

000566

62.   To date, I have identified three locations associated with Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY." The first two locations include 571 Thornbush Trace, and 1672 Paladin Drive, both in Lawrenceville, Georgia. As outlined earlier in this affidavit, both of these residences were searched by agents on May 15, 2005 which resulted in the seizure of money and drugs. I know based on information provided by CS2 that VALENCIA-GONZALEZ has established new locations in Atlanta to store money and drugs. Based on the search warrants conducted at these locations I do not believe that VALENCIA-GONZALEZ will continue to utilize these houses for illegal activity.

63.   Additionally, I have recently identified a residence associated with VALENCIA-GONZALEZ as the result of information he provided during the purchase of a new vehicle on March 18, 2005. This residence is located at 3078 Meadow Wood Court, Lawrenceville, Georgia. Recent investigative activities may be sufficient to allow agents to apply for and obtain a search warrant for this residence, and this option is, and will continue to be, evaluated. However, even if a search of this residence yields drugs or money, the search may not provide a full picture of the VALENCIA-GONZALEZ distribution organization, including customers, sources of

000567

supply, and distribution and importation methods, in order to fulfill the goals of this investigation.

64.   I also know based on information provided by CS2 and my investigation of this organization that Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," most likely is utilizing more than one location to store drugs and money. For these reasons, I believe that the interception of Target Telephone #1 would be very helpful in identifying all the locations utilized by the Target Subjects as residences and stash houses as well as locations used by the supervisors of the Target Subjects.  Furthermore, I believe that the conversations intercepted on the wiretaps would greatly assist agents in interpreting the evidence that may be seized in later searches of these residences, including ledgers, documents, and receipts.

65.   Further, other DEA agents and I have worked many drug investigations and have found that, although drug traffickers frequently keep records, such records have generally been insufficient in and of themselves to establish the full scope of a drug conspiracy, and additionally are difficult to interpret. Moreover, too many searches would alert the subjects of the investigation to the existence of the investigation, and thereby would risk jeopardizing the ongoing investigation, as well as thwart any chance to learn the identities of additional conspirators. As stated earlier, this investigation is aimed at

46

developing prosecutable cases on not just Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," but also on his sources of supply in Mexico, his transportation coordinators, substantial customers, and other conspirators. For these reasons, I believe that the execution of search warrants at this time would be more likely to compromise the investigation by alerting the principal targets of the investigation and allowing other unidentified co-conspirators to insulate themselves further from successful detection, or even to flee from the United States. I further believe that the performance of trash pulls would not likely yield sufficient evidence to establish the full scope of the conspiracy.

## Wiretaps, Pen Registers and Toll Records

66. As discussed earlier, one of the Target Subjects of this investigation, Jose Martin GOMEZ, a.k.a. "GORDO," was intercepted on a court-authorized wiretap conducted in the Northern District of Georgia in May 2004. However, after these conversations occurred, GOMEZ left Atlanta to return to Mexico after agents seized approximately 3,200 pounds of marijuana in connection with this wiretap. The investigation has shown that GOMEZ has remained in Mexico since then and that new members of the drug distribution organization have taken his place. Consequently, the evidence obtained from the May 2004 wiretap will not accomplish the goals of this

000569

investigation, which are to identify the current members of the organization and their methods of obtaining and distributing illegal drugs and laundering the proceeds of their illegal activities.

67.    In addition, it appears that the wiretap investigation currently pending in Cobb County, Georgia, has produced evidence that the cellular telephones being used by Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," are communicating with a telephone used by                    a.k.a. "JUAN."   The Cobb County wiretap has intercepted calls during which JUAN negotiates for the sale of cocaine.   However, agents have not identified thus far any conversations intercepted on the Cobb County wiretap involving the Target Subjects of the DEA investigation of VALENCIA-GONZALEZ.   Based on the facts obtained so far, I believe that the Cobb County wiretap is focusing upon a separate drug distribution organization, and that one of the customers who obtains drugs from the VALENCIA-GONZALEZ organization also negotiates for the sale or purchase of drugs with the targets of the Cobb County wiretap.   Given these circumstances, I believe that the Cobb County wiretap likely will not yield evidence that will allow DEA to accomplish the goals of this investigation, which is to identify the top-level members of the VALENCIA-GONZELEZ organization, their sources of supply, and their distribution methods.

48

68. As described in earlier sections of this affidavit, telephone-billing information has been useful in identifying subjects in this investigation. This investigative tool, however, has limited use because information gathered from pen registers and toll records only serves to confirm a contact between telephones, or a telephone and a paging device. It does not provide "real-time" information regarding the contact (i.e., as the events are occurring), shed light on the content of any such conversations, or even identify the persons who are actually doing the communicating.

69. Pen registers and trap and trace devices are also being used in this investigation. These devices, while helpful, only document numbers dialed or pulsed to or from the particular telephones on which the devices are installed. The devices do not identify the actual participants in the conversations or reveal the nature of the conversations. In addition, I am aware based on my experience in conducting drug investigations that the subscriber information associated with telephone numbers of potential co-conspirators that are obtained from the use of these devices is often false. Finally, the use of pen registers alone would not enable agents to identify the Target Subjects without the aid of monitoring Target Telephone #1.

