IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CARLOS MONTEMAYOR,

Defendant.

CRIMINAL CASE NO.

1:09-CR-00551-LMM-JFK

## REPORT AND RECOMMENDATION

Pending before the court are Defendant Carlos Montemayor's preliminary motion [Doc. 198] to suppress wiretap evidence and supplement [Doc. 268] to the motion to suppress wiretap evidence. The Government filed a response opposing the motions to suppress. [Doc. 313]. Although Defendant was allowed an opportunity to file a reply brief in support of his motions to suppress in order to address the issues raised by the Government, as noted *infra*, Defendant declined to file a reply brief. [Docket Entry Dated August 14, 2018]. After consideration of the motions, briefs filed in support of and opposition to the motions, and the record before the court, the court makes the following findings of fact, conclusions of law and recommendations.

## 1.    Procedural History/Background Facts

Pending before the court are motions to suppress evidence obtained by the Government as a result of the execution of six (6) wiretap orders signed by District Judges sitting in this District.  As noted by the Government [Doc. 313 at 1-2], the wiretaps under attack by Defendant Montemayor all result from an investigation in the companion criminal case, United States v. Flores, 1:05-CR-00558-WSD-JFK (hereinafter cited to as: "Flores" or, when citing to docket entries, "Flores Doc.").  The challenges to these wiretaps by Defendant Montemayor track, often verbatim, the challenges raised by the defendants in Flores.  After consideration of the Flores motions, this court recommended denial of the motions [Flores Doc. 214], and District Judge Duffey adopted the recommendation and denied all of the attacks - repeated by Defendant Montemayor in this case [Id. 257; United States v. Flores, 2007 WL 2904109 (N.D. Ga. September 27, 2007)].  This court has relied in large part on the prior report and recommendation filed in the Flores case, edited herein as necessary to facilitate consideration of the pending motions by the District Court.

Defendant Montemayor filed the preliminary motion to suppress which failed to identify the wiretap orders being challenged, failed to particularize the attacks being made on each wiretap order, offered only generalized challenges based on necessity

2

and probable cause, and failed to establish that he was an "aggrieved person" or had "standing" under the wiretap statute. [Doc. 198]. At a status conference held on July 7, 2017,[1] the court pointed out to Defendant's counsel the failure to establish standing as to each of the wiretap orders that he sought to challenge and failure to particularize his challenge to the wiretap orders. The court had previously entered an order [Doc. 116] instructing how a defendant may establish standing to challenge a wiretap order and how to particularize each statutory challenge to each wiretap. Defendant Montemayor was directed to comply with that order in supplementing his motion to suppress. [Doc. 263]. In large part, as pointed out by the Government in response to the pending motions and to which Defendant declined to reply, Defendant did not comply with the court's order.

## II.     Aggrieved Person/Standing

The Government contends that Defendant, although given the opportunity to supplement his motion in compliance with the court's instructions, has failed to establish that he is an "aggrieved person" as required to allow him to move to suppress

---

[1]This conference followed resolution of the Government's motion to disqualify one of Defendant's attorneys. The District Court affirmed this court's holding that the attorney was disqualified based on his prior service in the United States Attorney's Office. [Docs. 253, 261].

AO 72A
(Rev.8/8
2)

evidence obtained pursuant to the wiretap orders in this case.[2] [Doc. 313 at 4-8]. As noted, Defendant has not responded to the Government's arguments.

"When information is obtained in violation of the [Federal Wiretap] Act, 'no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial.' . . . But only an 'aggrieved person . . . may move to suppress' a communication that was 'unlawfully intercepted.'" United States v. Faulkner, 439 F.3d 1221, 1223 (10th Cir. 2006) (citation omitted). An "aggrieved person," as defined both by the Act, 18 U.S.C. § 2510(11), and in accordance with the Supreme Court's decision in Alderman v. United States, 89 S. Ct. 961, 968 n.9 (1969), indicates that the Act's standing requirement implements existing Fourth Amendment standing rules. "Generally, to establish standing the movant must show that (1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises." Faulkner, 439 F.3d at 1223; see also United

---

[2]The applications for the wiretap orders are identified by Defendant and the Government as: Target Telephone ("TT") #1 (Exhibit ("Exh.") 1), date of order June 10, 2005; TT#3 (Exh. 2) date of order July 15, 2005; TT#5 (Exh. 3) date of order August 12, 2005; TT#6 (Exh. 4) date of order September 14, 2005; TT#10 (Exh. 5) date of order October 9, 2005; and TT#17 (Exh. 6) date of order November 10, 2005. The parties did not provide the orders for each challenged wiretap which are available for review as exhibits in the Flores case but, generally, are not pertinent to resolution of the pending motions to suppress.

4

States v. Apple, 915 F.2d 899, 905 (4ᵗʰ Cir. 1990) (same); United States v. Benitez, 2014 WL 2807988, at *2 (N.D. Ga. June 20, 2014) (same).   Accordingly, "[a] defendant has the burden of proof of showing standing under the Fourth Amendment standard." Flores, 2007 WL 2904109, at *2.

Although neither the Eleventh Circuit Court of Appeals nor the former Fifth Circuit Court of Appeals has addressed this issue, the court finds that in order to establish that wiretap efforts "were directed at" a defendant, the defendant must demonstrate that he or she was named in the wiretap order and not merely allege that he or she falls within the grouping of "others unknown" referred to in the order.[3]  See United States v. Fury, 554 F.2d 522, 525-26 (2ⁿᵈ Cir.), cert. denied, 97 S. Ct. 2978 (1977) (the Second Circuit Court of Appeals limited attacks on wiretap evidence to those named in the wiretap order, along with those whose conversations were

---

[3]In United States v. Scasino, 513 F.2d 47 (5ᵗʰ Cir. 1975), the court declined to decide whether the defendants who were neither named in the wiretap order nor intercepted during the wiretap could challenge the admissibility of the interceptions based on the allegation that they fell within the group of "others unknown" against whom the wiretap order was directed. Id. at 50.  In fact, the court in Scasino held that an "aggrieved person" under 18 U.S.C. § 2510(11) is limited to one who participated in an intercepted conversation or on whose premises the conversation occurred. Id. (Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11ᵗʰ Cir. 1981) (en banc)).

5

AO 72A
(Rev.8/8
2)

intercepted); United States v. Ragusa, 586 F. Supp. 1256, 1258 (E.D. N.Y. 1984) (finding that only one of the defendants had standing to attack wiretap because only that defendant was named in the order and participated in conversations intercepted during the period of the order).

Additionally, standing is not conferred on co-conspirators or others involved in the criminal activity under investigation merely because they are implicated by the evidence obtained during the surveillance, see United States v. McIntyre, 2018 WL 2051686, at *3 (M.D. Ala. April 13, 2018), report and recommendation adopted by 2018 WL 2050153 (M.D. Ala. May 2, 2018); United States v. Eiland, 398 F. Supp. 2d 160, 167 (D. D.C. 2005), or because evidence from a wiretap surveillance is used to obtain a subsequent wiretap order which is directed at them or during which they are intercepted, see Brunoehler v. Tarwater, _ Fed. Appx. _, _, 2018 WL 3470210, at *6 & n.3 (9th Cir. July 19, 2018); United States v. Wright, 524 F.2d 1100, 1102 (2nd Cir. 1975); United States v. Vasconcellos, 658 F. Supp. 2d 366, 382 (N.D. N.Y. 2009).[4]

---

[4]Accordingly, for example, Defendant Montemayor could not challenge the wiretap order on TT#1 simply because evidence obtained during the execution of that order was used in the application/affidavit to obtain one of the later wiretaps that he may have been intercepted on or that may have named him as an interceptee. Defendant's argument that Title III generally, without a defendant establishing that he is an "aggrieved person," requires suppression of evidence from an "illegal wiretap," [Doc. 268 at 33-34], is not persuasive and fails in light of the legal authority cited

AO 72A
(Rev.8/8
2)

Any other definition of the phrase "directed at" in the statute would not conform to traditional ideas of standing, that is, of privacy rights being personal and of restricting challenges to the introduction of evidence to instances where the movant's privacy rights were infringed.

