IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>CARLOS MONTEMAYOR<br>AKA THE DIRECTOR<br>AKA LICENCIADO<br>AKA FOX | Criminal Action No.<br><br>1:09-CR-551-2-LMM-JFK |

## Government's Sentencing Memorandum

The United States of America, by Byung J. Pak, United States Attorney, and Elizabeth M. Hathaway and Garrett L. Bradford, Assistant United States Attorneys for the Northern District of Georgia, files this sentencing memorandum and requests that Defendant Carlos Montemayor be sentenced to a term of imprisonment of 540 months and ordered to forfeit a sum of $192,000,000.

While many large-scale Mexican drug traffickers are well known, others stay in the shadows amassing millions of dollars behind the scenes.  So it was with Carlos Montemayor.  An astute businessman, Defendant came from a humble upbringing in Mexico and built a well-oiled transportation infrastructure in the United States for his legitimate trucking business.  Able to earn millions of dollars in lawful commerce, by the late-1990s, Defendant became the epitome of the American dream.  But, in 2002, that all changed.  Defendant turned instead to being a dream for an American: Edgar Valdez-Villareal, the Texas high school

football star who would rise to become the highest ranking American in a
Mexican drug cartel.

Known for his good looks, flashy lifestyle, and ruthlessness, Valdez
thrived in the limelight as his career skyrocketed to becoming the chief enforcer
for the Sinaloa cartel, while at the same time earning millions of dollars selling
tons of cocaine.  However, while Valdez's brutal enforcement tactics, bribery of
public officials, and strategic alliances provided him a method of obtaining
cocaine from Colombia and transporting it across Mexico, Valdez was not as
proficient at getting the drugs across the border and into the hands of his
American customers.  And that's where Defendant came in.

Content to remain in the shadows, Defendant used his business acumen and
talent for logistics to convert his legitimate trucking business to a network for
drug distribution.  Pooling their resources, Defendant and Valdez built the
perfect symbiotic relationship, with Valdez overseeing the transfer of large
amounts of cocaine through Mexico to the border, and then Defendant taking the
reins to import the cocaine into the United States and deliver it to customers.
Over the course of only a few years, Defendant and Valdez built an empire
where thousands of kilograms of cocaine poured into the United States and
millions of dollars were returned to their pockets.  Together Defendant and
Valdez built a well-organized, regimented, and extremely profitable organization
– but one that left a trail of destruction in its wake.

# I.
# FACTUAL BACKGROUND

## A. The Rise of Mexican Drug Trafficking Cartels and Edgar Valdez-Villareal's Role as Enforcer

In the 1990s, the successful efforts to dismantle the established Colombian drug cartels – specifically, the Cali and Medellin cartels – and to close off the coast of Florida as an entry point for cocaine led to the rise of the Mexican drug trafficking cartels. (*See Congressional Research Service Report: Mexico's Drug Cartels* dated October 16, 2007 (hereinafter "*CRS*") at 4 (attached as Exh. A).) By the early 2000s there were approximately seven known drug cartels, many of whom began to form alliances. (*Id.* at 1.) Among the most well known and profitable cartels were the Tijuana Cartel (lead by Benjamin Arellano-Felix), the Gulf Cartel (led by Osiel Cardenas-Guillen) and the Sinaloa Cartel (led by Joaquin "El Chapo" Guzman-Lorea). (*Id.* at 3-4, 11, Presentence Report & Recommendation ("PSR") ¶ 21.) Among the alliances were the pairing of the Tijuana and Gulf Cartels, and the formation of "The Federation," an alliance between the Sinaloa, Juarez, and Valencia Cartels. (*CRS* at 1.)

However, in the early 2000s, these cartels found themselves in the crosshairs of the United States government. By 2002, Tijuana Cartel leader Benjamin Arellano-Felix had been arrested, followed by the 2003 arrest of Gulf Cartel leader Osiel Cardenas-Guillen. (*CRS* at 11.) With the leaders of these allied cartels behind bars, a brutal war between rival Gulf and Sinaloa cartels broke out to control the Laredo (Texas)/Nuevo Laredo (Mexico) corridor – a profitable route to bring large amounts of cocaine from Mexico into the United States. (*Id.*

at 7-8, 11-12.)  The Gulf Cartel partnered with a then-newly formed enforcer group known as the Zetas.  (*Id*. at 7-8.)  The Zetas was an organization created by a number of former Mexican military members of the Special Air Mobile Force Group.  (*Id.* at 7.)  As such, the Zetas were able to use their sophisticated training, complex operations, and specialized weapons to protect the Gulf Cartel's trade routes and turf.  (*Id.*)  The Zetas were known as assassins for the Gulf Cartel, who trafficked in weapons, executed kidnappings, and collected fees for use of the Cartel's trade routes.  (*Id.* at 8.)

In response to the Zetas, the Sinaloa Cartel created two of its own enforcer groups.  (*CRS* at 8.)  One of those enforcer groups was led by Edgar Valdez-Villareal, Defendant's partner and a co-defendant in this case.  (*Id.* at 8; *see also* Doc. 44, Doc. 293-9.)[1]  With the backing of the Sinaloa Cartel's top leadership, Valdez and his allies sent approximately 300 men to push the Zetas out of Nuevo Laredo and back into Reynosa.  (Doc. 293-9.)  Valdez provided many of his men with government uniforms and bribed members of law enforcement to allow his men to be commingled with their forces.  (*Id.*)  Valdez himself wore a uniform at times.  (*Id.*)  Violence increased, with members of the Zetas being robbed or disappearing.  (*Id.*)  It is estimated that approximately 1,000 people were killed in Mexico between March 2003 and December 2005 in this bloody turf war.  (*See* Ginger Thompson, *Rival Drug Gangs Turn the Streets of Nuevo Laredo Into a War Zone,* N.Y. TIMES, December 4, 2005 (hereinafter "N.Y. TIMES") (attached as

---

[1] The citations for Valdez's actions are to the Government's Sentencing Position for Valdez.  (Doc. 293.)  Valdez did not object to these facts.

Exh. B).)  And it was Valdez who made the final decisions in organizing the response to the Zetas.  (Doc. 293-9.)

Moreover, Valdez's role as the head of the Sinaloa's enforcement efforts were well known.  For example, during this time period, the Zetas used their contacts and influence with a local newspaper to make sure that Valdez was frequently on the cover of a local newspaper and blamed for the killings.  (*Id.*)  The Zetas would leave notes with the bodies of those they killed that mentioned Valdez by name.  (*See* N.Y. TIMES at 4.)  Continually aware of the power of image and the media, Valdez bought off the local newspaper and wrested control of it from the Zetas, even taking out a full page ad to falsely declare his innocence and ask the Mexican President for justice.  (Doc. 293-9; N.Y. TIMES at 4.)

## B.  Defendant Joins Forces with Valdez to Transport Drugs into the United States

At the same time that Valdez was the head of enforcement for the Sinaloa Cartel, he also ran his own drug trafficking operation ("DTO") within that Cartel.  (Doc. 293-2-4.)  In 2002, Valdez teamed up with Defendant, who possessed the infrastructure of trucks, drivers, and stash houses to transport cocaine from Mexico into the United States for distribution, and then transport cash proceeds from that cocaine – millions of dollars at a time – back to Mexico.  (PSR ¶ 20, 53, 56-59.)[2]

_____

[2] With respect to the facts, all citations to the PSR are to facts to which Defendant has not objected.  Accordingly, those facts are deemed to be admitted and proven true.  *United States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014) ("[A] defendant is deemed to have admitted any [PSR] statements that he has not

### 1. Defendant's Childhood and Attainment of the American Dream

Defendant was not preordained for a life of crime.  He was born and raised in a financially stable family, the youngest of five children by parents who were married and lived on a ranch in Mexico with all the necessities.  (PSR ¶¶ 114-16.) His father was a rancher and restauranteur, his mother took care of the children and household full time, and all his siblings – except for codefendant Juan Montemayor[3] – currently have legitimate jobs including being an architect or selling food and crafts.  (PSR ¶ 114.)  To this day, Defendant has a good relationship with his family.  (PSR ¶ 115.)

