IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CARLOS MONTEMAYOR | CRIMINAL ACTION NO. 1:09-CR-551-LMM-RDC-2 |
| *v.* | |
| UNITED STATES OF AMERICA | CIVIL ACTION NO. 1:21-CV-3555-LMM-RDC |

### Response to 28 U.S.C. § 2255 Motion

The United States of America, by Kurt R. Erskine, Acting United States Attorney, and Elizabeth M. Hathaway and Garrett L. Bradford, Assistant United States Attorneys for the Northern District of Georgia, files this Response to Carlos Montemayor's 28 U.S.C. § 2255 Motion to Vacate, Set Aside, or Correct Sentence.

### Background

By the early 2000s, Montemayor, a Mexican citizen living lawfully in Texas, owned a successful trucking business which he operated in Laredo, Texas. (PSR, ¶ 131).[1] But sometime in 2002, Montemayor turned from his lawful employment and teamed up with Edgar Valdez-Villareal a/k/a "La Barbie," the infamous enforcer of the Sinaloa Drug Cartel who was waging war against the Zetas in Nuevo Laredo. (PSR, ¶¶ 20, 53, 56-59). Valdez would obtain and transport cocaine to Nuevo Laredo, at which point Montemayor took over to transport it across the border and ultimately to stash houses run by his cousin, Hector Flores. (PSR, ¶¶ 20, 24-25, 53, 81). Their operation flourished: in Atlanta alone, their organization distributed a

---

[1] *See United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006) (holding that a defendant who fails to object to allegations of fact in a pre-sentence report admits those facts for sentencing purposes).

total of 1,500 kilograms of cocaine in just six months. (PSR, ¶ 25). But their actions were not unnoticed, and by 2004, agents and prosecutors in the Northern District of Georgia started an investigation that would ultimately lead to Montemayor's arrest and conviction. (Docs. 253-3; 261-3).

In December 2009, Montemayor was charged in six counts of a nine-count federal indictment with drug trafficking and money laundering offenses. (Doc. 44). Count one charged conspiracy to possess with intent to distribute cocaine; count two charged conspiracy to import cocaine; counts four, five and eight charged substantive possession with intent to distribute cocaine; and count nine charged conspiracy to launder money. (*Id.*). Montemayor was arrested in Mexico on November 30, 2010, and he was extradited to the United States on September 30, 2015. (PSR ¶ 119).

Montemayor first hired attorneys Michael Friedman, Todd Henry and Ramon Alvarado. (Docs. 155; 175). They did not file any pretrial motions, and they informed the Court that no pretrial hearings were needed, so the Court certified the case ready for trial on February 25, 2016. (Docs. 155; 175; 186). But at that same time, on February 24, 2016, Montemayor replaced Friedman, Henry and Alvarado with former Assistant United States Attorney (AUSA) Richard Rice.[2] (Doc. 184). Rice asked for de-certification of the case and for an extension of time to file pretrial motions, which the government did not oppose, and the Court granted. (Docs. 189; 190; 191; 192; 195). The government later filed a motion to disqualify Rice,

---

[2] Although they no longer appeared on behalf of Montemayor, Henry and Alvarado did not formally withdraw until September 14, 2018, (Doc. 321), and Friedman never formally withdrew.

asserting that he was prohibited from representing Montemayor based on his participation while he was an AUSA in the investigation that ultimately led to the indictment in the present case. (Doc. 196).

While the disqualification motion was pending, on September 6, 2016, attorney William Coleman Sylvan, III, joined Rice as counsel for Montemayor.[3] (Doc. 221). After extensive litigation, on June 2, 2017, the Court granted the government's motion to disqualify Rice. (Docs. 208; 210; 230; 231; 253; 257; 258; 261). Sylvan continued to represent Montemayor, litigating a still pending motion to suppress wiretaps, and also beginning plea negotiations, but on November 7, 2017, Montemayor requested that new counsel be appointed. (Doc. 273). The Court appointed Paul M. Cognac on December 7, 2017. (Docs. 277; 279).

Plea negotiations continued, so litigation of the wiretap suppression was temporarily suspended in the hopes that the case could be resolved without further litigation, (Docs. 271-72; 281-82; 289-90); but the parties did not reach a resolution and Montemayor persisted in his motion to suppress. (Doc. 3033-04; 313). The Court denied the suppression motion on September 20, 2018, and set a trial date of November 5, 2018. (Doc. 322). About three weeks prior to the trial date, on October 11, 2018, Montemayor informed the Court that he would enter a non-

---

[3] In a written waiver of the potential conflict of interest that he filed on December 2, 2016, Montemayor stated that he had discussed the advisability of his continued representation by Rice, and the advisability of waiving the conflict, with both Rice and "independent counsel" Sylvan. (Doc. 231-3-4).

negotiated guilty plea,[4] which he did on November 14, 2018, pleading guilty to all six counts in which he was charged. (Doc. 324).

At the first sentencing hearing held on May 16, 2019, the Court imposed a sentence of 411 months (34 years) of imprisonment, and a 10-year term of supervised release. (Doc. 364-116-117). The Court held open the issue of forfeiture, and it gave the parties a schedule for submitting supplemental briefs regarding forfeiture. (Doc. 364-131-136). The Court did not enter a written judgment at that time. (Doc. 364-135-136). On May 27, 2019, Montemayor replaced Cognac with attorney Stephen Reba. (Docs. 346; 347; 353). Reba immediately filed a notice of appeal on behalf of Montemayor, on May 28, 2019, stating that Montemayor was appealing "from the Judgment of Sentence entered on May 16, 2019." (Doc. 348). Reba also requested two continuances to file a supplemental forfeiture brief, which the Court granted, but instead of filing a forfeiture brief on the due date, Montemayor filed a motion to withdraw his guilty plea, asserting that his attorney had been ineffective for counseling him to reject the government's earlier plea offer and for failing to bring a Spanish interpreter to certain client meetings. (Docs. 356; 358; Docket entries at 05/30/2019 and 06/05/2019).[5] The Court denied the motion to withdraw the plea on July 16, 2019, and it again extended Montemayor's deadline to file a supplemental forfeiture brief. (Doc. 366). Montemayor did not file

---

[4] There is no document number for the entry on the docket at October 11, 2018, that states: "NOTICE Setting Case for Tender of Plea as to Carlos Montemayor. A Tender of Plea Hearing is set for 11/14/2018 . . .".

[5] These two docket entries also have no document numbers.

a brief, but on July 23, 2019, he filed a three-sentence response that stated he contested the forfeiture and needed an evidentiary hearing. (Doc. 368).

At the second sentencing hearing, held on August 7, 2019, the parties argued the forfeiture issue, and the Court ordered forfeiture of $192,000,000. (Doc. 379). The Court entered both a written forfeiture order and a written judgment, which incorporated the forfeiture order, on that same day, August 7, 2019. (Docs. 369; 371). Montemayor did not file a second notice of appeal.