70. For these reasons, telephone toll records and subscriber records, as well as the use of pen register and trap and trace devices, in and of themselves,

000571

cannot establish proof of the drug distribution conspiracy. The interception of wire communications for which authorization is sought herein will provide "real-time" information on the content of communications and the identity of the persons making the communications, and consequently will permit investigators to more completely realize the legitimate goals of this investigation, particularly identifying and developing prosecutable cases on the users of Target Telephone #1, their co-conspirators, substantial customers, and sources of supply.

71. No prior interception of digital paging devices has occurred in this investigation. Based on current information, I have no evidence that the Target Subjects or any members of this drug organization use digital paging devices.

## PHYSICAL SURVEILLANCE

72.    Physical surveillance has been used in this investigation, but it is unlikely to lead to the accomplishment of all investigative goals regarding the drug trafficking activities of the organization. Specifically, DEA agents conducted surveillance of Alfredo VELASQUEZ in conjunction with the seizure of the $1.3 million on March 12, 2005. Although this surveillance was productive in securing a large, cash seizure, the surveillance alone did not identify the scope of the entire organization. This surveillance identified

000572

two subjects responsible for transporting the money but beyond that failed in uncovering the identities of the leaders of this organization or all the methods used by this organization to conduct their illegal activities.

73.   Agents have also conducted surveillance at all of the residences identified during this investigation. During some of these surveillances agents have made observations of vehicles and have followed vehicles from one house to another. Although these observations are valuable to investigators, I believe the performance of surveillance alone at these locations, without also having the benefit of intercepting calls on Target Telephone #1, will not likely allow law enforcement to obtain any meaningful understanding of the illegal activities that take place during the surveillance.

74.   Based on the investigation to date, I know that the members of this organization have demonstrated that they are highly conscious of surveillance by law enforcement.  For example, as described earlier, the agents following CS2 as he/she was escorted around northern Atlanta by Jose Alfredo VELASQUEZ on March 11, 2005, had to abandon this surveillance because VELASQUEZ engaged in counter-surveillance driving techniques.  Under these circumstances, I believe that performing surveillance without the interception of Target Telephone #1 would be detrimental to the overall objectives of this investigation and would most

000573

likely cause the targets of the investigation to discontinue the use of identified cellular telephones. The interception of Target Telephone #1 will allow agents to have a clearer picture of the activities of the organization and the movements of unidentified members of the organization, thus allowing agents to conduct surveillance more effectively.

75.   I believe that the interception of Target Telephone #1 will assist in identifying locations at which to perform physical surveillance of drug-related activities of Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY." I further believe that the interception of Target Telephone #1 will reveal the full scope of the organization that VALENCIA-GONZALEZ is managing. Specifically, I believe that surveillance in conjunction with the interception of Target Telephone #1 will reveal more clearly the identities of the Mexican sources of supply and organizational members located in Atlanta, Mexico, Texas, California and other locations that have yet to be identified.

76.   As demonstrated in this affidavit, Target Telephone #1 is a cellular telephone, which is mobile and can be concealed easily and thus are not amenable to surveillance. Even if agents obtained cellular site information and determined the location of a meeting involving the users of Target Telephone #1 such surveillance would be insufficient to provide evidence of

000574

the purpose(s) of the observed meeting or to determine the nature of the conversations during the meeting. It is my opinion that, in order to determine why such meetings take place, agents would need to intercept their telephone conversations, and such use of the cellular telephone would show how, and in what manner, these individuals conduct their drug trafficking business.

77.   During the course of this investigation, I have identified several vehicles used by members of this organization and have observed these vehicles on surveillance. On May 18, 2005, subsequent to receiving a court order, a tracking device was installed on one of the vehicle used by the VALENCIA-GONZALEZ organization. I believe the use of this tracking device alone would provide insufficient evidence to meet the goals and objectives of this investigation. Specifically, even if agents determined the location of a meeting involving the vehicle, the resulting surveillance would be insufficient to provide evidence of the purpose(s) of the observed meeting or to determine the nature of the conversations during the meeting. It is therefore my opinion that, in order to determine why such meetings take place, agents would need to intercept telephone conversations to identify how, and in what manner, these individuals conduct their drug trafficking business.

53

000575

78.   Finally, it is my experience that, when relied upon exclusively, surveillance alone can and has caused agents to react to false clues, alerting the Target Subjects to the existence of an investigation without obtaining any usable information with regard to the criminal enterprise, and the prosecution thereof. Also, because cellular telephones are concealable, surveillance may not be able to establish which cellular telephones the Target Subjects are using at any given moment.

79.   It is anticipated that physical surveillance will be used as the investigation continues. Physical surveillance, when available, will not provide a reasonable alternative to the electronic surveillance applied for herein, however, because visual observation of conspirators will not provide information on the content of their communications.  Physical surveillance cannot enable DEA to learn of the many vital communications among members of the organization occurring over telephones, and is unlikely to allow the government to develop prosecutable cases on the users of Target Telephone #1 and those organizational members who are communicating with Target Telephone #1.