In the supplemental motion to suppress, in an effort to establish that he was an "aggrieved person" with respect to TT#1, #3, #5, #6, #10 and #17, Defendant states:

> Carlos Montemayor is a participant in multiple conversations recorded pursuant to these wiretaps. Defendant further has standing in regards to TT #3, #5, #6, #10, and #17 as he is a named intereceptee [sic] in all five applications specifically referred to as "John Doe a.k.a. 'Licenicado' a.k.a. 'The Director'" (See ¶ 2 of each Application Affidavit). In addition to being a participant and a specifically targeted interceptee, there are sworn affidavits from individuals who identify Carlos Montemayor as a participant in conversations. (See Exhibits 7 and 8).

[Doc. 268 at 2].[5] This statement is woefully inadequate to establish that Defendant is an "aggrieved person" in each of the six wiretaps that he challenges.

As noted, the court instructed Defendant how to establish that he is an "aggrieved person." [Doc. 116]. Defendant may make this showing by: (1) submitting an affidavit containing *specific facts* showing that he is an "aggrieved

herein.

[5]Because Defendant failed to provide pagination in his brief, the court will refer to the CM/ECF page designation in citing to the supplemental motion to suppress.

7

person"[6]; or (2) filing a request for a hearing in which counsel shall set forth *Defendant's specific contention* (not the Government's contention) as to how Defendant is an "aggrieved person" under the wiretap statute. [Id.].  Defendant's vague references to being a participant in conversations does not satisfy his burden. Likewise, Defendant's reference to the affidavits of two individuals utilized in support of the extradition of Defendant and others from Mexico does not establish standing. Only one of the two affidavits referenced by Defendant, that of Jesus Hector Flores (Exh. 7), even referenced Defendant Montemayor and only identifies his voice on conversations on July 18, 2005, and August 13, 2005.  Nothing in the affidavit links those conversations to specific conversations intercepted on a specific wiretap order. And the affidavit of Luis Fernando Trevino (Exh. 8) does not even reference Defendant Montemayor.  Defendant simply has not carried his burden to show that he

---

[6]If a defendant contends that he was a party to an intercepted communication, his affidavit should specifically set forth the targeted telephone(s) on which he was intercepted and state that he was in fact intercepted.  If a defendant contends that the wiretap efforts were directed at him, he should direct the Court to the specific reference to him in the wiretap application(s) and affirm that he is in fact the person named in the application(s).  Any admissions in a defendant's affidavit may not be used against him in the Government's case-in-chief.  See Simmons v. United States, 88 S. Ct. 967 (1968).

AO 72A
(Rev.8/8
2)

is an "aggrieved person" with respect to TT#1, #3, #5, #6, #10 or #17 based on these allegations.[7]

With respect to TT#3, #5, #6, #10 and #17, as the Government acknowledges, if Defendant is conceding that he is the individual in the intercept orders identified as "John Doe a.k.a. 'Licenciado' a.k.a. 'The Director'" or that he is the individual referred to by that identifier on the line sheets for the intercepted conversations thereby conceding that he was intercepted on each wiretap, then he has established standing. [Doc. 313 at 7-8]. Defendant has not clearly made this concession and, as noted, has not replied to the Government's standing challenge. For the purpose of ruling on the pending motions to suppress, the court finds that Defendant does concede, for the purposes of establishing he is an "aggrieved person," that he is the individual identified

---

[7]The court also notes that, as explained in the prior order specifying how to establish standing, Defendant was advised that he cannot rely on the government's position or theory to establish standing and must instead prove his standing as to each wiretap order. See, e.g., United States v. Bell, 218 Fed. Appx. 885, 895 (11th Cir. 2007) (finding that the defendant, who had testified that he had no interest in the location of the search, "cannot adopt the government's evidence" that he did have an interest "for the limited purpose of establishing standing while challenging the validity of this same evidence"); United States v. Thompson, 171 Fed. Appx. 823, 828 (11th Cir. 2006) (Because the "only fact Thompson alleged in his motion to suppress relating to standing was that the 'government contends [the motel room] to be a room rented by or to the defendant[,]'" the appellate court "agree[d] with the district court that this allegation is not sufficient to establish standing."); United States v. Bushay, 859 F. Supp. 2d 1335, 1364 (N.D. Ga. 2012) (same).

AO 72A
(Rev.8/8
2)

as "John Doe a.k.a. 'Licenciado' a.k.a. 'The Director'" in the intercept orders for TT#3, #5, #6, #10 and #17 or that he is the individual participating in the conversations on those intercepts identified as such on the line sheets. If Defendant does not so concede, he should clearly make that statement in his objections to this report and recommendation. If that is the position that he takes, then the court would recommend denial of the motions to suppress on the ground that Defendant has not established that he is an "aggrieved person."

Although Defendant has not established standing for TT#1, for the purpose of resolving the pending motions to suppress wiretap evidence, the court will nonetheless discuss his challenges to the first wiretap intercept in order to facilitate discussion of the later orders and Defendant's challenges to those orders.

## III.   Probable Cause for Issuance of Wiretap Orders

In the supplement to the motion to suppress wiretap evidence, Defendant particularizes his challenge to admission of the wiretap evidence by contending that the affidavits submitted in support of the wiretap orders for TT#10 and #17 do not establish probable cause identifying the reasons he contends support his motions to

suppress.[8]  [Doc. 268 at 1, 13-18].  The Government has responded in opposition relying on the arguments made in the Flores case [Flores Doc. 169 at 13-36] and noting that District Judge Duffey rejected the arguments [Id. 257 at 11-12].  [Doc. 313 at 9-10].  Defendant's only attack on probable cause for the wiretap order authorizing the intercept on TT#17 is that the affidavit offered in support of that wiretap order relies on intercepted conversations from the wiretap on TT#10.  He argues, if wiretap evidence from TT#10 is suppressed, there is not independently sufficient probable cause in the affidavit for TT#17.  [Doc. 268 at 17-18].  For that reason, unless the evidence obtained from the intercept of TT#10 is suppressed, the court will not address whether there is probable cause for the wiretap order as to TT#17.

Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, sets forth numerous requirements the government must meet before electronic surveillance (wiretaps) may be authorized.  One of those requirements is that an "application must include a full and complete statement of the facts and circumstances . . . including (I) details as to the particular offense that has been, is

---

[8]Because, as the Government noted, Defendant copied for the most part verbatim the motions to suppress in Flores, he appears to also attack probable cause in TT#18, #19 and #20.  [Doc. 268 at 17-18].  However, Defendant Montemayor did not identify these intercept orders as being challenged, and he has made no effort to establish that he is an "aggrieved person" for each of these intercept orders.  [Doc. 268 at 1-2].

11

being, or is about to be committed." 18 U.S.C. § 2518(1)(b)(I).  Accordingly, "[a]n

application for a wiretap authorization must be supported by the same probable cause

necessary for a search warrant. . . .  The issuing [district judge] is to make a 'practical,

common-sense decision' about whether the 'totality of the circumstances' indicate that

there is probable cause that the sought-for evidence will be obtained." United States

v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990); see also United States v. Angulo-

Hurtado, 165 F. Supp. 2d 1363, 1375-76 (N.D. Ga. 2001) (the same standard for

judging adequacy of affidavit for search warrant is applied to affidavits in support of

wiretap, and in this regard, "[p]robable cause does not require overwhelmingly

convincing evidence, but only 'reasonably trustworthy information'") (citation

omitted).  Like other types of warrants, probable cause must exist at the time

surveillance is authorized. See United States v. Domme, 753 F.2d 950, 953 (11th Cir.

1985).

Moreover, a wiretap order is presumed to be valid, and a defendant has the

burden of overcoming this presumption and of proving that the wiretap order was

unlawfully obtained. See United States v. Mitchell, III, 274 F.3d 1307, 1310 (10th Cir.