When he was a teenager, Defendant worked on a farm raising show horses and riding bulls in rodeos.  (*See* PSR ¶¶ 125, 133.)  He then moved with his wife from Nuevo Laredo, Mexico, to the United States, obtaining a green card as a Lawful Permanent Resident when he was 18 years old.  (PSR ¶ 117.)  Defendant got a job at a trucking company, where he learned to drive a tractor-trailer and the logistics of loading and unloading merchandise.  (PSR ¶¶ 130, 132.)

By 1992 at the age of 20, Defendant was the embodiment of the American Dream, already owning and operating his own trucking company in Laredo,

---

objected to 'with specificity and clarity.'")  That includes conclusory statements that support Guidelines adjustments. *See id; see also United States v. Harness*, 180 F.3d 1232, 1236 (11th Cir. 1999) (holding that a district court may rely on undisputed conclusory statements in the PSR even in the absence of supporting evidence).

[3] Defendant's brother and codefendant Juan Montemayor was convicted in this case.  (Doc. 135.)

Texas.  (PSR ¶ 131.)  That company, CMG Trucking, earned gross revenues of $4-5 million between 1992 and 2002.  (PSR ¶ 131.)  However, unsatisfied with his accomplishments and the financial success afforded him in the United States, Defendant decided to harness his trucking and logistics expertise, as well as the network of trucks and drivers he had established on both sides of the border, in a new direction: transporting massive quantities of cocaine into and throughout the United States.

### 2.   Defendant Turns His Back on the Law, and Becomes the Domestic Transportation Arm of Valdez's Drug Trafficking Operation

In 2002, Defendant decided to join forces with the infamous enforcer of the Sinaloa Cartel who was waging war against the Zetas in Nuevo Laredo: Valdez.  (*See* PSR ¶¶ 20, 53, 56-59.)  Valdez's violent reputation was well known; but rather than staying clear of that dangerous world, Defendant saw an opportunity he could exploit.  Valdez had cocaine suppliers in Colombia, and a transportation network to move the cocaine into and across Mexico to the border town of Nuevo Laredo (as well as the violent henchmen and corrupt government officials to protect it during that journey).  What Valdez didn't have, however, was the ability to quickly and efficiently move large quantities of contraband across the border and to distribution hubs in the United States.  He was only able to move shipments of 20 kilograms every three to four weeks to his customers in Memphis.  (PSR ¶ 18.)  He needed a partner.  Defendant, who had an established trucking company and transportation network on both sides of the border (in

Nuevo Laredo and Laredo), and also had a cousin (Jesus Hector Flores) with drug contacts in Memphis, was a perfect match.  (*See* PSR ¶¶ 20, 53, 56-59.)

They joined together, with Valdez obtaining the cocaine and getting it to Nuevo Laredo, where Defendant took over to transport it across the border and ultimately to stash houses in Memphis run by Flores.  (PSR ¶¶ 20, 24-25, 53, 81.) Flores, working under direction of Defendant, recruited individuals who worked full time to run the stash houses, met Defendant's tractor trailer trucks, offloaded shipments of hundreds of kilograms of cocaine at a time, repackaged and parceled the cocaine, and distributed it to customers.  (PSR ¶¶ 25, 83.)  Flores' workers also collected payments from the customers, packaged and labeled the bulk cash to keep track of which customer it came from, and loaded it into Defendant's trucks to be transported to the border.  (PSR ¶¶ 25, 33.)  When the cash arrived at the border, Defendant oversaw the counting of it through his primary lieutenant and right-hand man, co-defendant Roberto Omar Lopez, a/k/a Shrek, a/k/a Forty-Five (who also handled many of the logistics with the truck drivers).  (*See* PSR ¶¶ 31, 41, 49, 53, 60.)  Lopez, acting on Defendant's behalf, pulled out money for the transportation expenses, including payments to the drivers and the workers at the stash houses.  (*See* PSR ¶¶ 41, 49, 53-54, 81-82.) He then repackaged the money and transported it over the border.  (*See* PSR ¶ 53-54.)  Once the cash was in Mexico, it was divided and distributed according to Valdez's instructions.  (PSR ¶ 53.)

The operation was a particularly disciplined and regimented organization that used military-like precision and orders, where nothing could be done

without approval and consultation or instruction from supervisors in Mexico working on behalf of Valdez and Defendant.  (PSR ¶ 30.)  Before long, thanks to the efficiency of Defendant's transportation network and distribution hubs, Defendant was transporting 150-180 kilograms of cocaine at a time to Memphis, up from Valdez's prior capability of 20 kilograms every three to four weeks.  (PSR ¶¶ 18, 24, 60.)  Business was so successful, Defendant ordered Flores to open another distribution hub in Atlanta.  (PSR ¶ 24.)  With the new base of operations, Defendant was sending weekly shipments of 100 to 300 kilograms of cocaine at a time across the border.[4]  (PSR ¶¶ 25, 81.)  In Atlanta alone, the organization distributed a total of 1,500 kilograms of cocaine in just six months.  (PSR ¶ 25.)

### 3.  Defendant Fully Embraces the "Narco" Life

Whereas Defendant spent the first thirty years of his life building a successful business and living within the bounds of the law, he quickly turned his back on that when he partnered with Valdez in 2002 and embraced the drug trafficking world.  (*See* PSR ¶¶ 20, 53, 56-59.)  Not satisfied with his role transporting Valdez's cocaine, Defendant wanted larger profits, which meant buying and selling his own cocaine.  So, by spring of 2002, Defendant started purchasing his own cocaine with Valdez's help.  (PSR ¶ 56.)  At first, Defendant purchased batches of 30-40 kilograms at a time.  (PSR ¶ 56.)  Defendant developed his own customers in Memphis, Atlanta, and Dallas.  (PSR ¶¶ 24, 30-31, 58.)  He sent his

---

[4] The shipments usually occurred on a weekly basis, but sometimes they occurred twice a week and sometimes every other week.  (PSR ¶ 25.)

cocaine in his trucks together with shipments of Valdez's cocaine, pooling the transportation resources, with the stash house workers dividing and distributing the loads to Valdez and Defendant's personal customers once the loads arrived in the destination cities. (PSR ¶ 31.) As time passed, those shipments increased in size, with Defendant ultimately purchasing batches of 300-400 kilograms at a time. (PSR ¶¶ 27, 56, 66-67, 80.) Indeed, by late 2004, the share of the cocaine being distributed in the United States owned by Defendant even surpassed that of Valdez. (PSR ¶ 67.)

Defendant also helped Valdez grow his influence within the Mexican cartels. For example, as Valdez was making a strategic play to solidify his relationship with Arturo Beltran-Leyva (then one of the top-ranking members of the Sinaloa cartel), Valdez learned that Beltran liked horses. (PSR ¶ 59.) Knowing Defendant was, in a way, a "cowboy" (with experience on ranches, caring for show horses, and in rodeos), Valdez asked Defendant for help. (PSR ¶¶ 59, 125, 133.) Defendant purchased two horses and personally delivered them, along with a horse trainer, to Beltran. (PSR ¶ 59.) Beltran loved the horses, and Valdez's partnership with Beltran and standing in the Sinaloa Cartel increased dramatically. (PSR ¶ 59.)

If somehow Defendant was not already aware (despite widespread media reports), he quickly learned that the drug trafficking world, especially in the high levels where he had immersed himself, was a dangerous and violent affair. Valdez was in a widely published war with the Zetas in the struggle between the Sinaloa and Gulf cartels, resulting in 1,000 murders and hundreds of

10

kidnappings in Nuevo Laredo between just 2003 and 2007.  (*See CRS* at 11.)
Within the first year of partnering with Valdez, Defendant was confronted by the
Zetas in Nuevo Laredo.  (PSR ¶ 58.)  The Zetas forced Defendant to pay them
"quotas" and start purchasing batches of cocaine averaging 50 kilograms, but
reaching as much as 100 kilograms, from them in order to remain in Nuevo
Laredo.  (PSR ¶¶ 58, 68.)