In his initial appeal brief, Montemayor raised three claims, asserting that the District Court erred by: (1) disqualifying Attorney Richard Rice; (2) denying his motion to withdraw his guilty plea without holding an evidentiary hearing; and (3) ordering him to forfeit $192,000,000. *United States v. Montemayor*, 815 F. App'x 406, 407 (11th Cir. 2020). The government filed a partial motion to dismiss Montemayor's second and third claims for lack of jurisdiction because Montemayor failed to file a second notice of appeal of those two District Court orders. The Eleventh Circuit granted the government's motion in part on February 19, 2020, dismissing the guilty plea issue, but decided that a final determination about jurisdiction over the forfeiture issue would be "carried with the case." *Montemayor*, 815 F. App'x at 408. On May 29, 2020, the Eleventh Circuit dismissed the forfeiture issue for lack of jurisdiction, and held that Montemayor's challenge to Rice's disqualification was waived because he entered an unconditional, knowing, and voluntary guilty plea. *Montemayor*, 815 F. App'x at 409.

On August 26, 2021, Montemayor, through counsel, timely filed a 28 U.S.C. § 2255 motion seeking to vacate his convictions and sentence, which is pending before the Court. (Doc. 410). In his motion, Montemayor raises two claims, arguing

that: (1) his counsel was ineffective for failing to preserve the issue of Rice's disqualification for appeal; and (2) his guilty plea was involuntary based on ineffective assistance because his counsel allegedly promised that he would receive a sentence of 10 to 15 years of imprisonment, and also failed to bring a Spanish interpreter to his meetings with Montemayor. (Doc. 410-6-12).

Montemayor is currently incarcerated, with a projected release date of December 8, 2044. *See* Bureau of Prisons, http://www.bop.gov (last visited September 24, 2021).

## Statement of Facts

### 1. Disqualification of former AUSA Richard Rice

In October 2004, then-AUSA John Horn[6] was the lead prosecutor assigned to investigate and prosecute the drug trafficking organization (DTO) led by Edwar Valencia-Gonzalez—the Valencia investigation; and that investigation ultimately led to the indictment in the present case that charged Montemayor and five co-defendants. (Docs. 253-3; 261-3). In April 2005, Rice was the lead prosecutor investigating and prosecuting another DTO led by Javier Alvarez-Lopez (a.k.a. Gotti)—the Gotti investigation.[7] (Docs. 253-4-5; 261-4). In its motion to disqualify Rice, the government asserted that the Valencia and Gotti investigations overlapped

---

[6] Horn is no longer at the United States Attorney's Office, but he was an AUSA with the office from May 2002 until January 2015, when he became the Acting United States Attorney. He was appointed as the United States Attorney in December 2015, and he was still serving in that position in January 2017, when he filed his sworn declaration in this case.

[7] Rice served as an AUSA from Spring of 2003 to February 2008. (Docs. 253-5; 261-2).

at times, exposing Rice to confidential information and prosecution strategy related to Montemayor; thus, he participated in the Valencia investigation which prohibited him from representing Montemayor under 18 U.S.C. § 207(a)(1) and Georgia Rules of Professional Conduct 1.11(a), 1.9, and 1.7(a). (Docs. 196; 210; 261-2). Montemayor asserted that Rice's limited involvement in the Valencia investigation did not justify disqualifying his chosen defense counsel. (Doc. 208). Prior to ruling on the motion, the Court held a *Garcia*[8] hearing, at which time Montemayor waived any potential conflict. (Docs. 230; 231; 261-14).

The Court found that, because Montemayor's waiver raised a presumption in favor of keeping Rice, it next must determine whether that presumption was overcome by the government's "demonstration of an actual conflict or a serious potential for conflict." (Docs. 253-2; 261-14). The Court set an evidentiary hearing for that purpose on January 6, 2017; but both parties agreed that the additional evidence the Court needed could be presented via sworn written declarations of Rice and Horn, and the Court granted the parties' joint request to proceed in that manner. (Doc. 253-2-3; Docket entries at 12/21/2016 and 01/05/2017). After the declarations were filed, the parties also submitted supplemental briefs.[9] (Doc. 253-2-3).

---

[8] *United States v. Garcia*, 517 F.2d 272, 276-78 (5th Cir. 1975) (holding that when a defendant's attorney has a conflict of interest, the court should conduct an inquiry akin to a Rule 11 plea colloquy to determine if the defendant wishes to waive the conflict; a waiver of the conflict must be knowing and voluntary), abrogated on other grounds by *Flanagan v. United States*, 465 U.S. 259 (1984).

[9] The sworn declarations and the parties' supplemental briefs were all filed under seal. (Doc. 253-2-3). However, rather than seal the order that addressed Montemayor's Sixth Amendment right to counsel of his choice, the Court omitted

### a. Valencia Investigation–led by John Horn

On March 15, 2005, DEA agents seized currency and large quantities of cocaine from two stash houses associated with Valencia. (Doc. 261-3). During the course of the investigation, several Title III wiretaps were authorized.[10] (Doc. 261-3). The June 10, 2005, wiretap for a device associated with Valencia provided identifications of Montemayor's brother, Juan Montemayor ("Juan"), as a Mexican source of supply, and Romero Roel Martinez, as an intermediary in the DTO. (Docs. 253-4; 261-3).

The July 15, 2005, wiretap for devices associated with Valencia and Martinez established that Montemayor and Juan supplied drugs to the Valencia DTO, and then laundered the drug proceeds. (Docs. 253-4; 261-3-4). The affidavit supporting the July 15, 2005, wiretap stated that Gotti was a target of the Valencia investigation. (Docs. 253-6; 261-5). The affidavit further stated that: (1) although the Valencia and Gotti DTOs each had separate sources of supply and distribution channels, Valencia and Gotti communicated with each other, and they had been intercepted discussing drug distribution; (2) the DTOs had at least one common source of supply, and they used some common resources, such as off-loading sites and drug stash houses; (3)

---

full target names, unless the target was a named defendant, minimized exact quotations to sealed material, and summarized information with specific references to underlying documents and exhibits. (Docs. 253-1 n.1, 261). The government does not cite herein to any sealed material.

[10] Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510-22, regulates the interception and disclosure of electronic surveillance ("wiretaps"), and sets out numerous requirements that wiretap applications and orders authorizing wiretaps must meet to be valid.

there appeared to be common targets including an individual known as "Ulysses;"[11] and (4) though they operated independently, there was a "loose connection." (Docs. 253-6-7; 261-5-6).

In late July 2005, Horn asked Rice to assist with the Valencia investigation while Horn was on vacation. (Docs. 253-10; 261-9). On July 27-28, 2005, Rice signed and submitted two pen register and cell site applications for a device used by Martinez.[12] (Docs. 253-10; 261-9). The July 27, 2005, application had been prepared by Horn, but Rice signed and submitted it to the Court. (Docs. 253-10; 261-9). Rice prepared, signed, and submitted the July 28, 2005, application. (Docs. 253-10; 261-9). In both applications, Rice certified that he had discussed the applications with the investigating agent.[13] (Docs. 253-10; 261-10). From those pen registers, agents

---

[11] The lead case agents for each investigation initially disagreed about whether the "Ulysses" identified by both investigations was the same individual, but they later agreed that it was indeed two different individuals. (Docs. 253-7-8 n.8; 261-7 n.5).