### Consensual Recordings

80.   Because consensual recordings are merely recorded conversations of an undercover agent or confidential informant, they are subject to limitations.

As described earlier, CS2 is able to have telephone conversations with Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY," on Target Telephone #1. DEA would be able to record all these telephone calls and use them as evidence in a trial against VALENCIA-GONZALEZ. However, as summarized earlier, CS2's conversations with VALENCIA-GONZALEZ would not result in evidence showing the present scope of VALENCIA-GONZALEZ' drug trafficking activities, his sources of supply in Mexico, and the manner in which he disposes of the bulk currency proceeds from his drug dealings. A controlled delivery of cocaine and/or marijuana by CS2 would only identify those involved in delivering and accepting delivery of the load, which most likely would be "mules" working for VALENCIA-GONZALEZ' drug trafficking organization. In fact, based on my experiences investigating Mexican drug organizations, including this organization, it is very unlikely that VALENCIA-GONZALEZ or any high-level organization members would be present when the drugs are delivered, and the arrests following the delivery would only tip VALENCIA-GONZALEZ and others off to the existence of this investigation.

## SUMMARY

81.   Based on the foregoing, it is my opinion that "real time" interception of wire communications occurring over Target Telephone #1 is necessary to

000577

uncover the full scope of this drug conspiracy and that normal investigative techniques have been tried and have failed, are reasonably appear unlikely to succeed fully if tried, or are too dangerous to employ.

## MINIMIZATION

82.     The requirements regarding the minimization of interception will be strictly followed. Before interception begins, a meeting will be held for all monitoring agents and civilian contract personnel during which the requirements of minimization will be discussed. Any monitoring agents and civilian contract personnel (who will be under the supervision of an agent at all times they are monitoring a conversation) not in attendance of this meeting will be instructed on the requirements of minimization at a later time prior to his or her involvement in any monitoring activity. A memorandum regarding minimization, as well as a copy of the Court Order authorizing interception, will be provided to all monitoring agents and civilian contract personnel. A copy of that order and a copy of the minimization memorandum will be posted at the listening site. Before a monitor begins to intercept communications, he or she will sign a form indicating that he/she has read the affidavit, the Court's Order authorizing interception, and the minimization memorandum, that he/she is familiar with

000578

the contents of these documents, and that he/she will intercept communications in compliance with the Court's Order.

83.   All interceptions will be minimized in accordance with Chapter 119 of Title 18, United States Code. Interception of wire communications will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that the Target Subjects or any other associates are not participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Agents will monitor all wire communications to determine if a party to a conversation is a conspirator. Monitoring will be discontinued if, while making this identification, the agents determine that the conversation does not involve the Target Subjects or is not criminal in nature. Even if one or more of the Target Subjects or their co-conspirators, when identified, is a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or not otherwise related to the criminal offense.

84.   Based on my experience, and that of other agents who have monitored and supervised wire interceptions, I believe that many drug-related conversations may be part of an otherwise innocent conversation. For that reason, if monitoring is discontinued, monitoring agents will "spot check"

000579

the conversation in order to determine whether the conversation has become criminal in nature.

85.    Because Edwar VALENCIA-GONZALEZ, a.k.a. "SAUL," a.k.a. "SAMMY" is associated with a Mexican-based drug trafficking organization, and because they speak fluent Spanish, it is anticipated that most, if not all, of the conversations to be intercepted will be in Spanish. I therefore anticipate the use of Spanish-speaking civilian, non-law enforcement, contract personnel, acting under the supervision of the investigative or law enforcement officers who are authorized to conduct the interception.

86.    All intercepted wire conversations will be recorded, and all recordings will be securely preserved. Logs will be prepared regarding the date and time of calls, the parties involved, the subject of the call, and if and when minimization occurred. A Report detailing the progress of the interception will be filed with the Court on or about the 15th day following the commencement of interception pursuant to the Court's Order.

87.    Wherefore, based on the facts related above and my experience as a law enforcement officer, I believe that the Target Subjects have committed, are committing, and are about to commit offenses enumerated in Section 2516 of Title 18, United States Code, and that particular wire communications of

000580

the Named Interceptees over Target Telephone #1 concerning those offenses

will be obtained through the requested interception applied for herein.

### GPS Technology

88.   I have communicated with Nextel regarding the model of cellular

telephone that is being used as Target Telephone #1, and Nextel advised me

that, based on the date on which this account was initiated, the model should

be equipped with Global Positioning System ("GPS") technology.   GPS

technology allows Nextel to identify the GPS coordinates where the cellular

telephone is being operated.   Using this information, Nextel can reference

these coordinates and identify the location of the cellular telephone at any

moment in time.

Renita D. Foster
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me
this ___10th___ day of May, 2005.

_____
UNITED STATES DISTRICT JUDGE