2001) ("'a wiretap authorization order is presumed proper, and a defendant carries the

burden of overcoming this presumption'") (citation omitted); Nixon, 918 F.2d at 900

12

("We have also said that the practical nature of the [district judge's] decision justifies 'great deference' upon review and calls for upholding the [district judge's] findings even in marginal or doubtful cases.") (citation omitted); <u>United States v. Moody</u>, 762 F. Supp. 1491, 1495 (N.D. Ga. 1991) ("In passing upon the validity of the authorization, the court accords 'great deference' to the issuing judge's probable cause determination.") (citation omitted). This court has carefully reviewed the affidavits for the wiretap orders challenged by Defendant and finds that the totality of the circumstances set forth in the affidavits support the District Judges' probable cause determinations.[9]

Defendant attacks the finding of probable cause for the wiretap order on TT#10 alleging that there is an insufficient nexus between the telephone being intercepted and the criminal activity being investigated, that is, that the conversations on the target telephone will involve drug activities. In making this argument, Defendant asserts that the affidavit for the wiretap fails to demonstrate that the user of the target telephone being intercepted is, as the Government contends, Romero Roel Martinez, a/k/a Cache, a/k/a Cuchillo, a defendant in the <u>Flores</u> case. [Doc. 268 at 14-15]. Defendant also

---

[9]The court, in fact, prior to issuing the report and recommendation in <u>Flores</u>, reviewed the affidavits offered in support of each of the wiretaps in this case and would reach the same conclusion as to the remaining wiretap orders.

13

contends that the pen register information discussed in the affidavit does not contribute to the probable cause finding. [Id. at 14, 16-17]. Finally, Defendant contends that the reliability of the information included in the affidavit from the confidential source identified as T-CS is not sufficiently established and does not contribute to the probable cause finding. [Id. at 15-16]. None of these arguments is supported by a review of the wiretap affidavit.

First, the court, after review of the wiretap affidavit, adopts the Government's summary of the facts previously set forth in support of probable cause in each wiretap affidavit. On October 9, 2005, U.S. District Court Judge William S. Duffey signed the wiretap order for TT#10. [Doc. 268, Ex. 5]. The wiretap affidavit submitted by DEA Special Agent Renita Foster for TT#10 established that:

1.     For several months, Special Agent Foster and other DEA agents had been conducting a wiretap investigation that identified Romero Roel Martinez, a/k/a Cache, as a high-level member of a large drug-trafficking organization that was actively importing cocaine into Atlanta. Agents already had initiated and monitored three wiretaps of Martinez's cellular telephones, which showed that he was an intermediary between a Mexican source of supply known as "Licenciado" and an Atlanta drug trafficking cell headed by Edwar Valencia-Gonzalez. The intercepted calls further showed that Martinez distributed drugs to other customers as well. (TT#10 Affidavit ("Aff."), ¶¶ 4, 12, 13, 17, 46, 47).

2.     The wiretaps of Martinez's cellular telephones showed that he and other members of the drug trafficking organization used a technique known as

14

"dropping" phones in order to conceal themselves from law enforcement. As an example, Special Agent Foster described an intercepted conversation in July 2005 between Martinez and his supervisor, known at that time as "Cain." During the call, Cain advised Martinez that something happened to a co-conspirator known as "Shrek" and that, therefore, Martinez must drop, or stop using, his cellular telephone (at that time, TT#3) and obtain a new one. Subsequently, Martinez obtained a new cellular telephone (TT#5), which the agents began monitoring on a new wiretap on August 12, 2005. After several months of monitoring Martinez's phone usage, Special Agent Foster concluded that he changed cellular telephones approximately every 30 days. (TT#10 Aff., ¶¶ 18, 38 n.6).

3.     Five days into the new wiretap on TT#5, Martinez spoke with several co-conspirators to arrange a delivery of drug proceeds to a truck driver referred to as "C-1." Agents began watching a location that Martinez previously used to unload shipments of cocaine and saw a tractor trailer truck that, according to the intercepted calls, had been loaded with the proceeds. On August 18, 2005, a Georgia State Patrol trooper pulled over the truck, and agents seized $2.5 million in currency that was vacuum-packaged and labeled with numbers that agents believed corresponded with Martinez's drug customers. The day after the seizure, Martinez "dropped" TT#5. (TT#10 Aff., ¶ 19).

4.     Later in August, the agents obtained permission to continue a wiretap on Valencia-Gonzalez's telephone. The agents intercepted drug-related conversations between Valencia-Gonzalez and Martinez, but the wiretap was suspended after Valencia-Gonzalez stopped using the telephone on August 29, 2005, only three days after the order was signed. (TT#10 Aff., ¶ 20).

5.     On September 15, 2005, agents initiated a wiretap on Martinez's new cellular telephone, TT#6, and intercepted numerous drug-related conversations involving Martinez and other co-conspirators, including Cain and an individual referred to solely as "38." That same day,

15

Case 1:09-cr-00551-LMM-RDC   Document 319   Filed 08/27/18   Page 16 of 50

Licenciado called Martinez and instructed him to drop TT#6 because an unidentified person in the organization had a problem. Licenciado further instructed Martinez to ensure that "13" also dropped his telephone. Martinez immediately called a co-conspirator named "Gordo" and relayed Licenciado's instructions to "13" to drop the telephone that "13" used to speak with Licenciado. Martinez stopped using TT#6 later that day, and no further calls were intercepted on that telephone. (TT#10 Aff., ¶¶ 24-28).

6.   Special Agent Foster then summarized her efforts to identify Martinez's new cellular telephone, which was TT#10. First, she noted that although the account for TT#10 was activated on August 28, 2005, the telephone was not used to make calls until September 15, 2005 – the same day that Martinez obeyed Licenciado's instructions to drop TT#6. After September 15, the new telephone was used actively, with 153 calls to 11 different numbers during the four-day period between September 15 and September 20, 2005. (TT#10 Aff., ¶ 28).

7.   Special Agent Foster noted that telephone toll records showed that the first five calls on TT#10, made on September 15, 2005, were to telephones used by Cain, Valencia-Gonzalez, Gordo, and a person knows as "Reuben," all of whom were co-conspirators who had been intercepted during the earlier wiretaps of Martinez's phones. Moreover, after these initial calls, the records showed that TT#10 made no further calls to or from the numbers then used by Cain, Gordo, and Reuben. Special Agent Foster stated her opinion that these circumstances suggested that Martinez was the user of TT#10 and that he called Cain, Gordo, and Reuben to advise them that he had obtained a new telephone and that they also should drop their current telephones.[10]   (TT#10 Aff., ¶¶ 29-30).

---

[10]See United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (opinions and conclusions of experienced agents regarding facts are properly considered in determining probable cause); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995) (same); United States v. Jenkins, 901 F.2d 1075, 1081 (11th Cir. 1990) (same); United States v. Espinosa-Orlando, 704 F.2d 507, 511 (11th Cir. 1983)

16

8.    Special Agent Foster further noted that, during the 15-day period after September 15, 2005, TT#5 had approximately 18 calls to or from a telephone used by Valencia-Gonzalez, who was one of Martinez's drug customers.  Moreover, she observed that Valencia-Gonzalez would not be subject to Licenciado's instructions to drop his telephone because Valencia-Gonzales was simply a customer of the organization.  She stated her opinion that these contacts strengthened her conclusion that TT#10 was Martinez's new telephone.  (TT#10 Aff., ¶¶ 31, 38).

9.    Special Agent Foster described a confidential informant identified as "T-CS," who provided information about the drug trafficking organization. T-CS described how Martinez moved to Memphis in late August 2005 to assume control of the organization's drug trafficking activities there. This information was corroborated by calls intercepted on Target Telephone #5 on August 16, 2005, during which Cain told Martinez that he was unhappy with Martinez's performance and was moving him to "another department."  Special Agent Foster interpreted this statement to refer to Martinez's move to Memphis.[11]   T-CS told agents that T-CS personally saw Martinez engage in drug trafficking activities in Memphis on behalf of the organization.  Finally, T-CS said members of Martinez's drug trafficking organization used "company" telephones, meaning that

---

(same).