 Defendant paid the Zetas' extortion, but did not remain a victim or even a
passive participant.  (PSR ¶ 58.)  Instead, he joined in the shocking violence of his
new world.  In one instance, he assembled intelligence about the identity and
location of the leader of a rival paramilitary force in Nuevo Laredo and delivered
the information to Valdez in Mexico City.  (PSR ¶ 40.)  Approximately one week
later, an assassin dispatched by Valdez gunned down the rival leader.  (PSR
¶ 40.)  Additionally, Defendant's primary lieutenant and right-hand man, Lopez,
was in charge of obtaining weapons and other equipment of war (military gear
including, but not limited to, night vision goggles, ammunition, ballistic vests,
helmets, magazines, and silencers).  (PSR ¶¶ 41, 45, 48.)  Lopez and others
working for him routinely purchased such gear through cash purchases at gun
shows and sporting goods stores, then smuggled the gear into Mexico using
couriers.  (PSR ¶ 45.)  Lopez would also convert assault rifles to function as fully
automatic machine guns, and made silencers for handguns.  (PSR ¶¶ 44, 47.)  He
is estimated to have smuggled over 1,000 assault rifles, 100-200 converted assault
rifles, and over 1,000 magazines and ammunition drums into Mexico from the
United States.  (PSR ¶ 47.)  Even Defendant's workers in Memphis and Atlanta

were crystal clear about the high stakes and danger involved in Defendant's operation, as well as the risks to their lives if Defendant was shortchanged.[5]

Defendant also played a key role in a particularly chilling episode of the war between Valdez and the Zetas, widely distributing and publicizing a video of the interrogation and assassination of a member of the Zetas. Specifically, in 2004 or 2005, after years of war between Valdez and the Zetas, after Defendant had personally been extorted by the Zetas, after Defendant's lieutenant had been smuggling massive numbers of assault rifles and military gear into Mexico, and after Defendant had been funneling intelligence to Valdez resulting in the assassination of rivals, Valdez captured a number of Zetas who had been sent to kill him. (PSR ¶¶ 44, 72-74.) While being graphically filmed, the captives were interrogated and at least one was shot and killed. (PSR ¶¶ 44, 72-74.) While the identity of the shooter is not shown on the film, the gun used for the fatal shot was fitted with a silencer that appears to have been made by Defendant's primary lieutenant, Lopez. (PSR ¶ 44.) Defendant had the VHS tape with this video recording, and wanted it distributed to the media and law enforcement in Mexico and the United States. (PSR ¶¶ 42-44, 73-74.) Accordingly, Lopez converted the tape to DVD format and made at least 30 copies, 25 of which were

---

[5] *See* Trial Testimony of Luis Fernando Trevino (hereinafter "*Trevino Trial Testimony*"), *United States v. Jesus Hector Flores, et al.*, N.D. Ga. Case No. 1:05-CR-558 (hereinafter *Flores Case*), Doc. 377-477 ("You are playing with a powerful, powerful organization's money. If money comes up missing, it – you know, they could kill you or your family.").) Excerpts of this trial testimony are attached hereto as Exhibit C.

mailed to media outlets and law enforcement in the United States.[6]  (PSR ¶¶ 42-43.)

## C.  The DEA Uncovers and Takes Down the Atlanta Distribution Cell

The DTO's activities in Atlanta were eventually discovered by agents with the Drug Enforcement Administration ("DEA").  (*Id.* ¶ 30.)  On June 10, 2005, DEA agents began intercepting the first in a series of court-authorized wiretaps of one of the DTO's customers in Atlanta.  (*Id.*)  Evidence from that wiretap then led to wiretaps of Flores and his workers in Atlanta.  (*Id.*)  Agents ultimately determined that Valdez and Defendant were partners, supervisors, and the sources of supply for the Atlanta organization.  (*Id.* ¶ 31.)  Ruben Hernandez a/k/a "Super" or "Secre," was Valdez's bookkeeper and logistics coordinator.[7]  (*Id.*)  Roberto Omar Lopez a/k/a "Shrek," was Defendant's primary lieutenant and oversaw transportation.[8]  (*Id.*)  Defendant's brother, Juan Montemayor a/k/a "Vice," contributed his own U.S.-based customers and provided other support.[9]  (*Id.*)  Agents learned that Valdez and Defendant each had their own

---

[6] A portion of that video can still be found on the internet.  *See From High School Star to Mexican Drug Cartel*, ABC NEWS, May 19, 2010, available at https://www.youtube.com/watch?v=v_I5sLvBYds (last visited May 8, 2019) (hereinafter "ABC NEWS").

[7] Hernandez was sentenced to 268 months imprisonment in this case.  (PSR at Codefendants.)

[8] Lopez was charged in this case and remains a fugitive.  (PSR at Codefendants).

[9] Juan Montemayor was sentenced to 262 months imprisonment in this case. (PSR at Codefendants.)

customers for which they received personal proceeds, but they pooled their cocaine supply and used the same transportation and distribution network.  (*Id.*)

Agents also identified two of Defendant's workers in Atlanta as Romero Martinez and Luis Fernando Trevino, both of whom had also worked for Flores in Memphis before transferring to Atlanta.  (*Id.* ¶ 32(a); *United States v. Lopez*, 393 F. App'x 604, 605-06 (11th Cir. 2010).)  Based on wiretap interceptions of Martinez's phone, agents learned that on July 18, 2005, one of Defendant's Atlanta stash houses had 215 kilograms of cocaine.  (PSR ¶ 32(a).)  In a recorded call, which is an example of the type of tight control and micromanagement Defendant exerted over his workers, Defendant instructed Martinez to deliver 25 kilograms of that supply to a customer and provided the customer's telephone number.  (*Id.*; *see* Exhibit D.[10])  Martinez later called Defendant to report that Martinez made contact with the customer and had arranged to meet him.  (PSR ¶ 32(a); Exh. D.)  Defendant then instructed Martinez to charge the customer $16,500 per kilogram.  (PSR ¶ 32(a); Exh. D.)  Later, on August 13, 2005, agents intercepted a call between Martinez and Flores in which Martinez confirmed that 131 kilograms of cocaine had been delivered to a warehouse in Atlanta, and Martinez asked Flores to let Defendant know the exact quantity that had arrived. (PSR ¶ 32(b).)

Ultimately, on August 17-18, 2005, based on information from the wiretaps, agents coordinated a traffic stop of a tractor trailer truck driving from Atlanta to

---

[10] Exhibit D contains copies of transcripts of telephone calls that were introduced in the Flores Trial.

Texas.  (*Id.* ¶ 33.)  Inside, they found proceeds from the DTO's cocaine sales that had been collected and packed by the Atlanta workers, destined for Mexico.  (*Id.*) That shipment — a single example of the type of transport that occurred approximately weekly — contained $2.5 million in cash.[11]  (*Id.* ¶¶ 33, 25.)

On November 15, 2005, agents raided a stash house in Atlanta.  (*Id.* ¶ 36(e).) Inside they discovered, on that single day, 120 kilograms of cocaine and $1.5 million in cash.  (*Id.*)  The majority of that cocaine and cash belonged to Defendant; only a small portion belonged to Valdez.  (*Id.* ¶¶ 34, 69.)  Agents arrested four workers at the stash house and then arrested Flores in Laredo the following morning.  (*Id.* ¶ 34.)