[12] A pen register is a mechanical device installed at a central telephone facility that records the numbers dialed, but it does not intercept oral communications and does not indicate whether calls are actually completed. *Smith v. Maryland*, 442 U.S. 735, 736 n.1 (1979). Cell site records provide the geographical location of a cell phone. *United States v. Joyner*, 899 F.3d 1199, 1204 (11th Cir. 2018). At the time of this investigation, cell sites could be obtained by court order under the Stored Communications Act. *See United States v. Carpenter*, 926 F.3d 313, 317 (6th Cir. 2019) (finding Government's reliance on the Stored Communications Act to obtain cell sites via court order to be reasonable prior to the Supreme Court's holding in 2018 that such data could be obtained only by search warrant).

[13] Rice also worked with agents on another pen register and cell site request dated August 4, 2005, for a device used by Valencia, but it was not submitted to the Court. (Docs. 253-10; 261-9-10).

learned about calls between Martinez and Montemayor, and information about those calls was provided in a later Valencia wiretap affidavit. (Docs. 253-10; 261-9).

The affidavits supporting the August 12, 2005, August 26, 2005, September 14, 2005, October 9, 2005, and November 10, 2005, wiretaps continued to identify Gotti as a target of the Valencia investigation, and provided discussions similar to the July 15, 2005, affidavit of the linkage between the Valencia and Gotti DTOs. (Docs. 253-8-9; 261-8). The affidavit for the October 9, 2005, wiretap, which was for a new device used by Valencia, relied in part on intercepted communications between Valencia and Gotti that had been obtained from monitoring a Gotti wiretap. (Docs. 253-9; 261-8). The November 10, 2005, wiretap affidavit referenced Gotti's arrest on October 12, 2005, and stated that the agents hoped to interview him about Valencia, but did not expect him to have information about Montemayor. (Docs. 253-9; 261-9).

### b. Gotti Investigation–led by Richard Rice

The first wiretap in the Gotti investigation was authorized on May 10, 2005, and the supporting affidavit stated that agents had identified Valencia and seized large quantities of drugs and currency associated with him in March 2005. (Docs. 253-5; 261-4). The affidavit further stated that telephone toll records showed numerous communications between Valencia and Gotti in the Spring of 2005, though the content of the communications was unknown, and that Valencia was a target of the Gotti investigation. (Docs. 253-5; 261-4). The affidavits supporting the later June 8, 2005, and July 8, 2005, wiretaps also identified Valencia as a target of the Gotti investigation. (Docs. 253-6; 261-5).

The affidavit supporting the July 27, 2005, wiretap stated that: (1) in the past, the Valencia and Gotti DTOs had a common source of supply, but now each had separate sources; (2) there was "limited" communication between Gotti and Valencia when using the same source of supply, or when one needed to "borrow" drugs from the other because of a shortage; (3) they used some common resources, such as off-loading sites and stash houses; and (4) there appeared to be common targets including an individual referred to as "Ulysses." (Docs. 253-7; 261-6-7).

The affidavits supporting the August 4, 2005, September 2, 2005, September 16, 2005, and September 30, 2005, wiretaps continued to identify Valencia as a target of the Gotti investigation, and provided discussions similar to the prior affidavits of the linkage between the Valencia and Gotti DTOs. (Docs. 253-8-9; 261-8).

In each of the wiretap applications, Rice's statements included that he had discussed all of the circumstances of the offenses with the affiant who, along with other agents, conducted the investigation; he had reviewed the affidavit and believed it established probable cause; and the affidavit contained a full and complete statement establishing necessity for the wiretap. (Docs. 253-5-6; 261-4-5, 28-29). Rice signed the applications, certifying under penalty of perjury that the contents of the applications he signed were true. (Docs. 253-5-6; 261-5, n.4, 28-29).

### c. Sworn declarations of Horn and Rice

During the Valencia and Gotti investigations, both Horn and Rice were in the Narcotics/OCDETF section of the United States Attorney's Office. (Docs. 253-11; 261-10). Horn stated that the section held weekly attorney meetings, during which the attorneys discussed their pending investigations and cases. (Docs. 253-11; 261-10). Horn further stated that during these meetings in 2005, he "openly shared"

information about the Valencia investigation. (Docs. 253-11-12; 261-10). Rice stated that he recalled attorneys only sharing "general information" during the weekly meetings, similar to what would be contained in discovery materials. (Docs. 253-12; 261-10). Rice further stated that the DEA agents working on the Gotti investigation also held weekly meetings, which he tried to attend, but that he did not recall any discussion of the Valencia investigation during those meetings. (Docs. 253-12 n.11; 261-10 n.7).

Horn stated that he talked to Rice about the tension between the DEA groups conducting the investigations, whether targets were overlapping, and the Valencia investigation generally. (Docs. 253-12; 261-11). According to Horn, the two DEA groups disagreed with each other about the roles of Valencia and Gotti—*i.e.*, whether one was the customer of the other, and whether priority should be given to the investigation that included the source of supply. (Doc. 261-7). Both Horn and Rice recalled at some point attending a joint meeting with both DEA groups to discuss the issues arising from the two investigations. (Doc. 261-7). According to Rice, the meeting focused on whether the "Ulysses" in each investigation was the same individual. (Doc. 261-7). Rice stated that the "Ulysses" issue was the sole reason the applications and affidavits for each investigation referenced each other. (Doc. 253-7-8 n.8). Rice further stated that he ensured there would be no overlap in the investigations, and he left the meeting before there were any substantive discussions about the investigations. (Doc. 261-7).

Horn stated that when an AUSA supervised a wiretap investigation, and prepared wiretap applications and supporting affidavits, the AUSA was responsible for ensuring the accuracy of the applications and affidavits; complying with statutory

requirements; and certifying under oath that he or she had reviewed and discussed the affidavit with the affiant. (Docs. 253-12; 261-11). According to Horn, before an AUSA included any information about another AUSA's investigation in a wiretap application or affidavit, those two AUSAs would discuss it; and in accordance with that policy, Horn stated that he and Rice discussed the information included in each other's wiretaps in the Valencia and Gotti investigations. (Docs. 253-12-13; 261-11).

Rice stated that he prepared wiretap applications and affidavits, including those used in this case, using templates which were only moderately modified case to case to fit the specific facts. (Docs. 253-13; 261-11). Rice denied having any "strategic discussions" with Horn about the Valencia and Gotti investigations. (Docs. 253-13; 261-11-12). Rice stated that Horn provided Rice with text about the Valencia DTO that Rice simply "cut and pasted" into the Gotti wiretap applications and affidavits, and he similarly provided Horn with text to use in the Valencia wiretaps. (Docs. 253-13; 261-12). Rice denied receiving any telephone toll records other than what was included in the Gotti applications and affidavits; he denied being aware of the defendants charged as a result of the Valencia investigation; and, with the exception of the two pen register applications he submitted for Horn, he denied participating in, assisting with, or providing legal advice in the Valencia investigation. (Docs. 253-13-14; 261-12).