[11]Courts considering wiretap applications are allowed to rely upon the reasonable interpretations given by experienced law enforcement affiant-agents as to the code, slang or obtuse language used by those persons engaged in allegedly conspiratorial communications.  See United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006); United States v. Cano, 289 F.3d 1354 (11th Cir. 2002) (allowing agent at trial to interpret hieroglyphics in drug ledgers); United States v. Novaton, 271 F.3d 968, 1009 (11th Cir. 2001) (allowing police officer to testify at trial as to meaning of code words during intercepted conversations); United States v. Carrazana, 921 F.2d 1557, 1567-68 (11th Cir. 1991) (same).  If a jury can properly consider this evidence, a District Judge may certainly take it into consideration in determining whether probable cause exists to authorize communication intercepts.

17

they used the telephones exclusively to contact other organization members and contacts.  Special Agent Foster performed a review of the intercepted calls on each of Martinez's three prior telephones, which showed that each and every call on these telephones during the interception periods was made to or from another organization member or drug customer.[12]  (TT#10 Aff., ¶¶ 32, 60 & n.8).

[Flores Doc. 169 at 17-19].  And, on November 10, 2005, U.S. District Judge Julie E. Carnes signed the wiretap order for TT#17.[13]  [Doc. 268, Ex. 6].

The facts offered in support of the wiretap application established that Martinez was the user of TT#10.  As that was the focus of Defendant's challenge to probable cause for the wiretap order, the challenge fails.  Accordingly, the court finds that Defendant has failed to overcome the presumption of validity for each wire intercept

---

[12]Contrary to Defendant's assertions, the affiant sufficiently established the informant's reliability as evidenced by:  (1) the corroboration of T-CS's information, see United States v. Foree, 43 F.3d 1572, 1576 (11th Cir. 1995) (corroborating evidence gathered by officers can provide indicia of reliability); (2) the fact T-CS was not an anonymous tipster, see United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) ("Unlike the anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements."); and (3) the details and apparent first-hand knowledge provided by the informant, see Illinois v. Gates, 103 S. Ct. 2317, 2330 (1983) (affidavit set forth an "explicit and detailed description of alleged wrongdoing," and the informant was recounting events observed firsthand; therefore, the tip is entitled "to greater weight than might otherwise be the case").

[13]As noted previously, Defendant is only challenging the probable cause for TT#17 to the extent probable cause relies on interceptions obtained from the monitoring of TT#10.  [Doc. 268 at 17-18].

AO 72A
(Rev.8/8
2)

and that there is a substantial basis for the District Judges' determinations of probable cause for TT#10 and #17.

## IV.   Necessity

Defendant contends that the wiretap applications for the wire intercepts on TT#1, #3, #5, #6, #10 and #17 fail to establish that the Government exhausted traditional investigative techniques.  [Doc. 268 at 2-12, 21-32].  The Government opposes the motion, relying on its response in the Flores case [Doc. 169 at 36-49], asserting that each affidavit meets the necessity requirements of the Federal Wiretap Act.  [Doc. 313 at 10]. And, as the Government notes, District Judge Duffey rejected the arguments  now being made by Defendant Montemayor.  [Flores Doc. 257 at 12-17].

An application for interception must contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.  See 18 U.S.C. § 2518(1)(c); Carrazana, 921 F.2d at 1565; United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986).  "Full and complete" means a description with specificity as to why in this particular investigation ordinary means of investigation would fail or are too dangerous.  See United States v. Weber, 808 F.2d 1422 (11th Cir. 1987).  The

19

necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed.  See United States v. Giordano, 94 S. Ct. 1820, 1826-27 (1974); United States v. Kahn, 94 S. Ct. 977, 983 n.12 (1974). The affidavit need not, however, show a comprehensive exhaustion of all possible techniques but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.  See United States v. Maxi, 886 F.3d 1318, 1331 (11th Cir. 2018); Nixon, 918 F.2d at 901; Van Horn, 789 F.2d at 1496; United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984); United States v. Hyde, 574 F.2d 856, 867 (5th Cir. 1978).  "The burden of establishing necessity is 'not great,' and [a reviewing court] must review the government's compliance with the necessity requirement in a 'practical and common-sense fashion.'"  United States v. Gray, 410 F.3d 338, 343 (7th Cir. 2005) (citation omitted); see also United States v. Oriakhi, 57 F.3d 1290, 1298 (4th Cir. 1995) (the burden imposed upon the government is "'not great'" and "the adequacy of such a showing is 'to be tested in a practical and common-sense fashion'") (citation omitted); United States v. De La Fuente, 548 F.2d 528, 538 (5th Cir. 1977) ("The [necessity] provisions contemplate that 'the showing be tested in a practical and commonsense fashion.'") (citation omitted).

AO 72A
(Rev.8/8
2)

Defendant has the burden of overcoming the presumption of validity that attaches to the District Judges' findings that the necessity provisions have been satisfied. See Mitchell, 274 F.3d at 1310. And, likewise, in reviewing whether the affidavit satisfies this statutory requirement, great deference is accorded the District Judges' determinations. See United States v. McGuire, 307 F.3d 1192, 1197 (9th Cir. 2002); Oriakhi, 57 F.3d at 1298; Moody, 762 F. Supp. at 1495.

The court finds that Defendant failed to specifically address alleged deficiencies in each wiretap affidavit to support his claims - as he was instructed by the court and just as the court found was a deficiency in the Flores defendants' motions to suppress that he copied. [Doc. 268 at 2-12, 21-32]. Instead, Defendant generally alleges that the affidavits do not set forth alternative investigative techniques that were tried nor state the reason why other techniques were not tried. He also summarily alleges that no other investigative techniques were even tried, after the first wiretap order was obtained, but that the affidavits contain boilerplate language which does not satisfy the necessity requirement. [Doc. 268 at 3-4]. These vague, conclusory allegations are insufficient to support Defendant's burden and, based on this court's review of each affidavit, are not in fact borne out by the affidavits submitted to the District Judges. Defendant focuses most of his attacks on satisfying the necessity provisions on the

21

general assertion that there was "enormous success" achieved by the use of confidential informants and conventional investigative techniques.[14]  [Doc. 268 at 2-12].  However, Defendant misreads the necessity requirements, as evidenced by his assertion that the Government did not "exhaust" other investigative techniques, see Nixon, 918 F.2d at 901 (exhaustion of other techniques not required); Van Horn, 789 F.2d at 1496 (same), and he failed to properly analyze the necessity provisions in light of the nature and scope of the investigation in this case.

In analyzing whether the Government has satisfied the necessity requirements, the court must consider the nature and scope of the investigation and the goals of the Government in that investigation.  The wiretap applications and affidavits stated that the goals of this investigation, which involved investigating several related drug conspiracies, was: (1) the identification of all participants, (2) the identification of all locations utilized by the participants, (3) the identification of methods of operation, including importation, transportation, storage and distribution of drugs, for the trafficking organizations, (4) the identification of the methods of collection and

---

[14]Defendant also contends that the affiants intentionally misstated and omitted the extent of the success of these traditional techniques, especially the use of confidential informants, which the court will further address *infra* during discussion of the Franks issues.

AO 72A
(Rev.8/8
2)

disbursement of drug proceeds, (5) the identification of customers and the sources of supply in Mexico, and (6) the dismantling of the organizations, including the identification and seizure of assets.  [Doc. 268, Exh. 1 (TT#1, ¶ 44); Exh. 5 (TT#10, ¶ 44); Exh. 6 (TT#17, ¶ 56)].[15]    Accordingly, the effectiveness of traditional investigative techniques must be judged in light of the goals of the investigation and not based on whether one or more of the conspiracies' participants can be successfully prosecuted.  See United States v. Decoud, 456 F.3d 996, 1007 (9th Cir. 2006) ("The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to 'develop an effective case against those involved in the conspiracy.'") (citation omitted); United States v. Torres, 908 F.2d 1417, 1422 (9th Cir. 1990) ("We have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of suppliers, major buyers or other satellite conspirators."); United States v. Sobamowo, 892 F.2d 90, 93 (D.C. Cir. 1989) ("Circuit precedent clarifies that a court may authorize the wiretap of the phone of a member of an operation if traditional investigative techniques have proved

---

[15]During this discussion, the court will reference one or more exhibits as representative of the information set forth in the wiretap applications.

AO 72A
(Rev.8/8
2)

inadequate to reveal the operation's full nature and scope.") (citations and internal quotation marks omitted).