Martinez ultimately pled guilty and was sentenced to 322 months imprisonment.  (PSR at Codefendants.)  Trevino pled guilty and, after testifying at trial against his codefendants, was sentenced to 177 months imprisonment. (*Id.*)  Flores was convicted at trial and sentenced to 460 months imprisonment. (*Id.*)

### D. The DTO is Dismantled

Even after these seizures and arrests, Valdez and Defendant continued their partnership and cocaine trafficking activities.  (PSR ¶ 35.)  However, on December 16, 2009, Arturo Beltran-Leyva was killed during a firefight with a unit

---

[11] The minimum size shipment of cash Defendant's workers would transport was $1 million, but the shipments got as big as $3 million.  *See Trevino Trial Testimony*, *Flores Case* Doc. 377-453 ("If I remember, it was I think like two, two and a half, three million dollars, somewhere around there.  I mean, there were so many times that – you know what I mean?").

of the Mexican Navy.  (*Id.* ¶ 36.)  Valdez was finally arrested by Mexican Federal Police on August 30, 2010, at a ranch he owned near Mexico City.  (*Id.*)  However, the carnage did not stop there; on September 30, 2010, a busload of 20 tourists were kidnapped and murdered near Acapulco, reportedly in a case of mistaken identity by what was left of the Beltran-Leyva cartel, causing outrage in Mexico and beyond.[12]  Defendant was arrested shortly thereafter, in Mexico City, on November 23, 2010.  (*Id.*)

Valdez and Defendant were extradited to the United States on September 30, 2015.  (PSR at Arrest Date.)  Valdez pled guilty and faced a Guidelines range of life but, due to post-plea developments and mitigation considerations discussed during the sentencing hearing, was ultimately sentenced to 660 months incarceration, less credit for the time he was imprisoned in Mexico prior to his extradition to the United States (plus good time credit for that time), for a final sentence of 589 months imprisonment.  (Doc. 301.)

## II.
## SENTENCING GUIDELINES CALCULATION

Between the parties, there are five Sentencing Guideline applications to be determined by the Court:  (1) the base offense level (*i.e.*, the amount of drugs for which Defendant is responsible); (2) whether the offense involved the possession of firearms; (3) whether Defendant played an aggravating role in the offense; (4) whether Defendant can be held accountable for the restraint of a victim; and

---

[12] (*See Mexico drugs baron admits tourist deaths mistake*, BBC NEWS, Nov. 24, 2010 (attached as Exh. E).)

(5) whether the offense involved the use of body armor.  For the reasons stated below, the Court should find that Defendant's conspiracy involved at least 450 kilograms of cocaine, such that his base offense level is 38.[13]  Further, the Court should apply all of the remaining Sentencing Guideline enhancements, for a total offense level of 45 (after a 3-level reduction for acceptance of responsibility).

### A. Defendant Is Legally Responsible for at least 450 Kilograms of Cocaine, and Therefore His Base Offense Level is 38

Despite his years of trafficking in hundred or more kilogram loads of cocaine into the United States, Defendant objects to the recommendation that his base offense level under § 2D1.1 is level 38.[14]  (*See* PSR ¶ 88.)  The Government bears the burden of establishing drug quantity by a preponderance of the evidence. *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012).  A defendant is

---

[13] Although Defendant is being sentenced under the 2009 Guidelines, which would set a base offense level of 38 if the offense involved only 150 kilograms or more of cocaine, Sentencing Guidelines Amendment 782 (which raised the threshold to 450 kilograms of cocaine) is retroactively applied.  *See* U.S.S.G. § 1B1.10(d) (2018).  Hence, in order to find that the base offense level is 38, the Court must find that this conspiracy involved at least 450 kilograms of cocaine.

[14] Notably, Defendant does not object to any of the facts in the PSR regarding the drug shipments by his transportation network and the drug quantities contained in those shipments.  Facts that are not objected to with specificity and clarity are deemed admitted.  *Aguilar-Ibarra*, 740 F.3d at 592.  Defendant only objects to one of the legal conclusions that flows from those facts, specifically, that his relevant conduct should be calculated to include all the drugs he transported, including the drugs that were owned by Valdez.

liable for all acts he commits or that he aids and abets.  U.S.S.G. § 1B1.3(a)(1)(A).[15]
But when a defendant is convicted of conspiracy, he can be held accountable not
only for his own personal acts, but also those acts in furtherance of the
conspiracy that were reasonably foreseeable to him.  *See* U.S.S.G. § 1B1.3(a)(1)(B);
*see also United States v. Dixon,* 901 F.3d 1322, 1349 (11th Cir. 2018), *cert. denied sub
nom. Portela v. United States,* 139 S. Ct. 854 (2019*),* and *cert. denied sub nom. Chacon
v. United States,* 139 S. Ct. 1392 (2019).

Nevertheless, in his objections to the PSR, Defendant suggests that he should
not be held accountable for Valdez's drugs because he claims that he and Valdez
acted independently, with Valdez having different suppliers and customers.  (*See*
PSR ¶ 88.)  Defendant's argument should be rejected because even if Defendant
and Valdez were operating independently, Defendant was aiding and abetting
Valdez's drug trafficking by importing Valdez's drugs from Nuevo Laredo into
the United States, bringing those drugs to Defendant's stash houses, and then
delivering them to Valdez's customers.  (*See* PSR ¶¶ 20, 24-25, 53, 81, 83.)
Accordingly, even if Defendant and Valdez had different suppliers and
customers, Defendant would still be accountable for all of the drugs he and his
workers transported, stored and delivered.  *See* U.S.S.G. § 1B1.3(a)(1)(A) and cmt.
n. 2(a)(1) ("This is conceptually similar to the case of a defendant who transports
a suitcase knowing that it contains a controlled substance and, therefore, is

---

[15] Unless otherwise noted, the Sentencing Guidelines cited herein refer to the
2009 Sentencing Guidelines.  (*See* PSR ¶ 85 (noting that the 2009 Guidelines are to
be applied here).)

accountable for the controlled substance in the suitcase regardless of his knowledge or lack of knowledge of the actual type or amount of that controlled substance.").

Of course, the evidence shows that Defendant and Valdez were not working independently, but were actually engaged in a criminal conspiracy. They were partners who had a symbiotic relationship: Valdez would transport the drugs within Mexico and conduct enforcement actions there, and Defendant would transport the drugs across the U.S./Mexico border and deliver them within the United States, and then collect the money and transport it back into Mexico. (*See* PSR ¶¶ 20, 24-25, 53, 81, 83.) Because the two pooled their resources and jointly undertook these criminal acts, Defendant is accountable for all drugs and money transported in this joint relationship that were reasonably foreseeable to him. As the PSR notes, this amounts to thousands of kilograms of cocaine.

First, it is undisputed that this conspiracy involved the following specific amounts of drugs and money trafficked in Atlanta:

- 215 kilograms of cocaine on July 18, 2005 (PSR¶ 32a);

- 131 kilograms of cocaine on August 13, 2005 (PSR ¶ 32b);[16] and

---

[16] The government also seized $2.5 million from Defendant's organization on August 17 and 18, 2005. (PSR ¶ 34.) In order to mitigate the risk of double counting the 131 kilograms received on August 13, 2005, the government has not included the cocaine equivalents of this money in the above drug calculation.

- 120 kilograms of cocaine and $1.5 million possessed on November 15, 2005.  (PSR ¶ 34.)[17]  With cocaine selling at $16,500 in Atlanta at the time (PSR ¶ 32), the $1.5 million equates to another approximately 90 kilograms.

Accordingly, Defendant is responsible for no less than 556 kilograms of cocaine, resulting in a base offense level of 38.  *See* U.S.S.G. § 2D1.1(c)(1) (2018) (base offense level of 38 if offense involves at least 450 kilograms of cocaine).

Yet, this snapshot of Defendant's drug trafficking activity captures merely a drop in the bucket of the amount of cocaine Defendant's organization trafficked.  Where, as here, the direct evidence (such as actual seizures) does not reflect the true scale of the criminal activity, "the district court must approximate the drug quantity attributable to the defendant." *Dixon*, 901 F.3d at 1349 (quoting *United States v. Reeves*, 742 F.3d 487, 506 (11th Cir. 2014)).  In doing so, the Court "may rely on evidence demonstrating the average frequency and amount of a defendant's drug sales over a given period of time." *Id.* (quoting *Reeves*, 742 F.3d at 506).  However, the Court's estimate must be based on "fair, accurate, and conservative estimates of the drug quantity attributable to a defendant," rather than speculation.  *Id.* (quoting *Reeves*, 742 F.3d at 506).