### d. District Court's findings

The Court granted the government's motion to disqualify Rice, finding that although Rice was not the lead Valencia prosecutor and did not participate in every decision made about the investigation and prosecution, Rice's involvement in the wiretap and pen register applications constituted personal and substantial

participation that was sufficient to require his disqualification under 18 U.S.C. § 207(a)(1) and Georgia Rules of Professional Conduct 1.11(a) and 1.9(a). (Docs. 253-15-44; 261-14-33). The Court found that, during the relevant time frame—Spring to Fall of 2005—the investigations were interrelated and connected, and the prosecutors and agents dealt with overlapping and related targets, facts, and issues, as was discussed in the wiretap applications and affidavits for both investigations. (Docs. 253-22-44; 261-18-33). The Court further found that Rice signed the applications, certifying under penalty of perjury that the contents of the applications he signed were true, including that he had discussed all of the circumstances of the offenses with the affiant and reviewed the affidavit; and thus, his later denial of involvement in the Valencia investigation was in conflict with his prior certifications, which "severely undercuts [his] claim now," and "belies belief." (Docs. 253-27-37; 261-21-29).

### 2. Guilty Plea

During the Court's colloquy with Montemayor, the Court established that Montemayor entered a knowing and voluntary guilty plea. (Doc. 336). The Court ensured that Montemayor understood the constitutional rights he was waiving by pleading guilty, including his right to a trial where the government would be required to prove his guilt beyond a reasonable doubt. (Doc. 336-6-8). The Court also ensured that Montemayor understood the charges to which he was pleading guilty, first asking the government to state the elements of each count, and then asking Montemayor if he understood the elements that the government would have to prove. (Doc. 336-8-10). Montemayor responded that he understood. (Doc. 336-10).

At the Court's direction, the government stated the evidence it would prove at trial beyond a reasonable doubt. (Doc. 336-10-16). Montemayor agreed in large part with the government's recitation of the evidence, but asserted a few exceptions and clarifications. (Doc. 336-16-22). The Court found that the conduct Montemayor admitted provided a sufficient factual basis for the plea. (Doc. 336-21-22).

The Court ensured that Montemayor understood the consequences of his guilty plea, including that he faced a maximum sentence of life imprisonment and a mandatory minimum sentence of 10 years on counts one, two, four, five and eight; and a maximum sentence of 20 years of imprisonment with no mandatory minimum on count nine. (Doc. 336-22-27). Montemayor stated under oath that he understood that if the sentence the Court ultimately imposed was more severe than he anticipated, he would still be bound by his guilty plea and would have no right to withdraw it. (Doc. 336-24). He further stated under oath that he had not been coerced in any way into pleading guilty, nor had anyone made any undisclosed promises or representations to him to persuade him to plead guilty. (Doc. 336-27-28).

In response to the Court's questioning, Montemayor stated that there had not been anything about the proceeding he did not understand, that he had been afforded sufficient time to discuss his case and his guilty plea with his attorney, and that he was satisfied with his attorney's representation. (Doc. 336-28). Given this record, the Court found that the guilty plea was made knowingly and voluntarily, and the Court accepted the plea. (Doc. 336-29).

## Discussion

**1. Montemayor has failed to meet his burden to prove that he received constitutionally ineffective assistance of counsel, and his motion should be denied.**

To prevail on a claim of ineffective assistance of counsel, a defendant has the burden to prove by a preponderance of the evidence both incompetence and prejudice, *i.e.*, that "(1). . . counsel's representation fell below an objective standard of reasonableness, and (2). . . there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Chandler v. United States*, 218 F.3d 1305, 1312-13 (11th Cir. 2000) (en banc) (internal quotation marks omitted); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). But "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *see also Chandler*, 218 F.3d at 1312.

"Counsel's competence . . . is presumed and the [petitioner] must rebut this presumption by *proving* that his attorney's representation was unreasonable under prevailing professional norms." *Chandler*, 218 F.3d at 1314, n.15 (alterations and emphasis in original) (noting that the "presumption of competence must be disproved by a petitioner"). "Never does the government acquire the burden to show competence, even when some evidence to the contrary might be offered by the petitioner." *Id.* The standard for evaluating counsel's performance is "reasonableness under prevailing professional norms." *Chandler*, 218 F.3d at 1313 (internal quotation marks omitted). To prove ineffectiveness, a defendant must show that his attorney's representation fell "outside the wide range of professionally competent

assistance." *Id.* at 1314 (internal quotation marks omitted). "This standard of effectiveness applies equally to both the guilt and the sentencing phases of the trial." *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir. 1995); *see also Strickland*, 466 U.S. at 686-87.

When evaluating an attorney's performance, the Court must be highly deferential, and "must avoid second-guessing counsel's performance." *Chandler*, 218 F.3d at 1314. Instead, the Court must "indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." *Id.* (internal quotation marks omitted) (alteration in original). Thus, "counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168 (1986)). "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315. Furthermore, when reviewing counsel's performance, the Court "must evaluate the reasonableness of counsel's performance from counsel's perspective at the time," not with the distortion of hindsight. *Id.* at 1316 (internal quotation marks omitted). "The reasonableness of a counsel's performance is an objective inquiry." *Id.* at 1315.

To show prejudice, a defendant must show more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. "Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the

17

outcome undermines the reliability of the result of the proceeding." *Id.* (internal citation omitted). Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Prejudice is established only by showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *see also Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (the defendant has the burden of affirmatively proving prejudice).

In the context of guilty pleas, when a defendant has pleaded guilty as opposed to proceeding to trial, as is the case here, to meet *Strickland's* "prejudice" requirement, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). When the alleged ineffective assistance results in the rejection or lapse of a plea offer, the defendant

> must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, 566 U.S. 156, 164 (2012) (rejection of plea offer); *see also Missouri v. Frye*, 566 U.S. 134, 147-49 (2012) (failure to convey and lapse of plea offer).

The standard for ineffective assistance of counsel is the same on appeal as at the trial level. *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990). In the

context of appellate counsel, in order to determine the "prejudice prong" of the *Strickland* test, the Court's analysis is necessarily dependent on a review of the merits of the issues not raised on appeal. *Id.* If those issues would not have been meritorious on appeal, there is no prejudice and counsel's failure to raise the issues on appeal will not be deemed ineffective. *Id.* Further, in reviewing an ineffective assistance claim, the Court must "examine the total performance of appellate counsel and the effect thereof." *Matire v. Wainwright*, 811 F.2d 1430, 1434 (11th Cir. 1987); *Lambrix v. Singletary*, 72 F.3d 1500, 1507 (11th Cir. 1996).