Each wiretap affidavit then discussed the various traditional investigative techniques that had been tried as of that stage of the investigation, such as use of confidential informants, search warrants, consensual recordings, pen registers/trap and traces, toll records, and physical surveillance, with the results achieved by use of those techniques, and updated the information based on the results of the investigation to date. The affidavits also included a statement of reasons why continued use of the various investigative methods would not achieve all of the goals of the investigation, again updating that analysis in light of the information obtained to date. [Doc. 268, Ex. 1 (TT#1, ¶¶ 45-56, 60-80); Exh. 5 (TT#10, ¶¶ 45-63, 71-100); Exh. 6 (TT#17, ¶¶ 57-75, 84-120)].

In addition, each wiretap application sets forth the reasons why, based on the experience of the agents and attorneys, other investigative techniques, such as use of the grand jury, undercover agent introductions and/or drug buys, and witness interviews, would not achieve the goals of the investigation if tried. [Doc. 268, Ex. 1 (TT#1, ¶¶ 52, 57-59); Exh. 5 (TT#10, ¶¶ 64-70); Exh. 6 (TT#17, ¶¶ 76-83)]. Contrary to Defendant's assertions, the affidavits are not merely boilerplate recitations of the

24

reasons why traditional investigative techniques will not work but include specific reasons why, given the events in the investigations being conducted to date, traditional investigative techniques, although providing some success, would not achieve the goals of the investigation.  See United States v. Milton, 153 F.3d 891, 895 (8th Cir. 1998) ("Although some of these assertions might appear boilerplate, the fact that drug investigations suffer from common investigatory problems does not make these problems less vexing.  Drug crime is necessarily harder to detect than other crimes because it is difficult to witness and does not create victims who are compelled to come forward and report the crime."); Torres, 908 F.2d at 1423 ("The presence of conclusory language in the affidavit will not negate a finding of necessity if the affidavit, as a whole, alleges sufficient facts demonstrating necessity."); Sobamowo, 892 F.2d at 93 ("In this case, the government's conclusions followed upon a detailed description of the course of the investigation and the specific investigative procedures already employed.").

To demonstrate the sufficiency of the affidavits, the court will not recount the numerous instances set forth in the affidavits, instead, will offer a few illustrative examples of the case specific reasons given for the need to conduct the wiretaps.  The court will begin with the use of confidential informants as Defendant focuses much of

his attack on establishing necessity due to the "enormous success" of informants in the investigations. The wiretap affidavits, from the first order obtained to the last, outline the use of informants and document the success that was achieved with the use of the informants. In fact, one or more of the informants provided information about various members of the drug organizations, were able to make consensual monitored telephone calls with a limited number of the participants, assisted in the identification of one or more locations used by the organizations, and provided information that led to seizures of quantities of drug proceeds and drugs. The use of the informants assisted in obtaining evidence to prosecute one or more of the participants. [Doc. 268, Exh. 2 (TT#3, ¶¶ 48-54); Exh. 4 (TT#6, ¶¶ 40-45); Exh. 5 (TT#10, ¶¶ 54-63)]. However, the affidavits also explained the limitations associated with the use of these informants, specifically, that none of the informants could identify the sources of supply or those in the upper hierarchy of the organizations and could not, more importantly, contact those individuals, could not identify all of the locations utilized by the organizations or all of the participants in the organizations, and could not discover the methods of operation, either in importing, storing and distributing drugs or in collecting and redistributing drug proceeds, for the organizations. The use of informants would likely not result in the prosecution of all members of the drug organizations nor in

26

AO 72A
(Rev.8/8
2)

dismantling those organizations.  [Doc. 268, Exh. 2 (TT#3, ¶¶ 42-46, 48-54); Exh. 4 (TT#6, ¶¶ 35-38, 40-45); Exh. 5 (TT#10, ¶¶ 45-52, 54-63)].  The fact of successful use informants does not foreclose use of wiretaps.

In United States v. Canales Gomez, 358 F.3d 1221 (9th Cir. 2004), the Ninth Circuit Court of Appeals discussed the successful use of informants, which was pointed to by the defendant as evidence of the lack of necessity in the wiretap affidavit. The court, after noting that the wiretap affidavit explained why the informants would be unlikely to secure information about the entire criminal network under investigation, stated:

> Indeed, we have previously acknowledged the limitations of individual informants in such broad investigations and often upheld government requests for such wiretaps when large-scale organizations are under investigation. . . . The informants' previous success is inapposite. "[T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap."

Id. at 1225 (citations omitted); see also Maxi, 886 F.3d at 1331 (finding that the wiretap affidavit established necessity because, after the use of "search warrants, confidential sources, pen registers, and visual surveillance, law enforcement had not been able to track drug deliveries[,]" and the affidavit noted that further use of confidential informants was unlikely to succeed, in that case, "because the organization

27

was led by a small, tight-knit group"); McGuire, 307 F.3d at 1197-98 (noting that findings of necessity are upheld where traditional investigative methods, including use of informants, only identify and lead to the prosecution of some members of a conspiracy, the court rejected the defendant's argument that necessity was not established because informants had infiltrated the conspiracy and stated, "[n]ot only common sense but also our precedent confirms that the existence of informants and undercover agents does not preclude a necessity finding"). There is simply no credible evidence before the court that even suggests that utilization of the informants identified in this case would have resulted in achieving the goals of the investigation.

The wiretap affidavits also discussed why, in this case, other investigative techniques, although successful in obtaining evidence, were of limited value in achieving the goals of the investigation. Search warrants were executed during the early stages of the investigation and with some success due to the fact that drugs and drug proceeds were seized. Also, evidence was developed which could be used against some of the participants. However, utilization of search warrants had a negative impact on the investigation due to the fact that, once the locations were searched, participants simply relocated to new and unknown premises to stash both drugs and proceeds and utilized new and unknown lower level participants in operating those

AO 72A
(Rev.8/8
2)

locations.  Execution of the search warrants did not accomplish the goals of the investigation nor was it reasonable to expect that execution of additional warrants would accomplish the stated goals.  [Doc. 268, Exh. 1 (TT#1, ¶¶ 60-63)].  See United States v. Carter, 449 F.3d 1287, 1294 (D.C. Cir. 2006) (noting that use of search warrant, although likely to incriminate one or more conspirators, would not have revealed the full nature and scope of the organization and would have alerted co-conspirators to the investigation); Gray, 410 F.3d at 343 (use of search warrants had failed to accomplish the goals of the investigation and further use "would also alert the conspirators of the investigation").

Problems associated with using physical surveillance to achieve the goals of the investigation was also discussed specifically in terms of the attempts at surveillance during this investigation.  The affidavits outlined the attempts to conduct surveillance at locations identified as associated with known participants noting the difficulties due to the areas surrounding these residences.  The use of counter-surveillance by members of the organizations was also outlined demonstrating the limited usefulness of that traditional investigative procedure.  [Doc. 268, Exh. 1 (TT#1, ¶ 74); Exh. 6 (TT#17, ¶¶ 109-111)].  See Gray, 410 F.3d at 343 (noting that the location of the suspect's residence was isolated and protected with counter-surveillance equipment, the court

29

stated that "[t]he difficulty of surveillance also supports necessity"); United States v. Lopez, 300 F.3d 46, 54 (1st Cir. 2002) (attempts at surveillance resulting in use of counter-surveillance by conspirators indicated need for wiretap) (citing Carrazana, 921 F.2d at 1564-65).

After reviewing the information set forth to establish the necessity for each wire intercept, the court finds that Defendant has not overcome the presumption accorded the District Judges' determinations that the applications and affidavits satisfied the requirements of § 2518(1)(c) and that the affidavits did sufficiently "'explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves'" to accomplish the stated goals of the investigation in this case. Maxi, 886 F.3d at 1331 (quoting Van Horn, 789 F.2d at 1496).