Here, it is undisputed that by the spring of 2002, Defendant began purchasing batches of 30-40 kilograms of cocaine to deliver in Memphis, Atlanta,

---

[17] The Atlanta workers also delivered 40 kilograms of Valdez's cocaine on November 11, 2005.  (PSR ¶ 32c.)  In order to mitigate the risk that some of the $1.5 million seized four days later was proceeds from the sale of those drugs, the government has not included the 40 kilograms in the above calculation.

and Dallas.  (PSR¶ 56.)  Those shipments later increased to 100 kilograms or more.  (PSR ¶ 24.)  By 2005, his organization was so profitable that the Defendant established a second base of operation in Atlanta and was transporting shipments of 100 to 300 kilograms approximately every week.[18]  (PSR ¶ 25; *see also Trevino Trial Testimony*, *Flores Case* Doc. 377-441, 452.)  Yet even if the Court were to (1) calculate the drug weight solely based on the amount of cocaine that came to Atlanta since Defendant created his second base of operations (starting in late-June 2005 and continuing through mid-November 2005), (2) attribute only the lowest amount of drugs (100 kilograms of cocaine per shipment), and (3) attribute the fewest number of shipments (every other week), a fair and *extremely* conservative estimate would reveal that Defendant was responsible for at least 1,000 kilograms of cocaine.[19]  (*See also* PSR ¶ 25 (noting that, "in Atlanta alone, the organization distributed a total of at least 1,500 kilograms of cocaine in just six months"); *Flores Case* Doc. 397-4 (attached as Exh. F) (in sentencing conspirator Jesus Hector Flores, Judge Duffey considered the trial testimony and found that "the drug amount is well in excess of 150 kilograms, and in fact … [it's] at least a thousand kilograms").)

Further, as noted by the Probation Officer, even that amount of drugs is a vast underestimate of the amount of drugs trafficked by this Defendant, as it

---

[18] At times, these shipments came twice a week, and other times they came every other week.  (PSR ¶ 25.)

[19] That is: 100 kilograms in late June 2005, 200 kilograms each month in July, August, September and October 2005, and 100 kilograms in early November 2005.

does not account for the drugs Defendant transported between 2002 and late-June 2005, and it does not include drugs that were transported to Memphis (which were so profitable they enabled Defendant to open a second base of operations in Atlanta) or anywhere else.  Indeed, the evidence shows that Defendant imported approximately 200-300 kilograms of his own cocaine approximately every three weeks between 2004 through 2007.  (*See* PSR ¶¶ 66-67, 88; *see also* PSR ¶ 26-27 (noting that, once Valdez obtained a Colombian source of supply, the shipments of cocaine into the United States increased dramatically –– up to 600–700 kilograms of cocaine per shipment if combined with Defendant's multi-hundred kilograms).)  Even subtracting the drugs that did not actually belong to Defendant, the scope of Defendant's actions would still hold him responsible for more than 13,000 kilograms of cocaine.  (*See* PSR ¶ 88.) Accounting for others' drugs that Defendant's workers transported and distributed could easily increase the total estimated amount of drugs attributable to Defendant to tens of thousands of kilograms of cocaine. [20]  (*See* PSR ¶ 88.)

Neither the Probation Office nor the Government is advocating for holding Defendant accountable for this astronomical amount of drugs.  Instead, the Probation Office recommends – and the Government agrees – that a fair and conservative estimate of the amount of drugs attributable to Defendant's jointly

---

[20] Six hundred kilograms of cocaine every three weeks (17 shipments per year) for four years (PSR ¶ 88) would result in the distribution of over 40,000 kilograms of cocaine.

undertaken criminal activity is approximately 12,000 kilograms of cocaine.[21] (*See* PSR ¶ 88.) That is, taking the amount of drugs Defendant trafficked in this mid-point of his career in Atlanta alone as an average amount (1,500 kilograms over six months in 2005), and applying that to only four of the six years of Defendant's drug trafficking (2002 through 2007, but discounting all of 2002 and 2007 since it is unclear when defendant's shipments began and ended), would make defendant accountable for 12,000 kilograms of cocaine.[22]

But even if the Court disagrees with this estimate, the evidence demonstrates that Defendant is responsible for well above 450 kilograms of cocaine. Accordingly, his base offense level is properly calculated at level 38.

### B. Defendant's Offense Level is Properly Enhanced by Two-Levels for Weapons Possession

Under the Sentencing Guidelines, a defendant should receive a two-level increase if a firearm was possessed during a drug trafficking offense. U.S.S.G. § 2D1.1(b)(1). In order for the enhancement to apply, the Government need not show that Defendant personally possessed a firearm; rather, Defendant may receive the enhancement based on conspirator liability. *See United States v. Fields*, 408 F.3d 1356, 1359 (11th Cir. 2005). When a firearm is possessed by a conspirator, the government bears the burden of showing: "(1) the possessor of

---

[21] This is the same amount of cocaine that was attributed to Defendant's partner, Valdez. *See* Doc. 332-77.

[22] That is: 1,500 kilograms every six months, equals 3,000 kilograms a year. Three thousand kilograms a year for four years equals 12,000 kilograms.

the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant." *Id.*

Here, these elements are easily dispensed with. The evidence in this case demonstrates that numerous conspirators possessed firearms in furtherance of this offense, and that the possession was reasonably foreseeable to Defendant. On the domestic side, there is ample evidence of conspirators possessing firearms in furtherance of the criminal activity. For example, during the Flores trial, the Government introduced evidence of a telephone call between Jesus Hector Flores and Luis Trevino in which Trevino "stated that he was prepared to use his firearm when he arrived at the cell's stash house to investigate why members of the organization protecting the stash house were not answering Flores' telephone calls." *United States v. Flores*, No. 1:05-CR-558-WSD, 2018 WL 11383602, *1 (N.D. Ga. July 8, 2008) (Duffey, J.). Then, when agents arrested the Atlanta conspirators, two firearms were present where two conspirators were sleeping at the Atlanta stash house. *Id.* And, upon law enforcement's raid, one of the stash house occupants brandished a weapon just outside of his bedroom. *Id.* Further, when Flores was arrested the next day in Texas, law enforcement found a loaded firearm in his car and fifteen firearms in his home, including a semi-automatic assault rifle. *Id.* Five of the domestic members of the organization were convicted of possessing firearms in furtherance of the drug trafficking offense: Jesus Hector Flores, Romero Roel Martinez, Luis Fernando Trevino, Jose

Lopez, Roberto Garcia. *See Flores* Case Docs. 347, 350, 369, 372, 387; *see also United States v. Lopez*, 393 Fed. App'x 604, 609-10 (11th Cir. 2010) (affirming Jose Lopez's conviction for possessing a firearm in furtherance of a drug trafficking offense and discussing evidence presented at trial).

On the international side, Defendant's primary lieutenant, Roberto Lopez, was in charge of obtaining weapons and related equipment. (PSR ¶¶ 41, 45, 58.) Lopez would convert assault rifles to function as fully automatic weapons and make silencers for handguns, one of which was purportedly used to execute a Zetas member who had been sent to assassinate Valdez. (PSR ¶¶ 44, 47.) Further, about a week after Defendant gathered evidence about a leader of a rival and delivered the information to Valdez, that leader was gunned down by one of Valdez's assassins. (PSR ¶ 40.) Thus, there is no question that the conspirators possessed the firearms in furtherance of the conspiracy.

Additionally, Defendant was clearly a member of the conspiracy at the time the guns were possessed (PSR ¶ 20) and there can be little dispute that the firearms possession was reasonably foreseeable to him. The Eleventh Circuit has recognized that it is foreseeable to defendants in a drug trafficking conspiracy that their conspirators will possess weapons, if for no other reason than due to the nature of the activity. *See United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir. 2006) (per curiam) ("There is a frequent and overpowering connection between the use of firearms and narcotics traffic. To that end, we have found it reasonably foreseeable that a co-conspirator would possess a firearm where the conspiracy involved trafficking in lucrative and illegal drugs." (internal

quotation marks and citation omitted)); *see also United States v. Freyre-Lazaro,* 3 F.3d 1496, 1506 (11th Cir. 1993) (explaining "it was reasonably foreseeable that" a conspirator "would carry a weapon" because that conspirator was "transporting thirteen kilograms of cocaine").  If the *Freyre-Lazaro* Court found it reasonably foreseeable that a conspirator would carry a weapon when transporting 13 kilograms of cocaine, it was certainly reasonably foreseeable to Defendant that the conspirators here would possess firearms when trafficking in loads of hundreds of kilograms of cocaine.