**A. Because Rice was prohibited from representing Montemayor under 18 U.S.C. § 207(a)(1) and the Georgia Rules of Professional Conduct, the Court did not abuse its discretion by disqualifying him.[14] Thus, Montemayor cannot meet his burden to prove that he was prejudiced by his counsel's purported failure to "preserve" the issue for appeal, and his claim should be denied.**

Montemayor waived appeal of Rice's disqualification when he entered an unconditional, knowing, and voluntary guilty plea. *Montemayor*, 815 F. App'x at 409. He asserts that his counsel was ineffective for failing to "preserve" the issue for appeal, but the issue could only have been preserved by Montemayor entering a conditional guilty plea, or proceeding to trial. That is, if a defendant wishes to plead guilty, but preserve appellate review of a non-jurisdictional defect, he can only do so by entering a conditional plea under Federal Rule of Criminal Procedure 11(a)(2), which requires that the plea be in writing and consented to by both the Court and

---

[14] On appeal, the District Court's decision to disqualify a defendant's attorney is reviewed for an abuse of discretion. *United States v. Ross*, 33 F.3d 1507, 1522 (11th Cir. 1994).

the government.[15] *United States v. Pierre*, 120 F.3d 1153, 1155 (11th Cir. 1997);
*United States v. Saldrriaga-Palacio*, 209 F. App'x 950, 952 (11th Cir. 2006) (by entering
an unconditional guilty plea, the defendant waived appeal of the order disqualifying
his retained counsel; thus, whether the disqualification was an abuse of discretion
will not be considered). Here, the government did not offer, a conditional guilty plea
preserving the issue of Rice's disqualification; thus, Montemayor's only option for
preserving the issue was to proceed to trial instead of pleading guilty. He asserts that
his guilty plea was involuntary based on ineffective assistance of counsel, and as
addressed further below, that claim is affirmatively contradicted by the record and
fails. *See Infra* Section 1(B). But even assuming that he had not waived the
disqualification issue by pleading guilty, and it could have been properly raised on
appeal, the issue would not have been meritorious; thus, Montemayor cannot meet
his burden to establish that he was prejudiced, and his claim should be denied.

### 1. Rice was prohibited from representing Montemayor under 18 U.S.C. § 207(a)(1).

A defendant's right to the counsel of his choice is not absolute. *Wheat v. United
States*, 486 U.S. 153, 159 (1988); *United States v. Ross*, 33 F.3d 1507, 1523 (11th Cir.
1994). Though a district court must recognize a presumption in favor of a
defendant's counsel of choice, that presumption can be overcome by demonstrating
an actual conflict or a serious potential for conflict. *Wheat*, 486 U.S. at 164. The

---

[15] Rule 11(a)(2) states: "Conditional Plea. With the consent of the court and the
government, a defendant may enter a conditional plea of guilty or nolo contendere,
reserving in writing the right to have an appellate court review an adverse
determination of a specified pretrial motion. A defendant who prevails on appeal
may then withdraw the plea." Fed. R. Crim. P. 11(a)(2).

district court is allowed "substantial latitude" in refusing waivers of conflicts in cases where an actual conflict or a potential for conflict exists. *Wheat*, 486 U.S. at 163; *Ross*, 33 F.3d at 1524.

The conflict at issue in this case arose from Rice's previous service as an AUSA. Under 18 U.S.C. § 207(a)(1), a former AUSA is restricted from later representing defendants in prosecutions if he was involved at the investigative stage of the case.[16] 18 U.S.C. § 207(a)(1); *Wheat*, 486 U.S. at 159; *United States v. Clark*, 333 F.Supp.2d 789, 793-96 (E.D. Wis. 2004). One of Congress's purposes in enacting this statute was to prevent specific knowledge obtained while employed as a public servant from being used against the government itself. *See Clark*, 333 F.Supp.2d at 793. This restriction on "switching sides" requires disqualification when the particular matter involves the same "specific party or parties," and the former AUSA participated in the matter "personally and substantially." *Clark*, 333 F.Supp.2d at 793-94; 18 U.S.C. § 207(a)(1).

Here, the district court properly found that the matter involved the same specific parties, and that Rice participated in the matter personally and substantially. (Docs. 253; 261). The documents alone showed that the Gotti and Valencia investigations were related, and that Rice personally and substantially participated in the Valencia

---

[16] *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), the primary authority cited by Montemayor in support of his argument, did not address 18 U.S.C. § 207(a)(1), or any conflict of interest. (Doc. 410-7-8). In *Gonzalez-Lopez*, the government conceded that the trial court erred by disqualifying the defendant's counsel of choice based on the court's misinterpretation of the Missouri Rules of Professional Conduct. *Gonzalez-Lopez*, 548 U.S. at 144-52. The government argued however that the error was subject to a harmless error analysis, and the Supreme Court held that it was not. *Id.*

investigation, which led to the charges against Montemayor. The overlaps showing that the investigations were related included:

- The May 10, 2005, Gotti wiretap affidavit stated that cocaine and currency were seized in March 2005 from Valencia's stash house; that telephone toll records showed numerous communications between Gotti and Valencia in Spring 2005; and that Valencia was a target of the Gotti investigation. (Doc. 261-4).

- The June 8, 2005, and July 8, 2005, Gotti wiretap affidavits both identified Valencia as a target of the Gotti investigation. (Doc. 261-5).

- The July 15, 2005, Valencia wiretap affidavit stated that although the Valencia and Gotti DTOs each had separate sources of supply and distribution channels, Valencia and Gotti communicated with each other and had been intercepted discussing drug distribution; that the DTOs had at least one common source of supply and used some common resources, such as off-loading sites and drug stash houses; that there appeared to be common targets including an individual referred to as "Ulysses;" that although they operated independently, there was a "loose connection;" and that Gotti was a target of the Valencia investigation. (Doc. 261-5-6).

- The July 27, 2005, Gotti wiretap affidavit stated that in the past, the Valencia and Gotti DTOs had a common source of supply, but now each had separate sources; that there was "limited" communication between Gotti and Valencia when using the same source of supply, or when one needed to "borrow" drugs from the other because of a shortage; that they used some common resources, such as off-loading sites and stash houses; and that there appeared to be common targets including an individual referred to as "Ulysses." (Docs. 253-7; 261-6-7).

- The August 4, 2005, and September 2, 2005, Gotti wiretap affidavits identified Valencia as a target of the Gotti investigation, and provided discussions of the connections between the Valencia and Gotti DTOs that were similar to the previous wiretap affidavits. (Doc. 261-8).

- The August 12, 2005, August 26, 2005, and September 14, 2005, Valencia wiretap affidavits identified Gotti as a target of the Valencia investigation, and provided discussions of the connections between the Valencia and Gotti DTOs that were similar to the previous wiretap affidavits. (Doc. 261-8).

The documents showing that Rice personally and substantially participated in the Valencia investigation, which led to the charges against Montemayor, included:

· Rice signed and submitted a July 27, 2005, pen register request, which had previously been prepared by Horn, for a device used by Martinez. (Doc. 261-9).

· Rice worked with agents to prepare and submit another pen register and cell site records request for the same device used by Martinez on July 28, 2005, and from those pen registers, agents learned about calls between Martinez and Montemayor, which was provided in a later Valencia wiretap affidavit. (Doc. 261-9).

· Rice worked with agents on another pen register and cell site request dated August 4, 2005, for a device used by Valencia, though it was not submitted to the court. (Doc. 261-9-10).