## V.   **Franks** Challenge

Defendant contends that the wiretap affidavits contain either material false representations or omissions with respect to the showing of necessity, focusing on the information provided or omitted concerning the confidential informants, and argues that, when the misrepresentations are deleted and the omitted information is considered, the affidavits fail to demonstrate necessity.  [Doc. 268 at 32-33].  The Government, relying on the response to this argument in Flores [Flores Doc. 169 at 49-

30

73] and the fact that District Judge Duffey has rejected Defendant's arguments [Flores Doc. 257 at 14-17], asserts that each wiretap affidavit accurately reflects the nature of the cooperation provided to date and reasonably expected to be provided by the confidential informants and that there are no knowingly deliberate or reckless misrepresentations in or omissions from the wiretap affidavits. [Doc. 313 at 10-11].

A challenge to a wiretap authorization on the grounds of falsity or reckless statements in the supporting affidavit is handled the same as a similar challenge to an ordinary search warrant, pursuant to Franks v. Delaware, 98 S. Ct. 2674 (1978). See Angulo-Hurtado, 165 F. Supp. 2d at 1373. In Franks, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search. See Franks, 98 S. Ct. at 2684-85; United States v. Aisenberg, 358 F.3d 1327, 1333 (11th Cir. 2004). Franks also applies when the "misinformation" involves omissions from the affidavit "'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir.

31

1997) (quoting <u>United States v. Martin</u>, 615 F.2d 318, 329 (5th Cir. 1980)).  However,

"[o]missions that are not reckless, but are instead negligent . . . or insignificant and

immaterial, will not invalidate a warrant. . . .   Indeed, even intentional or reckless

omissions will invalidate a warrant only if inclusion of the omitted facts would have

prevented a finding of probable cause."  <u>Id.</u> at 1327 (citations omitted).

To mandate a <u>Franks</u> evidentiary hearing,

the [defendant's] attack must be more than conclusory and must be
supported by more than a mere desire to cross-examine.  There must be
allegations of deliberate falsehood or of reckless disregard for the truth,
and those allegations must be accompanied by an offer of proof.  They
should point out specifically the portion of the warrant affidavit that is
claimed to be false; and they should be accompanied by a statement of
supporting reasons.  Affidavits or sworn or otherwise reliable statements
of witnesses should be furnished, or their absence satisfactorily
explained. Allegations of negligence or innocent mistake are insufficient.
The deliberate falsity or reckless disregard whose impeachment is
permitted . . . is only that of the affiant, not of any nongovernmental
informant.  Finally, if these requirements are met, and if, when material
that is the subject of the alleged falsity or reckless disregard is set to one
side, there remains sufficient content in the warrant affidavit to support
a finding of probable cause, no hearing is required.  On the other hand,
if the remaining content is insufficient, the defendant is entitled, under the
Fourth and Fourteenth Amendments, to his hearing.  Whether he will
prevail at that hearing is, of course, another issue.

<u>Franks</u>, 98 S. Ct. at 2684-85; <u>see also</u> <u>United States v. Arbolaez</u>, 450 F.3d 1283, 1294

(11th Cir. 2006) (same); <u>Novaton</u>, 271 F.3d at 986 (same); <u>Angulo-Hurtado</u>, 165 F.

AO 72A
(Rev.8/8
2)

Supp. 2d at 1374 ("It is Defendants' burden at this juncture to make some affirmative showing both that the statement was false . . . and that the affiant had some basis for knowing that it was false."). As Defendant notes, the <u>Franks</u>' analysis is applicable to alleged misrepresentations pertaining to the necessity requirement, 18 U.S.C. § 2518(c). <u>See</u> <u>United States v. Bankston</u>, 182 F.3d 296, 306 (5th Cir. 1999), <u>rev'd in part on other grounds</u>, <u>Cleveland v. United States</u>, 121 S. Ct. 365 (2000).

The most glaring deficiency in Defendant's <u>Franks</u> attack on the wiretap affidavits is the failure to particularize the alleged misrepresentations or omissions as to each wiretap affidavit and to make specific arguments and offers of proof in support of his claims of deliberate falsehoods as to each wiretap affidavit. <u>See</u> <u>Franks</u>, 98 S. Ct. at 2684 ("There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should *point out specifically the portion of the warrant affidavit* that is claimed to be false; and they *should be accompanied by a statement of supporting reasons.* Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.") (emphasis added); <u>Arbolaez</u>, 450 F.3d at 1294 (noting that the substantiality requirement, which must be satisfied to obtain an evidentiary hearing, is not lightly met).

33

The following constitutes the totality of Defendant's allegations, in the section of the brief supporting his <u>Franks</u> claims, regarding confidential informants CS1's and CS2's cooperation:

> Routinely, the affiants misrepresented and omitted the full nature and success, potential and realized, of the CI's throughout this case. Agents downplayed the potential success of CSI and CS2/CS to obtain the initial wiretaps on TT#1. The affiant further omitted the continued use and success of CS/CS2 in subsequent wiretap applications regarding the ability of CS/CS2 to discover the organizations' sources of supply, as well as CS/CS2's actual involvement with Martinez and Cain.

[Doc. 268 at 41]. This court will not cull through the pages of Defendant's brief looking for facts and specific offers of proof to carry Defendant's burden to make the initial <u>Franks</u> showing. And it is apparently by inference that this court is to conclude that any misrepresentations or omissions made by the affiants was knowingly or recklessly made, as opposed to negligently or unintentionally, as there are no affidavits or sworn statements accompanying Defendant's brief establishing this element of proof. <u>See</u> <u>Arbolaez</u>, 450 F.3d at 1294 ("There is no affidavit or otherwise sworn statement alleging that [affiant] knowingly or recklessly included false statements in the search warrant affidavit. Accordingly, we find that Arbolaez has failed to make the necessary 'substantial preliminary showing' and that there is no error."); <u>Angulo-</u>

Hurtado, 165 F. Supp. 2d at 1375 (no Franks hearing when the defendants failed to offer proof that the affiant had some basis for knowing statement was false).

This being said, the court will briefly address a couple of the alleged misrepresentations and omissions as to CS1 and CS2 generally referenced by Defendant and discussed by the Government in response to the Franks claims in the Flores case, which illustrate that there were no material knowing or reckless falsehoods in the necessity sections of the wiretap affidavits.  With respect to CS1's association with one of the targets of the related investigation, Edwar Valencia-Gonzalez, Defendant contends that CS1 was more valuable as an informant than the affiant indicated and that CS1 potentially could have learned the identities of participants in the drug organization, including the source of supply, because in January 2005, Valencia-Gonzalez asked CS1 to rent an apartment to be used as a stash house.  [Doc. 268 at 5 (citing Affidavit for TT#1, ¶ 16)].  Accordingly, Defendant argues that the statement in the necessity section of that same affidavit that CS1 neither knows nor is in a position to meet and have drug-related conversations with Valencia-Gonzalez's source of supply is misleading.  [Doc. 268 at 4 (citing Affidavit for TT#1, ¶ 50)].  The Government correctly points out that these statements are not contradictory and do not support Defendant's contentions.  As the Government previously noted, the fact that

AO 72A
(Rev.8/8
2)

Valencia-Gonzalez asked CS1 to obtain an apartment (which did not occur) that would subsequently be used as a stash house does not support Defendant's leap to concluding that CS1 would be put in charge of that stash house or involved in drug-related transactions. [Flores Doc. 169 at 52-53]. And, the court notes that even assuming that CS1 did operate the stash house, absolutely no inference can be made that sources of supply, especially those located in other states or even out of the country, would participate in such low level activity as the delivery of drugs or the initial collection of drug proceeds. Furthermore, after consideration of the totality of the information in each affidavit submitted in support of the wiretap orders, as regards the nature of cooperation provided by CS1, the court finds that the affiants accurately reflected the cooperation which could be provided and the reasons that the cooperation would not achieve the goals of the investigation.