Further, this weapons enhancement was designed to "reflect[] the increased danger of violence when drug traffickers possess weapons."  U.S.S.G. § 2D1.1 cmt. n.3.  That danger is fully exemplified by the bloody war Valdez was carrying out to wrestle control of lucrative drug trade routes.  By partnering with one of Mexico's top cartel enforcers, Defendant could reasonably foresee that weapons would be possessed.  Accordingly, this enhancement applies.

### C. Defendant was an Organizer/Leader of this Drug Trafficking Organization

A defendant's base offense level should be increased by four levels if he was an organizer or leader of criminal activity involving five or more participants. U.S.S.G. § 3B1.1(a).  In his objections, Defendant claims that he was not a leader of this organization because "he did not exercise control and authority over others in the conspiracy," but rather sold cocaine to his cousin, Jesus Hector Flores, in a buyer-seller relationship.  (*See* PSR ¶ 98.)  Defendant's allegations are

unsupported by the evidence.[23]  To the contrary, the evidence in this case shows that Flores and the other workers in Atlanta operated solely at the direction of Defendant and Valdez.

A far cry from a buyer-seller relationship, the relationship of Defendant and Flores was that of members of a "particularly disciplined and regimented" organization.  (PSR ¶¶ 30-31;  *see also Flores Case* Doc. *377*-425 (noting the formality of this group).)  Defendant and Valdez were the supervisors and sources of supply for the organization, and Flores and the other Atlanta workers could act only on their orders or approval.  (PSR ¶ 30; *Flores Case* Doc. 377-433, 447.)  As joint leaders, Defendant and Valdez worked together supervising the organization, with Defendant in charge of the business-side and Valdez in charge of enforcement activities.  (PSR ¶¶ 31, 38.)

As the head of the business operations in the United States, Defendant was intimately involved in supervising the day-to-day activities of the Atlanta operations.  For example, on July 18, 2005, at 3:10 p.m., Defendant spoke to Atlanta-based conspirator Romero Martinez and asked how many kilograms of

---

[23] As perhaps most succinctly summarized by Judge Duffey in ordering the forfeiture of guns seized in the *Flores Case*:

> The evidence presented at trial [of Jesus Hector Flores and Joe Louis Lopez] painted a compelling picture of a sophisticated drug trafficking organization which Flores ran in Atlanta, Georgia.  The Atlanta operation was a distribution cell for a Mexican drug trafficking organization.

*Flores*, 2008 WL 11383602 at *1.

cocaine the organization currently had.[24]  (*See* Call 24 (together with other referenced call transcripts in Exh. D).)  Martinez told Defendant that he would call Defendant when he got to the stash house.  (*Id.*)  At 3:59 p.m., Defendant spoke to Martinez again and learned that the organization had received 215 kilograms of cocaine in Atlanta.  (*See* Call No. 51; PSR ¶ 32a.)  Defendant told Martinez that he would let Martinez know to whom Martinez would be delivering 25 kilograms of cocaine.  (*Id.*)  The next day at 3:32 p.m., Defendant provided a telephone number for "Javi" and instructed Martinez to deliver 25 kilograms of cocaine to him.  (*See* Call 139; PSR ¶ 32a.)  Defendant further instructed Martinez to charge Javi $16,500 per kilogram.  (*Id.*)  Defendant's micromanagement and complete control of the drug distribution demonstrates that he is a leader in this organization.

In order to determine whether Defendant is an organizer/leader, versus a manager/supervisor, the Guidelines direct the Court to consider numerous factors, including (1) the exercise of decision-making authority, (2) the nature of the participation in the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and the (7) the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1 cmt. n.4.  However, not all of the factors need to be present to find that Defendant was an organizer/leader.  *See United States v.*

---

[24] Although the transcripts identify Defendant solely as "The Director," Defendant does not dispute that it is him.  (*See* PSR ¶ 32.)

*Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009) (quoting *United States v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006)).

Here, Defendant was at the highest level of this conspiracy.[25]  In this highly regimented organization, Defendant did not answer to anyone.  Instead, Defendant owned large portions of the cocaine trafficked and controlled exactly what was done with it.  He developed his own customers and supervised the actions of his U.S.-based operations with military-like control.  He determined who was to receive drugs and how much each customer was charged.  And, when his business in Memphis took off, he ordered Flores to open a second base of operations in Atlanta.  Because Defendant was a top participant over the operations at the border and within the United States, the four-level leadership enhancement should be applied.[26]  *See* U.S.S.G. § 3B1.1.

### D. Defendant's Offense Level is Properly Enhanced by Two Levels for Restraint of a Victim

Under U.S.S.G. § 3A1.3, the district court should increase a defendant's offense level by two levels if a victim was "physically restrained" in the course of

---

[25] That Valdez also qualified as an organizer/leader is of no moment because there can be more than one leader in an organization.  *See Dixon*, 901 F.3d at 1348.

[26] There is no dispute that this organization involved more than five individuals.  (*See* Doc. 44 (indictment in this case charging six individuals: Defendant, Edgar Valdez-Villareal, Ruben Hernandez, Juan Montemayor, Roberto Lopez, and Jesus Ramos); *see also* PSR Introduction (noting six individuals charged in the *Flores Case*: Jesus Hector Flores, Romero Roel Martinez, Luis Fernando Trevino, Joe Louis Lopez, Roberto Garcia, Florentino Villanueva-Castillo).)

the offense. U.S.S.G. § 3A1.3.  A defendant may be held accountable for a conspirators' restraining of a victim if the act was reasonably foreseeable.  *See United States v. Santiago*, 200 Fed. App'x. 928, 934 (11th Cir. 2006) (applying § 3A1.3 based on conspirator liability).  Here, the PSR does not apply this enhancement in part because the Probation Officer questions the reasonable foreseeability of the restraint to Defendant.[27]  (PSR ¶ 90.)  However, because Defendant knew that his partner was a top enforcer for a prolific Mexican drug trafficking cartel who was in a bloody war with a rival drug organization, and because Defendant stood to gain from the restraint and helped exploit it, this enhancement should be applied.

By the time Defendant formalized his relationship with Valdez in 2004, Valdez was well known for starting a war with the Zetas – the paramilitary brigade of former military members employed by the Gulf Cartel – over control of lucrative trade routes.  (*See* PSR ¶¶ 20, 53, 56-59; *see also CRS* at 11; N.Y. TIMES at 1-4.).  The brutality of this war cannot be understated, and Valdez's role as a savage enforcer for the Sinaloa Cartel was well publicized.  (*See CRS* at 11; N.Y. TIMES at 1-4.)  Defendant joined with Valdez knowing that his partner was an enforcer and that hundreds of people in Nuevo Laredo were being killed and

---

[27] The PSR also did not apply the enhancement because there is no evidence that Defendant actually knew about the plans to restrain the individual prior to the act being carried out.  (*See* PSR ¶ 90.)  The Government concedes that it has no such evidence but, as explained above, actual prior knowledge is not required if a conspirator's actions were foreseeable.

kidnapped on an ongoing basis as part of that war.  (*See* PSR ¶ 38; *CRS* at 11; N.Y. TIMES at 1.)

Importantly, Defendant held a personal stake in the war, since the winner would control the routes through Nuevo Laredo for drugs to enter the United States.  (*See* PSR ¶¶ 58, 68.)  Moreover, Defendant had personally been extorted by the Zetas who allowed him to remain active in Nuevo Laredo only upon Defendant's purchasing significant amounts of drugs from them.  (PSR ¶¶ 58, 68.)  As the war waged on, hundreds of people were killed, with threats going back and forth between Valdez and the Zetas.  (*See CRS* at 11; N.Y. TIMES at 1, 3.)  Then, when Valdez's security team captured members of the Zetas who had been sent to assassinate Valdez, the security team made a videotape of Valdez and others questioning them while restrained and at gunpoint.  (PSR ¶¶ 4, 72-74.)  One of the men was then executed with a shot to the head.  (*Id.*)  Given Valdez's well-publicized role as enforcer, the Zetas extortion of Defendant, and the ruthless fighting between the Defendant's partner and the Zetas, it was reasonably foreseeable to Defendant that Valdez would hold a rival in restraint prior to seeing him killed.