· All of the Gotti wiretap affidavits identified Valencia as a target and discussed the connections between the Gotti and Valencia DTOs. (Doc. 261-4-8).

· In each of the wiretap applications, Rice's statements included that he had discussed all of the circumstances of the offenses with the affiant who, along with other agents, conducted the investigation; he had reviewed the affidavits and believed they established probable cause; and the affidavits contained a full and complete statement establishing necessity for the wiretap. (Docs. 253-5-6; 261-4-5, 28-29).

· Similarly, in each of the pen register applications, Rice's statement included that he had discussed all of the circumstances with an investigating agent. (Docs. 253-10; 261-9-10).

· Rice signed all of the applications, certifying under penalty of perjury that the contents of the applications he signed were true. (Docs. 253-5-6; 261-5, n.4, 28-29).

In addition to the other documents submitted, Horn's sworn declaration averred that:

· The Narcotics/OCDETF section held weekly attorney meetings, and during those meeting in 2005, which were attended by both Horn and Rice, Horn

"openly shared" information about the Valencia investigation. (Docs. 253-11-12; 261-10).

· Horn talked to Rice about the tension between the DEA groups conducting the two investigations; whether targets were overlapping; and the Valencia investigation generally. (Docs. 253-12; 261-11).

· Both Horn and Rice attended a joint meeting with both DEA groups to discuss the issues arising from the two investigations. (Doc. 261-7).

· In general, when an AUSA supervised a wiretap investigation, and prepared wiretap applications and supporting affidavits, the AUSA was responsible for ensuring the accuracy of the applications and affidavits; complying with statutory requirements; and certifying under oath that he or she had reviewed and discussed the affidavit with the affiant. (Docs. 253-12; 261-11).

· Before an AUSA included any information about another AUSA's investigation in a wiretap application or affidavit, those two AUSAs would discuss it; and in accordance with that policy, Horn and Rice discussed the information included in each other's wiretaps in the Valencia and Gotti investigations. (Docs. 253-12-13; 261-11).

The Court credited Horn's sworn declaration over Rice's because Horn's declaration was corroborated by the documents, and Rice's declaration denying his involvement was "in conflict with his prior certification," and "belie[d] belief." (Docs. 253-31-32; 261-21). Contrary to Montemayor's assertion that the Court was required to hold an evidentiary hearing in order to make a credibility determination between Horn and Rice, (Doc. 410-8-10), the Court properly credited Horn's declaration over Rice's because it was supported by other evidence in the record, and Rice's declaration conflicted with his certifications under penalty of perjury. *Owens*

*v. United States*, 551 F.2d 1053, 1054 (5th Cir. 1977)[17] (ordinarily, contested fact issues may not be decided on affidavits alone, but if the affidavits are supported by other evidence in the record the court may rely upon them); *see also Registe v. State*, 287 Ga. 542, 550 (2010) ("We give little credence to the argument that [former ADA] Jackson signed the warrants without reading and understanding them or that he had no actual basis for the representations he made to the trial court, which itself would raise serious ethical concerns") (citing Ga. R. Prof. Conduct 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal")). Also, both parties agreed that the additional evidence the Court needed could be presented via sworn written declarations of Rice and Horn, and the Court granted the parties' joint request to proceed in that manner. (Doc. 253-2-3).

Because Rice was prohibited from representing Montemayor under 18 U.S.C. § 207(a)(1), the Court did not abuse its discretion by disqualifying him.

### 2. Rice was prohibited from representing Montemayor under the Georgia Rules of Professional Conduct.

As a former AUSA, Rice was also prohibited from representing Montemayor under the Georgia Rules of Professional Conduct. Rule 1.11(a) states that "a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government entity gives informed consent, confirmed in writing." Ga. R. Prof. Conduct 1.11(a). Similarly, Rule 1.9(a) states that "[a] lawyer who has

---

[17] Decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding precedent on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Ga. R. Prof. Conduct 1.9(a). "A violation of this rule depends on whether: (1) there was a previous attorney-client relationship and, if so, (2) that relationship involved a matter substantially related to the current proceeding." *McGriff v. Christie*, 477 F. App'x 673, 678 (11th Cir. 2012).

As discussed above, Rice participated personally and substantially in the Gotti and Valencia investigations, and that participation was substantially related to his representation of Montemayor. *See Supra* Section 1(A)(1). Thus, the Court also properly disqualified Rice under the Georgia Rules of Professional Conduct. (Doc. 261-29-32). Indeed, Montemayor offers no argument whatsoever regarding Rice's disqualification under Rules 1.11(a) and 1.9(a).[18] (Doc. 410-6-11).

Because Rice was prohibited from representing Montemayor under 18 U.S.C. § 207(a)(1) and the Georgia Rules of Professional Conduct, the Court did not abuse its discretion by disqualifying Rice. Thus, the issue would not have been meritorious on appeal, even assuming that the issue had not been waived by his guilty plea. Montemayor has failed to meet his burden to prove that he was prejudiced, and his claim should be denied.

---

[18] The government also argued that Rice should be disqualified under Rule 1.7(a), (Doc. 196-29-31), but the Court did not address that additional ground. (Doc. 261-32 n.13).

**B. Montemayor has failed to meet his burden to prove that his guilty plea was involuntary based on ineffective assistance of counsel because the statements he made under oath to the Court at his plea hearing affirmatively contradict his assertions now that his counsel promised a certain sentence and that he did not understand the consequences of his plea. Montemayor also has failed to allege or show prejudice.**

It is well settled that "[t]he plea colloquy, provided in Rule 11 of the Federal Rules of Criminal Procedure, constitutes the constitutional minimum requirements for a knowing and voluntary plea for federal courts . . . ." *Stano v. Dugger*, 921 F.2d 1125, 1141 (11th Cir. 1991); *United States v. Arteaga-Tapia*, 454 F. App'x 884, 886 (11th Cir. 2012)(same). The three core objectives of Rule 11 are: "(1) ensuring that the guilty plea is free from coercion; (2) ensuring that the defendant understands the nature of the charges against [him]; and (3) ensuring that the defendant is aware of the direct consequences of the guilty plea." *United States v. Camacho*, 233 F.3d 1308, 1314 (11th Cir. 2000). But although Rule 11 requires disclosure of the punishment authorized by statute, it is only necessary that the defendant know the range of possible sentences, not the exact sentence the court will assess. *Ruiz v. United States*, 494 F.2d 1, 3 (5th Cir. 1974). There is a strong presumption that, (1) a plea created by proceedings pursuant to Federal Rule of Criminal Procedure 11 is knowing and voluntary; and (2) statements made during the Rule 11 plea colloquy are true. *United States v. Gonzalez-Mercado*, 808 F.2d 796, 800, n.8 (11th Cir. 1987); *see also United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988) ("when a defendant makes statements under oath at a plea colloquy, he bears a heavy burden to show his statements were false").

For the representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea,

27

> constitute a formidable barrier in any subsequent collateral proceedings.
> Solemn declarations in open court carry a strong presumption of verity. The
> subsequent presentation of conclusory allegations unsupported by specifics is
> subject to summary dismissal, as are contentions that in the face of the record
> are wholly incredible.

*Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

At Montemayor's plea colloquy, he stated that he understood he was under oath and required to answer the Court's questions completely and truthfully. (Doc. 336-4). He stated that he understood the charges to which he was pleading guilty, the constitutional rights he was waiving by pleading guilty, and the consequences of his guilty plea, including that he faced a maximum sentence of life imprisonment and that he would still be bound by his plea with no right to withdraw it if the sentence the court ultimately imposed was higher than he anticipated. (Doc. 336-6-10, 22-27). He also stated that he had not been coerced in any way into pleading guilty, nor had anyone made any undisclosed promises to him to persuade him to plead guilty. (Doc. 336-27-28). Indeed, every time the Court asked Montemayor if he understood the Court's statement or question, Montemayor replied that he did, and at the end of the plea hearing, Montemayor told the Court that he did not have any questions about anything. (Doc. 336-4, 6-10, 23-30).

Notwithstanding the statements he made under oath to the Court that he was not promised any particular sentence, and that he understood the charges against him and the consequences of his plea, Montemayor now makes contrary allegations in his § 2255 motion, asserting that: (1) his counsel promised that he would receive a sentence of 10 to 15 years of imprisonment; and (2) his counsel failed to bring a Spanish interpreter to meetings with Montemayor, "causing [Montemayor] to not

fully understand" his plea.[19] (Doc. 410-11-12). But because Montemayor's allegations in his motion are contrary to the oral statements he made under oath to the Court, comparatively, those allegations are entitled to little weight. *See Bryan v. United States*, 492 F.2d 775, 779-780 (5th Cir. 1974) (where defendant tendered only his own affidavit in support of his allegations, and the affidavit directly contradicted his statements made at his guilty plea hearing, the district court properly denied relief); *see also United States v. Cardenas*, 230 F. App'x 933, 935 (11th Cir. 2007) (defendant did not overcome the presumption that statements at a plea colloquy are true simply because he claimed his counsel promised him a shorter sentence, where he stated at the colloquy that he understood the court was not required to accept any sentence recommendation or agreement); *Patel v. United States*, 252 F. App'x 970, 975 (11th Cir. 2007) (plea voluntary where defendant's allegations are in direct conflict with his statements during his plea colloquy, and he produced no evidence to challenge the veracity of his sworn testimony).

Montemayor has not rebutted the strong presumption that the statements he made under oath to the Court at his plea colloquy, which established that his plea was knowing and voluntary, were true. *See Gonzalez-Mercado*, 808 F.2d at 800, n.8; *see also Blackledge v. Allison*, 431 U.S. at 74; *Rogers*, 848 F.2d at 168. Indeed, he does not even assert that the statements he made under oath to the Court were false, let alone

---

[19] Montemayor raised these same claims in his prior motion to withdraw his guilty plea. (Doc. 366-3-4). The Court denied that motion, and found that Montemayor's guilty plea was knowing and voluntary. (Doc. 366-3-4) ("It is clear that Defendant entered a knowing and voluntary plea. That Defendant is not happy with the imposed custodial sentence does not mean that Defendant gets a 'do over'").

offer any proof or corroboration that they were false.[20] (Doc. 410-11-12); *see Patel* 252 F. App'x at 975.

Alternatively, to the extent Montemayor is claiming that, despite knowing the minimum and maximum penalties he faced, and despite the fact that he was not "promised" any particular sentence, he nevertheless did not "fully understand" the consequences of his plea because the sentence he received was higher than the sentence his counsel predicted he might receive, Montemayor's reliance on counsel's estimation of a lower sentence does not overcome the responses he made under oath to the Court, or render his guilty plea involuntary, or his counsel ineffective. Montemayor stated under oath to the Court that he understood that the Court would calculate the Sentencing Guidelines, but could impose a sentence above or below those Guidelines, and, if the sentence the Court ultimately imposed was more severe than he anticipated, he would still be bound by his guilty plea and would have no right to withdraw it. (Doc. 336-23-26); *see also Ruiz*, 494 F.2d at 3 (the defendant need only know the range of possible sentences authorized by statute, not the exact sentence the court will assess); *Gonzalez-Mercado*, 808 F.2d at 800, n.10 ("A defendant's unexpressed reliance on his attorney's speculation cannot overcome his direct responses" to the court); *United States v. Munguia Ramirez*, 267 F. App'x 894, 898 (11th Cir. 2008) (a guilty plea is not involuntary based on counsel's estimate of the ultimate sentence); *Little v. Allsbrook*, 731 F.2d 238, 241 (4th Cir. 1984) ("An attorney's 'bad guess' as to sentencing does not justify the withdrawal of a guilty plea and is no reason to invalidate a plea"); *Wellnitz v. Page*, 420 F.2d 935, 936-37 (10th

---

[20] In his motion to withdraw his guilty plea, Montemayor similarly did not show, or even assert, that his sworn statements were false. (Docs. 358; 366).

Cir.1970) ("an erroneous sentence estimate by defense counsel does not render a plea involuntary. And a defendant's erroneous expectation, based on his attorney's erroneous estimate, likewise does not render a plea involuntary").

Montemayor has failed to meet the heavy burden required to establish that the statements he made under oath to the Court at his plea colloquy were false. *See Rogers*, 848 F.2d at 168 ("when a defendant makes statements under oath at a plea colloquy, he bears a heavy burden to show his statements were false"); *Patel*, 252 F. App'x at 975 (plea voluntary where record demonstrates that defendant did not mention counsel's alleged promise of a specific sentence during his plea colloquy, and instead confirmed no one had promised him anything in exchange for his plea).

Thus, his claim fails because he has failed to establish the first *Strickland* prong, *i.e.*, that his counsel's representation fell below an objective standard of reasonableness, and the Court need not go further. *See Strickland*, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one"). But notwithstanding that the Court need not address the second *Strickland* prong, Montemayor has also failed to establish, or even allege, prejudice; that is, that he would have accepted the plea agreement but for his counsel's alleged errors. *See Lafler*, 566 U.S. at 163-64. Instead, Montemayor states only that "[h]ad plea counsel accurately and reasonably computed Petitioner's potential sentence, he would have advised Petitioner to accept the negotiated plea or, if that was no longer an option, to proceed to trial . . ."[21] (Doc. 410-11). Montemayor's statement that counsel

---

[21] There is no dispute that the plea offer was conveyed to Montemayor. At his plea hearing, Montemayor confirmed that he had received the offer, he had

should have advised Montemayor differently, is insufficient to establish prejudice.[22]
He does not state that he would have accepted the plea agreement, and in any event,
a defendant's mere assertion that he would have accepted a guilty plea is insufficient
to establish prejudice. *Roach v. Roberts*, 373 F. App'x 983, 985 (11th Cir. 2010)
(citing *United States v. Campbell*, 778 F.2d 764, 768 (11th Cir. 1985)) ("bare
allegation that he would not have pleaded guilty is insufficient to establish prejudice
under *Strickland*."). "Courts should not upset a plea solely because of *post hoc*
assertions from a defendant about how he would have pleaded but for his attorney's
deficiencies. Judges should instead look to contemporaneous evidence to
substantiate a defendant's expressed preferences." *Lee v. United States*, __ U.S. __,
137 S. Ct. 1958, 1967 (2017) ("Surmounting *Strickland*'s high bar is never an easy
task, and the strong societal interest in finality has special force with respect to
convictions based on guilty pleas"); *Cedeno-Gonzalez v. United States*, 757 F. App'x
868, 870 (11th Cir. 2018) ("Post-hoc assertions from a defendant about how he
would have pleaded but for his attorney's deficiencies are generally insufficient").
Here, Montemayor does not cite to any "contemporaneous evidence" to corroborate
or support a claim that he would have accepted the guilty plea offered by the
Government. (Doc. 410-11-12).