Defendant also contends that the affiants misrepresented and omitted material facts as to the nature of the cooperation of CS2. [Doc. 268 at 7-9]. In making this argument, Defendant compares the reports of interview with CS2 and the information about CS2's cooperation included in the wiretap affidavits. [Id.]. This court has reviewed all of the DEA-6's submitted by Defendant [Doc. 268, Exhs. 10, 11, 12] and compared the details therein with the affidavits and finds no material

AO 72A
(Rev.8/8
2)

misrepresentations as to the nature and scope of CS2's actual or potential cooperation when considered in light of the goals of the investigation. Therefore, even if the court assumes that the affiants intentionally or recklessly omitted a fact or two or even three contained in the DEA-6's, Defendant still fails to establish the necessity for an evidentiary hearing. Even if the reports of interview referenced by Defendant were recorded word for word in the affidavits, the affidavits would still establish necessity for the wiretaps.[16]  See Novaton, 271 F.3d at 987 (noting that omissions about

---

[16]And the court agrees with the Government's previous analysis of the Franks claims with respect to CS2 that there were no intentional or reckless misrepresentations or omissions. [Flores Doc. 169 at 53-63]. An example of Defendant's attempts to stretch the potential for CS2's cooperation to achieve the goals of the investigation beyond that demonstrated by the facts is the assertion that "on July 14, 2005, a high-ranking member of the organization advised CS/CS2 that Juan Montemayor was Valencia-Gonzalez's source of cocaine for his Atlanta operations." This omission, according to Defendant, was intentional and material. [Doc. 268 at 8, citing Exh. 12]. In actuality, the report of interview referenced by Defendant does not come close to supporting Defendant's position. The conversation referenced by Defendant was between CS2 and a former associate of Valencia-Gonzalez, Alfredo Velasquez, who advised CS2 that Valencia-Gonzalez was selling drugs in Dallas and that an unidentified source had told Velasquez that Valencia-Gonzalez was obtaining cocaine from Montemayor. [Doc. 268, Exh. 12]. As the Government noted, this double-hearsay statement does not establish that CS2 knew the identity of Valencia-Gonzalez's source of supply, and the court notes, even if this statement proved to be true, it does not establish that CS2 could meet with or discuss drug activity with Montemayor, as would be necessary to achieve at least one of the goals of the investigation. [Flores Doc. 169 at 62-63]. Failure to include this inherently unreliable statement made by someone, who contrary to Defendant's claim, was not currently a "high-ranking member of the organization" was not fatal to the wiretap order.

AO 72A
(Rev.8/8
2)

confidential informant were "troubling," the court nonetheless denied the request for a <u>Franks</u> hearing finding that the defendants failed to demonstrate that the omissions were material to probable cause finding); <u>Bankston</u>, 182 F.3d at 305 (". . . a defendant is not entitled to an evidentiary hearing if a wiretap authorization would lawfully have issued after correcting the supporting affidavit by supplying any material omissions"); <u>United States v. Acosta</u>, 807 F. Supp. 2d 1154, 1248 (N.D. Ga. 2011) (same).  And, as was true with the cooperation of CS1, after consideration of the totality of the information in each affidavit submitted in support of the wiretap orders, as regards the nature of cooperation provided by CS2, the court finds that the affiants accurately reflected the cooperation which could be provided and the reasons that the cooperation would not achieve the goals of the investigation.

Defendant also contends that the affidavit for wiretap on TT#17 contains intentional or reckless omissions as to actual and potential capabilities of confidential informant T-CS.  [Doc. 268 at 11-12].  In this regard, Defendant specifically alleges in the <u>Franks</u> section of his brief, copying verbatim from the motions to suppress in <u>Flores</u>, that:

> [Affiant] omitted and misrepresented the past performance of T-CS in the exhaustion section for TT#17-20.  [Affiant] stated in her application that no arrangements could be made for T-CS to transport the Monte Carlo for

AO 72A
(Rev.8/8
2)

> Martinez, while in her affidavit for the tracking device on the same vehicle, which was submitted six days earlier, she states clearly that T-CS obliged himself to transport the subject vehicle and left on November 4, 2005.  This was a vehicle she alleged served as means to transport narcotics and drug proceeds.

[Doc. 268 at 32-33, citing Ex. 9 ("GPS Tracking Device")].  Defendant contends that the affiant omitted the information in the tracking device affidavit in order to demonstrate that traditional methods of investigation had been exhausted because T-CS would not be utilized "as a courier in a traditional undercover operation for the DEA."  [Doc. 268 at 12-12].

The wiretap affidavit for the intercept order obtained on November 10, 2005, TT#17, recounts the information obtained in August 2005 regarding T-CS's association with Martinez.  The affidavit also stated that when T-CS recently returned to San Antonio, Martinez requested that he serve as a courier to Atlanta for the organization.  The affiant then states that "T-CS expressed a willingness to perform this service, but no arrangements have been made for T-CS to do so." [Doc. 268, Exh. 6 (TT#17, ¶ 71)].  The affiant concludes that based on all of the information provided by and about T-CS, the informant is "able to contact Martinez and engage in conversations relating to Martinez's drug activities, but Martinez allows T-CS to be exposed to only a limited portion of the organization's activities."  [Id.].

39

AO 72A
(Rev.8/8
2)

Acknowledging that T-CS knows organization members, the affiant states that he cannot participate in drug-related conversations with the organization's hierarchy. [Id.]. The affiant also set forth her opinion as to the usefulness of the information to be obtained should T-CS formalize arrangements to serve as a courier for Martinez. She states that the agents will place a tracking device on any vehicle used by T-CS as a courier. [Doc. 268, Exh. 6 (TT#17, ¶ 115)]. Finally, the affiant states that use of such "tracking devices alone has, and will continue to provide insufficient evidence to meet the goals and objectives of this investigation."[17] [Doc. 268, Exh. 6 (TT#17, ¶ 116)].

Defendant is correct in noting that the affiant failed to include in the affidavit that, on October 25, 2005, Martinez placed a call to T-CS, which was not recorded, and requested that T-CS transport a vehicle from San Antonio to Atlanta. T-CS agreed to the request. [Doc. 268, Exh. 9 (GPS Tracking Device, ¶ 11)]. Thereafter, on November 1, 2005, Martinez instructed T-CS to pick-up a vehicle and to drive that vehicle to Atlanta, although Martinez did not advise T-CS of the purpose for the trip, and he advised T-CS that he would be met in Atlanta by someone who would check

---

[17]A tracking device was previously utilized on a vehicle associated with the Valencia-Gonzalez organization. [Doc. 256, Exh. 6 (TT#17, ¶ 115)].

AO 72A
(Rev.8/8
2)

out the vehicle.  T-CS obtained the vehicle and began the trip to Atlanta on November 4, 2005, with instructions to contact Martinez when he arrived.  [Doc. 268, Exh. 9 (GPS Tracking Device, ¶ 15].  An order was obtained on November 4, 2005, to install a tracking device on the vehicle.

The Government "concede[d] that the affidavit's language regarding T-CS's arrangements with Martinez could have been more clear. . . ." [Flores Doc. 169 at 72]. The court agrees and, while the Government is correct that nothing in the affidavit for the tracking device indicates that T-CS was actually acting as a drug courier for Martinez on the trip to Atlanta with the vehicle, the court also fails to understand how the affiant neglected to advise the District Court of the events occurring just days before the wiretap affidavit was submitted to the district court.  This being said, the court does not draw the inference that Defendant seeks that the omission was intentional or reckless.  Given the affiant's well-reasoned opinion that utilization of T-CS as a courier with a tracking device installed on the vehicle being used would not result in the goals and objectives of the investigation being obtained, there was no reason to hide from the District Judge the fact that T-CS drove a vehicle from San Antonio to Atlanta for Martinez, which had been outfitted with a tracking device.