Further, while Defendant may not have had personal knowledge of the assassination before it occurred, Defendant played a role in profiting from it once it happened.  Specifically, after the assassination, Defendant and Valdez had their associates make multiple copies of the recording and sent them to media outlets.  (PSR ¶ 42.)  When the Mexican press would not allow the video to become public, Defendant used his operation in the United States to send copies

to the press in the United States, and even wanted it sent to United States law enforcement, in the hopes that it would draw attention to the "competition."  (*See* PSR ¶¶ 42-44, 72-74.)  Copies of the video made it to some U.S. media outlets and was publicized.  (*See* N.Y. TIMES at 1-2; *see also* PSR ¶ 43.) [28]

Accordingly, while Defendant may not have known about the restraint of those specific Zeta rivals or the execution before it occurred, Defendant was in no way a limited or insulated partner in the cartel's evil practices.  Rather, he enthusiastically enrobed himself with the mantle of the cartel's violence and intimidation, and sought to maximize the reach of that reputation for cruelty throughout Mexico and the United States, among the public and even law enforcement.  And he sought to maximize his profit from that reputation.  Given Defendant's close connection to the violence of this organization, the restraint of the Zeta rival was reasonably foreseeable.  Accordingly, the two-level enhancement for restraint of a victim is warranted.

### E.  Defendant's Offense Level is Properly Enhanced by Two-Levels for Use of Body Armor

Defendant's knowledge and close connection to the violence of this organization also demonstrates that the two-level increase for use of body armor, U.S.S.G. § 3B1.5, is applicable.  Nevertheless, Defendant objects to the enhancement, claiming that he did not wear body armor, nor did he direct anyone to purchase, possess or wear it.  (*See* PSR ¶ 92.)  However, the PSR does

---

[28] A clip from this video can still be seen on the internet.  *See* ABC NEWS, *supra* n.6.

not assess Defendant the four-level enhancement for personal use of the body armor; rather, Defendant is being held accountable because the offense involved the use of body armor.  (*See* PSR ¶ 92.) *Compare* U.S.S.G § 3B1.5(2)(A) *with* § 3B1.5(2)(B).  Under § 3B1.5(2)(A), the two-level enhancement applies if the offense involved the use of body armor and that use was reasonably foreseeable to Defendant.  *See United States v. Jean Charles*, 696 Fed. App'x 405, 411 (11th Cir. 2017).

As noted above, Defendant was a member of a conspiracy that was well known for its brutal acts.  *See generally* N.Y. TIMES and *CRS* at 11.[29]  While Defendant was engaging in the business-side of the drug trafficking organization, his partner was engaged in a brutal war with a rival cartel in which hundreds of people were killed.  (*Id.*)  As a result of his leadership role in the war, Valdez and other members of the organization believed that the Zetas were attempting to locate and kill Valdez.  (*See* PSR ¶ 72.)  In this context, Defendant's primary lieutenant in and right-hand man, Lopez, was in charge of obtaining weapons and other equipment of war, including ballistic vests and helmets. (PSR ¶¶ 41, 45, 48.)  Lopez and others working for him – including CS1 – routinely purchased such gear through cash purchases at gun shows and sporting goods stores, then smuggled the gear into Mexico using couriers.  (PSR

---

[29] Even the Atlanta distribution cell was ruthless.  (*See Flores Case* Doc. 397-20 (Judge Duffey's comment that the evidence presented at the trial of Jesus Hector Flores and Joe Louis Lopez described "the most efficient, ruthless drug organization I have ever seen, whether I was in private practice or as the United States Attorney or a member of the Court.") (Exh. F).)

¶¶ 45, 48.)  That Valdez and others would then use this body armor for their protection is unsurprising.  Thus, given the nature, scope and notoriety of Defendant's organization, it was reasonably foreseeable to him that Valdez and others would use body armor.  Accordingly, the two-level enhancement should be applied.

In summary, Defendant's Sentencing Guidelines are properly calculated as follows:

**Drug Counts**

| | |
|---|---|
| Base Offense Level | 38 |
| Possession of a Firearm | +2 |
| Restraint of Victim | +2 |
| Leadership | +4 |
| Use of Body Armor | +2 |
| **Adjusted Offense Level** | **48** |

**Money Laundering Count**

| | |
|---|---|
| Base Offense Level | 40 |
| § 1956 Conviction | +2 |
| Leadership | +4 |
| **Adjusted Offense Level** | **46** |

Taking the group with the highest offense level, *see* U.S.S.G. § 3D1.3, Defendant's combined offense level is 45 (level 48, less three for acceptance of responsibility).  At criminal history category I, Defendant's Sentencing Guidelines range is life.  As set forth below, after considering the factors in § 3553, the Government recommends a sentence of 540 months.[30]

---

[30] That is, a term of 540 months on all counts except for Count Nine, for which the statutory maximum is 240 months.

**III.**

**A Reasonable Sentence**

A district court should begin all sentencing proceedings by correctly calculating the advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). While the Guidelines are significant factors in the Court's sentencing decision, the Court must ultimately determine a reasonable sentence based on the factors set forth in 18 U.S.C. § 3553(a). *United States v. Pugh*, 515 F.3d 1179, 1188 (11th Cir. 2008). As to the section 3553(a) factors, the Court is to consider, inter alia, (1) the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) the need for deterrence; and (3) the need to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a). The law also provides for the forfeiture of the proceeds a defendant obtained from trafficking in controlled substances. *See* 21 U.S.C. § 853(a)(1). Pursuant to these factors, the Government requests that Defendant be sentenced to a term of imprisonment of 540 months, with credit for 69 months to account for time served in Mexico (and good-time earned), for a total of 471 months

imprisonment.[31]  The government also requests that the Court order that Defendant forfeit a sum of $192,000,000.[32]

**A. The Nature and Circumstances of the Offense, the History and Characteristics of the Defendant, and the Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

Defendant is one of the highest ranking cartel members ever sentenced in this Court – likely surpassed only by Valdez.  And he occupies that infamous position not because he was forced into illegal activities, made some bad decisions, or needed money.  One only achieves that level of criminal success through a conscious decision to live a life of crime, and a dogged pursuit of that goal with relentless dedication, ambition, and hard work over a sustained period of time.  Defendant made the decision to pursue that goal and, unfortunately for the United States, was extremely talented at what he did.  He created a transportation network and series of stash houses that quickly and efficiently moved *tons* of cocaine across the border from Mexico and throughout the United States.  That same network rapidly distributed the cocaine, then collected and transported proceeds – at a minimum of $1 million at a time – back across the border to Mexico.  Unsatisfied with being the transportation guru, his greed led

---

[31] A sentence of 540 months (prior to a reduction for time served in Mexico prior to extradition) is appropriate relative to the sentences imposed on Defendant's primary conspirators in this case, specifically, it is below Valdez's sentence of 660 months, yet above Flores' sentence of 460 months.

[32] The government will be filing a separate motion for preliminary order of forfeiture in support of this request.

him to seek higher profits, which he did by developing his own drug customers and buying his own cocaine.  This, too, he excelled at, and before long he was selling more cocaine than even Valdez.