---

discussed it with his attorney, his attorney had answered all of his questions about it,
and he had decided to reject it. (Doc. 336-26-27).

[22] Although pro se pleadings must be liberally construed, here, Montemayor is
represented by counsel, so liberal construction of his pleading is unwarranted. *See
Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) ("[p]ro se
pleadings are held to a less stringent standard than pleadings drafted by attorneys
and will, therefore, be liberally construed").

On the contrary, at the time the parties were negotiating a potential plea, Defendant's motion to suppress the wiretap evidence was still pending before the Court. *See generally* Docs. 271, 281, and 289. The wiretaps were important evidence in the Government's case, especially given that Defendant's own conversations were intercepted. *See* Doc. 344. Yet nowhere in Defendant's motion does he demonstrate that he would have foregone litigating that motion in order to accept the Government's plea offer. Indeed, Defendant's choice not to accept the plea allowed him to litigate the wiretap and, when the motion was denied, to plead guilty without a plea agreement and argue for any sentence he deemed appropriate. Indeed, at sentencing, Defendant argued for a 15-year sentence, less than he asserts he would have been obligated to request under the plea agreement. *See* Docs. 334, 364-112 (requesting a sentence of 180 months, less time served in Mexican custody). As such, Defendant fails to show prejudice from his decision not to accept the plea agreement.

Further, Montemayor's assertion that, had he known of the sentence he would have received, he would have gone to trial if the Government would no longer extend the offer because "there is no distinction" between multiple life sentences if he lost at trial, and a "(40)-year sentence," is inapposite because his sentence was not equivalent to a life sentence. (Doc. 410-11-12). Montemayor received a 411-month sentence in this case, which is 34 years. (Doc. 371). Also, as the Supreme Court has instructed, a life sentence "is the second most severe [punishment] known to the law." *Harmelin v. Michigan*, 501 U.S. 957, 996 (1991). The fact that Montemayor received his 34-year sentence at age 47, rather than at a younger age, does not convert it to a "life" sentence, which by definition means he would be incarcerated

until his death. *United States v. Kirby*, 938 F.3d 1254, 1258 (11th Cir. 2019) ("the meaning of life imprisonment is clear: 'Confinement of a person in prison for the remaining years of his or her natural life'"). And by avoiding a "life" sentence, Montemayor is eligible to receive good-time credit, which means he may serve only 85% of his 34-year sentence—*i.e.* 29 years. A prisoner who is serving less than a life sentence is eligible to receive 54 days of good-time credit each year, but a prisoner sentenced to life is not eligible for that credit. *See* 18 U.S.C. § 3624(b)(1) (a prisoner serving a term of imprisonment of more than one year, but less than life, "may receive credit toward the service of the prisoner's sentence, of up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations"). Although Montemayor may very well be at an advanced age when he is released, avoiding a "life" sentence provided him with the opportunity for eventual release, rather than certain confinement until his death. *Kirby*, 938 F.3d at 1258.

The record and relevant law affirmatively contradict Montemayor's assertions that his counsel promised a sentence of 10 to 15 years of imprisonment, and that he did not "fully understand" the consequences of his plea. He has failed to establish both that his counsel's representation fell below an objective standard of reasonableness, and that he was prejudiced; thus, his claim should be denied.

## 2.  Statement as to evidentiary hearing.

An evidentiary hearing is not required in the present case because the record is sufficient for the Court to determine the issues. It is well settled in this circuit that the district court is not required to hold an evidentiary hearing every time a § 2255

claim is raised. *Futch v. Dugger*, 874 F. 2d 1483, 1485 (11th Cir. 1989). A federal habeas corpus petitioner is entitled to an evidentiary hearing only where the petitioner alleges facts that, if proven, would entitle him to relief. *Id.* "A hearing is not required on patently frivolous claims or those which are based upon unsupported generalizations. Nor is a hearing required where the petitioner's allegations are affirmatively contradicted by the record." *Holmes v. United States*, 876 F. 2d 1545, 1553 (11th Cir. 1989) (quoting *United States v. Guerra*, 588 F. 2d 519, 520-21 (5th Cir. 1979)). After reviewing the record, it is within a court's sound discretion as to whether to conduct an evidentiary hearing. *United States v. Lagrone*, 727 F. 2d 1037, 1038 (11th Cir. 1984).

There are no issues that require the introduction of facts from outside the record. For the reasons explained above, the files and records of the District Court are sufficient to dispose of this motion without a hearing. Therefore, a hearing is not necessary.

### 3.  Montemayor is not entitled to a COA.

As amended effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2255 Proceedings provides that a district court must issue or deny a Certificate of Appealability ("COA") at the time it enters a final order adverse to the defendant. 28 U.S.C. foll. § 2255, Rule 11. In this case, Montemayor is not entitled to a COA.

Under 28 U.S.C. § 2253, the Court may only issue a COA if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. §2253(c)(2). In addition, the COA must indicate which specific issue or issues satisfy the required showing of the denial of a constitutional right. 28 U.S.C. §2253(c)(3).

In order to obtain a COA, a petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 475 (2000).

Here, Monatemayor has not made a substantial showing of the denial of a constitutional right. The record and relevant law establish that Montemayor's counsel at all times provided the "reasonably effective assistance" required by the Sixth Amendment. *See Ward v. United States*, 694 F.2d 654, 664 (11th Cir. 1983) ("the Sixth Amendment requires 'not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance'"). Thus, this Court should decline to issue a COA.

## CONCLUSION

For the foregoing reasons, Montemayor's 28 U.S.C. § 2255 Motion to Vacate, Set Aside, or Correct Sentence should be denied.

Respectfully submitted,

KURT R. ERSKINE
*Acting United States Attorney*

/s/ ELIZABETH M. HATHAWAY
*Assistant United States Attorney*
Georgia Bar No. 076212

/s/ GARRETT L. BRADFORD
*Assistant United States Attorney*
Georgia Bar No. 074374

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
(404)581-6000; fax (404)581-6181

THERESA M. BASS
*Paralegal Specialist*

## CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify that this document was prepared using 14-point Goudy Old Style font, and that I have caused a copy to be electronically filed with the Clerk of Court using the CM/ECF system, which automatically sends notification to the parties and counsel of record.

This 1st day of October, 2021.

/s/ ELIZABETH M. HATHAWAY
*Assistant United States Attorney*