41

Even if the court assumes that the failure to advise the District Judge of these facts was intentional or reckless, Defendant again fails to establish that this omission was material to the necessity finding of the District Court. T-CS's role as a courier, a rather low-level position in a multi-district, international drug trafficking organization, is not likely to introduce him to the Mexican sources of supply or other high-level members of the organization and is not likely to give him insights into the organization's upper level operations. In fact, Martinez did not even advise T-CS of the purpose of the trip from San Antonio to Atlanta. Accordingly, the affiant's opinion that T-CS's cooperation would not achieve the goals of the investigation is not undermined by the omission in the affidavit. See Carter, 449 F.3d at 1294 (declining to find material omissions in the affidavits for the wiretap orders, the court stated, "the government's failure to inform the district court of the installation of a tracking device on Carter's car was of no moment because the affidavits set forth the reasons why such physical surveillance was inadequate to penetrate Carter's conspiracy and because such an omission does not undercut the fact that the government had 'engaged in an adequate range of investigative endeavors' . . . with regard to Carter") (citation omitted); United States v. Shryock, 342 F.3d 948, 976-77 (9th Cir. 2003) (noting that the Mexican Mafia (the subject of the investigation) "is a broad-based organization and

42

investigators were unlikely to discovery [sic] the full nature and extent of the enterprise without wiretaps[,]" the court declined to find that alleged omissions in the affidavit, that is, failure to more "robustly" describe the informant's contributions and acknowledging that jail calls were sometimes monitored contradicting the statement that a wiretap was needed to monitor inmates' calls, negated a finding of necessity). A review of the wiretap applications referencing T-CS, considered in light of the materials submitted by Defendant to establish a <u>Franks</u> violation, results in the conclusion that even if all of the omitted information was included in the affidavits, the District Judge's finding of necessity was reasonable.

The court finds that Defendant has not satisfied his substantial burden of first presenting specific, factual offers of proof that establish that intentional or reckless misrepresentations were included in or that information was omitted from the affidavits.   Defendant has also failed to establish that any of the alleged misrepresentations or omissions were material to a finding of necessity by the District Judges.  <u>Arbolaez</u>, 450 F.3d at 1294.  For this reason, Defendant is not entitled to an evidentiary hearing on his <u>Franks</u> challenge to the wiretap orders.  <u>Id.</u>

43

## VI.   GPS Data

Defendant also argues in the motion to suppress that wiretap evidence, including the alleged gathering of related Global Positioning Data ("GPS data"), should be suppressed because the Government obtained GPS data during execution of the wiretap orders which was not authorized by Title III and which violated his Fourth Amendment rights.  Defendant alleges that, because obtaining such data is not covered by Title III, allowing the gathering of this data converts the wiretap orders into general warrants.  [Doc. 268 at 37-40].  The Government's response to Defendant's challenge to the wiretaps on this ground persuades the court that the motion should be denied. [Doc. 313 at 11 (citing Flores Doc. 169 at 88)].

In making the argument in support of suppression, Defendant points to the fact that the wiretap orders included a provision for obtaining GPS data or technology in order to identify the locations of the target telephones when intercepted.  [Doc. 268 at 37 (citing Exhs. 1-4 (TT#1, #3, #5, #6)].  Copying the claims made years ago by the defendants in the Flores case, Defendant Montemayor - after having significant time to review the discovery - states that he is unable to determine if and when the Government obtained GPS data as a result of the authorization in the wiretap orders. [Doc. 268 at 37-38].  The Government previously acknowledged that wiretap orders

AO 72A
(Rev.8/8
2)

for TT#1, #3, #5, and #6 included provisions for obtaining GPS data; however, the Government stated in Flores and states again that no such data was obtained during the interceptions of those target telephones. [Doc. 313 at 11 (citing Flores Doc. 169 at 88)]. And, to the extent that GPS data was obtained on the remaining target telephones, the Government asserts that such data was not obtained pursuant to the wiretap orders inferring that separate authorization orders were obtained. [Id.]. As noted, although this challenge was first presented years ago along with the Government's denial of obtaining any GPS data through the wiretap orders, Defendant offers no proof to the contrary.

More significantly, the Government also contends that Defendant has not established a reasonable expectation of privacy in any of the GPS data obtained because he has failed to identify a cellular device belonging to him for which such data was obtained by any means, much less as a result of a wiretap order authorization. [Doc. 313 at 11 n.9]. Defendant offered no response to the Government's argument that he lacks a reasonable expectation of privacy in any GPS data.

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search." United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir.

AO 72A
(Rev.8/8
2)

1989).  It is each Defendant's burden to prove that he has a legitimate expectation of privacy in the place searched, in this case, a cellular device belonging to him.  See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this determination involves a two-part inquiry:  (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate."  Hastamorir, 881 F.2d at 1559 (citation omitted).  Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'"  United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted).  Because Defendant has not identified any GPS data obtained from the use of a cellular device that he identifies as his, he cannot assert a challenge to the use of any such data or the collection of such data or attack the wiretap orders based on inclusion of the authorization to gather such data.[18]  See United States v. Degaule,

---

[18]The court notes that District Judge Duffey, in part, adopted the prior report and recommendation because, to the extent GPS data was obtained, the Government obtained court authorization through 18 U.S.C. § 2703 orders.  [Flores Doc. 257 at 8-10].  In the recent decision Carpenter v. United States, 138 S. Ct. 2206 (2018), the Supreme Court held, under the specific facts of that case, that "the Government must generally obtain a warrant supported by probable cause before acquiring" historical cell site records.  Id. at 2221-23.  The Supreme Court did not address therein whether

AO 72A
(Rev.8/8
2)

797 F. Supp. 2d 1332, 1361-63 (N.D. Ga. 2011) (discussing reasonable expectation of privacy requirement and rejecting a challenge to GPS data obtained as part of a Title III order because Degaule "overlook[ed] the fact that he lack[ed] standing to challenge the seizure of [cell site] information because he does not have a privacy or possessory interest in" the target telephones).

## VII.   Good Faith

Finally, as the Government correctly notes [Doc. 313 at 11-12], the good faith exception to the exclusionary rule applies to wiretap applications and orders.[19]  See United States v. Reese, 611 Fed. Appx. 961, 967 (11th Cir. 2015); United States v. Lara, 588 Fed. Appx. 935, 938 (11th Cir. 2014); United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988); United States v. Bercoon, 2017 WL 3167805, at *3 (N.D.

---

the same conclusion is applicable to obtaining GPS data on a prospective basis.  Id. Assuming that Carpenter applies to obtaining prospective GPS data pursuant to a § 2703 order, the Eleventh Circuit Court of Appeals recently held that the good faith doctrine is applicable to § 2703 orders for cell site data obtained prior to the ruling in Carpenter, which clearly would be the circumstance before this court.  Suppression of that data is not required.  See United States v. Joyner, _ F.3d _, _, 2018 WL 3853443, at *3 (11th Cir. August 14, 2018) ("Here, the Government complied with the requirements of the SCA in obtaining the orders to compel cell site records, and when they did so in June 2015, that warrantless procedure was, under this Court's precedent, within the bounds of the Fourth Amendment.") (citing United States v. Davis, 785 F.3d 498, 518 (11th Cir. 2015) (en banc)).

[19]Defendant's argument to the contrary is not persuasive.  [Doc. 268 at 34-36].

47

AO 72A
(Rev.8/8
2)

Ga. July 25, 2017); <u>United States v. Jackson</u>, 2015 WL 2236400, at *11 (M.D. Ga. May 12, 2015).  In <u>United States v. Leon</u>, 104 S. Ct. 3405 (1984), and <u>Massachusetts v. Sheppard</u>, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In <u>United States v. Accardo</u>, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court.  With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" . . . or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" . . . or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies.  <u>Id.</u> at 1480 & n.4 (citations omitted).  The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'"  <u>Id.</u> at 1480 (quoting <u>Leon</u>, 104 S. Ct. at 3422); and see <u>Reese</u>, 611 Fed. Appx. at 967 (same).  In making this decision, the totality of

48

the circumstances surrounding issuance of the wiretap order may be considered.  See Accardo, 749 F.2d at 1481.

Based on the totality of the circumstances in this case, the court finds that the good faith exception would be applicable even if there were errors made in issuing the wiretap orders.  Defendant's attacks are based in part on an alleged lack of probable cause and necessity.  However, a review of the affidavits in question demonstrates that the wiretap orders are not "based on . . . affidavit[s] 'so lacking in indicia of probable cause [or necessity] as to render official belief in its existence entirely unreasonable[,]'" Accardo, 749 F.2d at 1480 & n.4 (citations omitted), nor (as the court has found *supra*) were the affiants dishonest or reckless in preparing the affidavits, see Reese, 611 Fed. Appx. at 967.

## VIII.  Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Docs. 198 and 268] to suppress wiretap evidence be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

AO 72A
(Rev.8/8
2)

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 27th day of August, 2018.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

50