Defendant was also undeterred by the gruesome aspects of the drug trade. He was extorted by the Zetas, but quickly embraced the violence for his own purposes, feeding intelligence about rivals to his partner, the Sinaloa enforcer Valdez, quickly resulting in assassinations.  Defendant's primary lieutenant was responsible for procuring and smuggling over 1,000 assault rifles into Mexico, converting hundreds of them into fully automatic machine guns, and fabricating silencers for hitmen's handguns, no doubt leading to countless deaths and other violence.  When he had a graphic video of kidnapped rivals being interrogated and executed at close range, Defendant did not recoil or reconsider his role in such an evil enterprise; instead he saw another opportunity he could exploit, and deliberately created a plan to duplicate and distribute the video far and wide as a viral video to the public, through the mass media, and even to law enforcement. Not just in Mexico, but in the United States as well.  Again, Defendant was effective in his plans, and his organization's infamy and reputation for ruthlessness became even more widespread, which worked to Defendant's benefit.

This was not the only path in life for Defendant.  He grew up in a good family, working good jobs, and riding in rodeos.  He moved to the United States, obtained legal permanent residence status, and lived the American Dream, building up his own trucking network that was successful.  That, however, was

not enough for Defendant.  He chose to betray that dream and instead import poison into this country.  As the Court is well aware, cocaine is an extremely dangerous and destructive illegal street drug.  Cocaine trafficking is not a victimless crime; cocaine abuse has devastated communities in the United States, Colombia, Mexico and elsewhere, ruining lives, splitting families apart, inflicting violence on innocent by-standers, and wreaking havoc on innocent family members and children.  It is also a very destabilizing and corrupting force in countries throughout the region whose law enforcement institutions are too overwhelmed to combat it, such as in Mexico, further adding to the destructive nature of the crime.  This effect is amplified even more when weapons of war are traded alongside the drugs.  Its social costs have been enormous.  And for years Defendant was responsible for a significant portion of that poison brought into neighborhoods in the United States and those weapons placed into the hands of assassins in Mexico.  His sentence should reflect the seriousness of that conduct, provide adequate punishment for all the harm he has directly and indirectly inflicted on society, and promote respect for the law that Defendant flaunted so brazenly.

### B.  The Need for Deterrence

Defendant's sentence should be significant enough to impress upon others that greed and profiting from distribution of poison and violence is not worth the potential profits, and to deter others from undermining the rule of law. Defendant obtained untold profits during his eight years as a high level cocaine trafficker moving tons of high value contraband and imposing negative effects

on the rest of society – profits which he has not disgorged.  Defendant's sentence should be lengthy enough that he will not be able to spend and enjoy his illicit treasure in the prime of his life, and send a message that his conduct does not pay off in the end.  The recommended sentence would provide a critical general deterrence to other high level drug traffickers by demonstrating that their conduct will result in being brought to justice in the United States, and will result in substantial sentences that deprive them of the benefits of their crimes.

Additionally, this case warrants a special consideration for deterrence. Defendant was not a low level distributor; he was an ambitious and high-achieving trafficker that consciously aligned himself with one of the most flashy and infamous enforcers: Valdez.  Defendant may not have personally sought out the spotlight, but he assisted Valdez in his key strategic alliances (providing the show horses and trainer to Arturo Beltran-Leyva, and stash house operators in multiple cities in the United States), lifestyle (multiplying Valdez's access to drug markets and related profits), violent ways (providing intelligence used to assassinate rivals, and supplying weapons and other military gear through Defendant's primary lieutenant, Lopez), and high profile intimidation campaign in the media and among law enforcement (distributing the video of the interrogation and execution of Valdez's rivals).  Defendant helped make Valdez the icon that he was, who became a role model of sorts for ordinary young people looking to make money fast and earn power.  *See* ABC NEWS, *supra* n.6. Defendant's sentence should clearly signal that the illegal career he chose was not glamorous, and any time of wealth and power he enjoyed will be

significantly overshadowed by the time he will serve in prison without the benefit of his ill-gotten gains.

### C. The Need to Protect the Public from Further Crimes of the Defendant

As already described, Defendant chose to profit from the mass distribution of tons of addictive poison across the United States, inflicting widespread damage in our communities.  His actions, through his lieutenant, also distributed over 1,000 assault weapons, including many that were converted to fully automatic weapons of war or fitted with silencers.  Moreover, he proved that he was very talented at it, multiplying the scale of the drugs he trafficked rapidly and without regard for the wellbeing of anyone or anything other than his own quick profits.  Defendant should be incarcerated to a point where he is no longer capable of restarting his criminal enterprises or inflicting further harm on society, no matter what remaining financial resources he may have hidden.

### D. Calculation of a Specific Sentence

The government's recommendation of a sentence of 540 months imprisonment, reduced to 471 months, ensures that Defendant receives credit for all the time he has been incarcerated since he was arrested on November 23, 2010, including time prior to his extradition to the United States on September 30, 2015 (with credit for good time).  *See* 18 U.S.C. § 3585(b) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed; or . . . as a result of any other charge for which the defendant was arrested after the commission of the offense

for which the sentence was imposed . . . .").  Generally, calculation of the appropriate amount of time served prior to extradition, and credit for that time against the sentence imposed, is a task delegated to the Bureau of Prisons.  *See United States v. Alexander*, 609 F.3d 1250, 1259 (11th Cir. 2010).[33]  However, if a sentencing court does perform the calculation, it will not be reversed on appeal unless the defendant can show he was prejudiced because the credit applied by the court was less than what BOP would have calculated.  *See Hernandez v. United States*, 542 F. App'x 865, 866-67 (11th Cir. 2013).

For consistency with the approach the Court took when sentencing Valdez, the Government requests that the Court explicitly adjust Defendant's term of imprisonment by 69 months to account for the 58.25 months Defendant was imprisoned in Mexico prior to his extradition to the United States and the corresponding "good time credit" to which he might otherwise be entitled for that time.  The Government further requests that the Court note this reduction and the reasons for it on the record so that the Bureau of Prisons is aware of the credit and does not award Defendant additional credit towards his sentence on the same basis.

### E.  Forfeiture of Drug Proceeds

The government also requests, pursuant to the forfeiture provision in the indictment, a forfeiture judgment equal to the amount of proceeds Defendant obtained as a result of his drug trafficking offenses.  Because Defendant's assets

---

[33] And, if a defendant disagrees with BOP's determination, the defendant must exhaust all administrative remedies before seeking relief from a court.  *Id.*

are likely in Mexico, in lieu of forfeiting specific assets, the government is requesting a money judgment.

As explained above, Defendant was responsible for the distribution of at least 12,000 kilograms of cocaine (a conservative estimate) at a price of around $16,500. (PSR ¶ 32(a).)  Even assuming a conservative price of $16,000 per kilogram,[34] Defendant would have collected at least $192,000,000 of proceeds from his cocaine distribution.  Defendant should not be allowed to keep the proceeds from his illegal activities that inflicted so much damage on so many people. Through the forfeiture order, the government is seeking to disgorge some measure of the riches Defendant amassed during his years as a high level drug trafficker and deprive him of the benefit from those funds.  As a conservative estimate, the government respectfully requests that the full $192,000,000 judgment be assessed against Defendant.

---

[34] As the government explained in connection with the sentencing of and request for forfeiture from Valdez, from 2005 until 2007 the average sales price for a kilogram of cocaine in Atlanta, North Carolina, South Carolina, and Chicago was $16,500, and $15,500 - $17,000 in Memphis.  (*See* Doc. 292-1 at 2; Doc. 293 at 25.)  As a conservative figure, the government requested and the Court applied a price of $16,000 per kilogram of cocaine to determine Valdez's order of forfeiture.  (*See* Doc. 300.)

**Conclusion**

For the reasons stated above, the government respectfully requests that the Court sentence Carlos Montemayor to a term of imprisonment of 540 months (reduced to 471 months to account for time imprisoned in Mexico prior to extradition), and order he forfeit $192,000,000.

Respectfully submitted,

BYUNG J. PAK
*United States Attorney*


/s/ELIZABETH M. HATHAWAY
*Assistant United States Attorney*
Georgia Bar No. 076212
Elizabeth.Hathaway@usdoj.gov


/s/GARRETT L. BRADFORD
*Assistant United States Attorney*
Georgia Bar No. 074374
Garrett.Bradford@usdoj.gov


600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

May 9, 2019

/s/ GARRETT L. BRADFORD

GARRETT L. BRADFORD

*Assistant United States Attorney*