IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CARLOS MONTEMAYOR,<br>BOP ID 59363-380,<br>     Movant,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>     Respondent. | CIVIL ACTION NO.<br>1:21-CV-3555-LMM-RDC<br><br>CRIMINAL ACTION NO.<br>1:09-CR-551-2-LMM-RDC |

## **FINAL REPORT AND RECOMMENDATION**

After Carlos Montemayor entered a non-negotiated guilty plea to an indictment charging him with serious drug trafficking and money laundering crimes, he was sentenced to a 411-month term of imprisonment and ordered to forfeit $192,000,000. *See United States v. Montemayor*, 815 F. App'x 406 (11th Cir. 2020).

This matter is before the Court on Montemayor's counseled Motion to Vacate, Set Aside, or Correct Conviction and Sentence Pursuant to 28 U.S.C. § 2255 [Doc. 410], the government's response [Doc. 416], and Montemayor's reply [Doc. 417]. Montemayor contends, inter alia, that he received ineffective assistance of counsel because (1) his right to appeal the disqualification of Richard Rice (an attorney he sought to retain) was not preserved and (2) he was allegedly advised that he would receive a shorter sentence. For the reasons set forth below, I will recommend that Montemayor's § 2255 motion and a Certificate of Appealability be denied.

In October 2004, a Drug Enforcement Agency (DEA) team began investigating a drug trafficking and money laundering organization headed by Edwar Valencia-Gonzalez (Valencia DTO).  [Doc. 261 at 3].  John Horn was the lead prosecutor handling this matter for the United States Attorney's Office for the Northern District of Georgia (USAO).  [*Id.*].

In April 2005, a different DEA team began investigating a drug trafficking and money laundering organization headed by Javier Alvarez-Lopez, a/k/a "Gotti" (Gotti DTO).  [Doc. 261 at 4].  Richard Rice was the lead prosecutor handling this matter for the USAO.  [*Id.*].

In May 2005, Rice applied for an order authorizing a wiretap under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, et seq. (TIII), in furtherance of the Gotti DTO investigation.

> The affidavit in support of the application set out background information about the organization, including that agents had identified Valencia as a drug trafficker and had seized large quantities of drugs and funds associated with him in March 2005, and that a summary of telephone toll records showed a number of communications, the contents of which were unknown, between Valencia and Gotti in the Spring of 2005.  Valencia was identified as a target of the Gotti DTO investigation.  In the application, Rice stated, in pertinent part, that he had "discussed all of the circumstances of the [listed offenses] with [the affiant], who along with other law enforcement officers, has conducted th[e] investigation[.]"  . . . Rice certified, under penalty of perjury, that the contents of the application he signed were true.

[Doc. 261 at 4–5].

Subsequent TIII wiretap applications certified by Rice, and submitted under penalty of perjury, in June and July 2005 continued to identify Valencia as a target of the Gotti DTO investigation.  [Doc. 261 at 5].

Similarly, TIII wiretap applications certified by Horn, and submitted under penalty of perjury, identified Gotti as a target in connection with the Valencia DTO investigation.  [Doc. 261 at passim].

In June 2005, Horn applied for the first of eight TIII wiretaps in connection the Valencia DTO investigation.  [Doc. 261 at 3].  This wiretap resulted in the identification of Juan Montemayor (Carlos's brother) and Romero Roel Martinez. [*Id.*].  A subsequent July 2005 TIII wiretap order for devices used by Valencia and Martinez led agents to "determine[] that Carlos . . . and Juan together supplied drugs to the Valencia DTO and laundered funds accumulated in drug trafficking activity." [*Id.* at 3–4].

A July 15, 2005 TIII wiretap application submitted by Horn in the Valencia DTO investigation stated that although the Valencia DTO and Gotti DTO each had its "own SOS [source of supply] and distribution channels," Valencia and Gotti communicated with each other and had been intercepted discussing drug distribution; the DTOs had at least one common SOS but also had separate SOS; the DTOs used some common resources, such as off-loading sites and drug stash houses;

there appeared to be common targets (beyond Valencia and Gotti themselves), including "Ulysses"; and there was a "loose connection" between Valencia and Gotti, even though each was "operating independently." [Doc. 261 at 6].

Similarly, a July 27, 2005 TIII wiretap application submitted by Rice in the Gotti DTO investigation stated that there were three drug trafficking cells operating in metropolitan Atlanta, including the Gotti DTO and the Valencia DTO; there was "limited" communication between Gotti and Valencia when using the same SOS or when one DTO needed to "borrow" drugs from the other; the DTOs used some common resources, such as off-loading sites and stash houses; and there appeared to be common targets, including "Ulysses." [Doc. 261 at 6–7].

When Horn was out-of-the-office in late July and early August 2005, he asked Rice temporarily to step into his role in the Valencia DTO investigation. [Doc. 261 at 9]. On July 27, 2005, Rice submitted a request prepared by Horn for a pen register on a device used by Martinez. [*Id.*]. On July 28, 2005, Rice "worked with agents to prepare and submit another pen register and cell site request for the same device used by Martinez." [*Id.*]. Together, the July 27 and July 28 requests produced "information about calls between Martinez and Montemayor discussing drug activities." [*Id.*]. And, on August 4, 2005, Rice again worked with agents to prepare a pen register and cell site application for a device used by Valencia. [Doc. 261 at

9].  Rice again certified that he had thoroughly discussed these applications with the agent running the Valencia DTO investigation.  [*Id.* at 9–10].

Both Horn and Rice acknowledge that at some point they and the two DEA teams involved in the Valencia DTO and Gotti DTO investigations, respectively, held a joint meeting to discuss issues arising in their overlapping investigations. [Doc. 261 at 7].  Horn and Rice have differing recollections of the substance of the meeting, but there was no disagreement that the meeting in fact occurred and that both of them were present.  [*Id.*].

In October 2005, an indictment was handed down in the Gotti DTO investigation, and Alvarez-Lopez (a.k.a. "Gotti") was arrested that month.  [Doc. 261 at 8]; *see also United States v. Alvarez-Lopez*, No. 1:05-cr-477-1-MHC-GGB (N.D. Ga. 2005).  It appears that Rice remained involved in the Gotti DTO investigation and various prosecutions arising out of it through his departure from the USAO in February 2008.  [Doc. 261 at 2].

In November 2005, the first indictment was handed down in the Valencia DTO investigation, albeit not one that named Montemayor.  *See United States v. Flores*, No. 1:05-cr-558-TWT-JFK (N.D. Ga. 2005).

Ultimately, Montemayor was named in a later indictment in 2009.  *See United States v. Montemayor*, No. 1:09-cr-551-2-LMM-RDC (N.D. Ga. 2009).  He was

arrested in Mexico in November 2010 and extradited to the United States in September 2015. [Doc. 261 at 2].

From September 2015 to February 2016, Montemayor was represented by several retained attorneys. *See, e.g.*, [Docs. 155, 175].

On February 24, 2016, Rice entered "his appearance as lead counsel on behalf of" Montemayor. [Doc. 184]. None of Montemayor's previously retained lawyers appeared again in later proceedings.

In May 2016, the government moved to disqualify Rice under 18 U.S.C. § 207(a)(1) and Georgia Rules of Professional Conduct 1.11(a), 1.9, and 1.7(a) "[b]ased on his exposure to . . . confidential information and strategy" and his "personal and substantial role in the investigation the led to the indictment and prosecution of his client." [Doc. 196 at 2]. Rice opposed the motion to disqualify him and brought in William Coleman Sylvan as "co-counsel." [Docs. 208, 221].

After Magistrate Judge Janet F. King held a hearing in December 2016, Montemayor elected to waive (for himself) any potential conflict that might apply to Rice. [Doc. 231]. Judge King determined that while this raised a presumption in favor of permitting Rice to represent Montemayor, the Court still needed to "determine whether that presumption is overcome by the Government's 'demonstration of an actual conflict or a serious potential for conflict'" and that

6

Montemayor was entitled to "'a full-scale adversarial hearing in order to evaluate the government's evidence regarding the attorney's alleged' conflict." [Doc. 253 at 2 (quoting *United States v. Register*, 182 F.3d 820, 830 (11th Cir. 1999))].  Judge King then scheduled just such a hearing for January 2017. *See* [Unnmbrd. Dkt. Entry dated 12/21/2016].  However, rather than proceed by hearing, Montemayor and the government agreed instead to submit sworn declarations.  [*Id.* at 2–3].

In April 2017, Judge King issued a comprehensive 45-page order granting the government's motion to disqualify Rice.  [Doc. 253].  Montemayor filed objections. [Doc. 257].  And, in June 2017, District Judge William S. Duffey, Jr., overruled Montemayor's objections and entered his own thorough 33-page order affirming Judge King's Order and granting the motion to disqualify Rice.  [Doc. 261].

Sylvan continued to represent Montemayor from June 2017 through late 2017, when Montemayor sought his removal.  [Doc. 273].  Montemayor then filed an affidavit stating that he could not afford to retain new counsel, and the Court appointed Paul Cognac to represent him.  [Docs. 278, 279].

After various pending motions were decided against Montemayor, he elected to enter (through Cognac) an unconditional, non-negotiated plea of guilty to all charges against him.  [Docs. 324, 336].

7

In May 2019, the Honorable Leigh Martin May sentenced Montemayor to a 411-month term of imprisonment with the amount to be forfeited held open. *See* [Doc. 339].

Montemayor retained new counsel, Stephen Reba. [Doc. 346]. Cognac moved to withdraw. [Doc. 347]. And Judge May granted Cognac's motion. [Doc. 353].

On May 28, 2019, Montemayor (through Reba) filed a notice of appeal "from the Judgment of Sentence entered on May 16, 2019." [Doc. 348].

On June 13, 2019, Montemayor (through Reba) filed a motion to withdraw his guilty plea on the grounds that Cognac provided ineffective assistance of counsel when he allegedly "advised Defendant to reject an offer by the Government of approximately twenty-five (25) years in prison, instead telling him that a sentence of approximately ten (10) to fifteen (15) years was very likely to be imposed in a non-negotiated plea" and "failed to bring a Spanish-speaking interpreter to all his visits with Defendant." [Doc. 358 at 3].

In July 2019, Judge May denied Montemayor's motion to withdraw his guilty plea. [Doc. 366].

The following month Judge May entered an Order and Judgment of Forfeiture and a Final Judgment and Commitment. [Docs. 369, 370, 371]. The first added the

$192,000,000 forfeiture, and the second confirmed the 411-month term of imprisonment (previously imposed by the May 16, 2019 Judgement of Sentence). [*Id.*]. *See also Montemayor*, 815 F. App'x at passim.

Montemayor (through Reba) did not file a further appeal (to supplement his appeal of the May 16, 2019 Judgment of Sentence).

The United States Court of Appeals for the Eleventh Circuit dismissed Montemayor's direct appeal insofar as it challenged the Court's orders disqualifying Rice, finding that his voluntary, unconditional guilty plea waived all nonjurisdictional defects. *Montemayor*, 815 F. App'x at 409. Among other things, the Eleventh Circuit specifically found that "Montemayor failed to rebut the strong presumption that the statements he made during his Rule 11 hearing were true, which established that his plea was knowing and voluntary." *Id.* The Eleventh Circuit also dismissed Montemayor's appeal insofar as it challenged the forfeiture amount, reasoning that his "premature notice of appeal [with respect to his term of imprisonment]. . . could not become effective to appeal the forfeiture order because the district court determined the forfeiture order separately." *Id.* at 410. And the Eleventh Circuit otherwise affirmed Montemayor's convictions. *Id.*

Montemayor (through Reba) then filed the § 2255 motion now pending before the Court. [Doc. 410]. Montemayor contends he received ineffective assistance of counsel because his counsel (1) "failed to properly raise and preserve the erroneous removal of . . . Rice," and (2)(A) "advised Petitioner to reject an offer by the Government of approximately twenty-five (25) years in prison, instead telling him that a sentence of approximately ten (10) to fifteen (15) years was very likely to be imposed in a non-negotiated plea," and (B) "failed to bring a Spanish language interpreter to his meetings with Petitioner on numerous critical occasions leading up to the plea and sentence." [*Id.* at 6, 11, 12]. Each of these grounds is meritless.

"The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel at 'critical stages of a criminal proceeding,' including when he enters a guilty plea." *Lee v. United States*, 137 S. Ct. 1958, 1964 (2017) (quoting *Lafler v. Cooper*, 566 U.S. 156, 165 (2012)). "To demonstrate that counsel was constitutionally ineffective, a defendant must show that counsel's representation 'fell below an objective standard of reasonableness' and that he was prejudiced as a result." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). Courts must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and "judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 690. In cases

10

where there is alleged to have been ineffective assistance in connection with the plea process, when a defendant alleges that his counsel's deficient performance led him to accept a guilty plea rather than go to trial, defendant must demonstrate a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial," *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), and when a defendant alleges that his counsel's deficient performance led him to reject rather than accept a plea offer, "a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 566 U.S. at 164.

Much of what the Eleventh Circuit wrote on Montemayor's direct appeal bears repeating here.

> The Rule 11 plea colloquy "constitutes the constitutional minimum requirements for a knowing and voluntary plea for federal courts." *Stano v. Duggar*, 921 F.2d 1125, 1141 (11th Cir. 1991). The three core objectives of Rule 11 are: "(1) ensuring that the guilty plea is free from coercion; (2) ensuring that the defendant understands the nature of the charges against [him]; and (3) ensuring that the defendant is aware of the direct consequences of the guilty plea." *United States v. Camacho*, 233 F.3d 1308, 1314, (11th Cir. 2000). There is a strong

11

> presumption that a plea created by proceedings that follow Rule 11 is
> knowing and voluntary, and that the statements made during that
> hearing are true. *United States v. Gonzalez-Mercado*, 808 F.2d 796,
> 800 & n.8 (11th Cir. 1987).

*Montemayor*, 815 F. App'x at 409. Because "solemn declarations in open court carry a strong presumption of verity," any "subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge v. Allison*, 431 U.S. 63, 67 (1977).

And a "district court is not required to reconsider claims of error that were raised and disposed of on direct appeal." *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000). "'Once a matter has been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack under § 2255.'" *Id.* (quoting *United States v. Natelli*, 553 F.2d 5, 7 (2d Cir. 1977). Put another way, "[a] rejected claim does not merit rehearing on a different, but previously available, legal theory." *Id.*

The Eleventh Circuit determined in Montemayor's direct appeal that his guilty plea was entered knowingly and voluntarily. *See Montemayor*, 815 F. App'x at 409 ("Montemayor failed to rebut the strong presumption that the states he made during his Rule 11 hearing were true, which established that his plea was voluntary."). To

the extent that Montemayor's § 2255 motion reraises this issue, he may not relitigate it. *See Nyhuis*, 211 F.3d at 1343.

But even assuming that Montemayor may once again argue that his guilty plea was not knowing and voluntary, the record in this case makes it plain that it was.

Montemayor's claims that his counsel provided ineffective assistance by "advis[ing] Petitioner to reject an offer by the Government of approximately twenty-five (25) years in prison, instead telling him that a sentence of approximately ten (10) to fifteen (15) years was very likely to be imposed in a non-negotiated plea," and "fail[ing] to bring a Spanish language interpreter to his meetings with Petitioner on numerous critical occasions leading up to the plea and sentence," [*id.* at 6, 11, 12], turn on whether those claims are factually accurate and supported. Here, Montemayor (through Reba) offers no evidence (beyond conclusory assertions made in a brief) that either of these things actually happened.[1]

---

[1] Montemayor points only to the sentencing transcript where Cognac presented an *argument* to the Court in which he *advocated* for imposition of a 180-month sentence. *See* [Doc. 410 at 11 (citing Doc. 364 at 111–12)]. Fairly read, there is nothing here to suggest that Cognac *advised* Montemayor that this would be his actual sentence. Conflating *advocacy* with *advice* in this way would mean that every defendant who receives a sentence longer than defense counsel argued for at his sentencing hearing would have a "valid" ineffective assistance of counsel claim and be entitled to federal habeas relief. Montemayor offers no authority to support this specious proposition.

Montemayor has not produced an affidavit from Cognac stating that this advice was given or that the absence of an interpreter impeded communication and understanding.  Indeed, Montemayor has not even produced his own affidavit.  And even if Montemayor had proffered his own affidavit making these allegations, it would be contradicted by the sworn responses he gave during the Rule 11 colloquy, including the following:

> Q.  Has anyone made a promise to you as to what your actual sentence will be?
>
> A.  I'm sorry?  I didn't understand.
>
> Q.  What I need to make sure is that nobody has promised you a specific sentence.  So, has there been anyone that has promised you that you will get a specific sentence?
>
> A.  No, your Honor.
>
> Q.  Are you satisfied with the service your lawyer has provided so far in the case?
>
> A.  Yes, your Honor.
>
> Q.  Have you had enough time to talk with your lawyer and discuss the case and your decision to plead guilty?
>
> A.  Yes, your Honor.

[Doc. 336 at 28].

And it is worth noting that these questions and answers followed a series of statements by Judge May and acknowledgments by Montemayor that:  (A) it was

"solely up to [the Court] to decide on [his] sentence"; (B) "if [he] receive[d] a sentence that is harsher than the sentence that [he] thought [he] was going to get, [he] would not be allowed to withdraw [his] plea of guilty"; (C) "it [was] not possible to determine [his] Guidelines [sentencing range] until after the presentence report ha[d] been developed and [he] and the government . . . had an opportunity to challenge the facts reported by the probation officer"; (D) even then the Court had "the authority to impose a sentence that is more severe or less severe"; (E) he was aware the government had offered a plea agreement; and (F) he "discussed the offer with [his] lawyer and [had] all of [his] questions about it" answered before rejecting it.  [Doc. 336 at 24–27].

Thus, even if Montemayor may relitigate whether the Rule 11 proceeding resulted in a knowing and voluntary guilty plea, an issue that the Eleventh Circuit already resolved in the government's favor on direct appeal, Montemayor has proffered no evidence that overcomes the strong presumption based on his prior sworn statements that his guilty plea was entered knowingly and voluntarily.

As the Supreme Court has observed:

> "Surmounting *Strickland's* high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and the strong societal interest in finality has "special force with respect to convictions based on guilty pleas," *United States v. Timmreck*, 441 U.S. 780, 784 (1979). Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his

> attorney's deficiencies. Judges should instead look to contemporaneous
> evidence to substantiate a defendant's expressed preferences.

*Lee*, 137 S.Ct. at 1967.   Here, Montemayor has proffered no contemporaneous evidence that he would have proceeded in a different manner, and his sworn answers during the Rule 11 colloquy contradict the story he is telling now.

Montemayor's contention that he received ineffective assistance of counsel because his attorneys failed to preserve his right to challenge the disqualification of Rice fares no better.  As the Eleventh Circuit made clear, the entry of a knowing and voluntary guilty plea waives all nonjurisdictional defects in that defendant's court proceedings.   *Montemayor*, 815 F. App'x at 409.   Thus, the two ways for Montemayor to have preserved that issue were either to enter a conditional plea or to proceed to trial.  Montemayor was proffered no evidence that the government would have agreed to (and the Court would have accepted) a conditional plea of guilty.  And Montemayor has proffered no evidence that he was prepared to go to trial, but for his unsubstantiated assertion that his counsel "promised" him a shorter sentence than he ultimately received.  Thus, Montemayor has not established that he was prejudiced and he has not demonstrated ineffective assistance of counsel.

Furthermore, counsel's performance is not ineffective unless "the neglected claim would have a reasonable probability of success on appeal." *Heath v. Jones*, 941 F.2d 1126, 1132 (11th Cir. 1991). *Accord Owen v. Sec'y for the Dep't of Corr.*,

568 F.3d 894, 915 (11th Cir. 2009) ("the underlying substantive claims on those issues lack merit[;] thus, any deficiencies of counsel in failing to raise or adequately pursue them cannot constitute ineffective assistance of counsel") (collecting cases). Here, the only basis that Montemayor has identified for challenging the disqualification of Rice is patently meritless.

"The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Among these is that no defendant may "insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government." *Id.*

The federal government has adopted a statute that sets out the circumstances in which former federal executive branch employees (including former Assistant United States Attorneys (AUSAs)) are precluded from representing parties (including in criminal proceedings in court) after leaving government employment. *See* 18 U.S.C. § 207(a). As relevant here, former AUSAs may not represent defendants in connection with matters in which the government has a direct and substantial interest, the former AUSA participated personally and substantially, and which involved a specific party or parties at the time of such participation. *Id.*

Montemayor's argument in his § 2255 motion that Rice was improperly disqualified proceeds like this:  Once "[t]he [g]overnment declined an evidentiary hearing, the district court was unable to make credibility determinations."  [Doc. 410 at 8]  Consequently, "the Government could only prevail if Rice conceded a violation of 18 U.S.C. § 207."  [*Id.* at 8–9].  And Rice "conceded no such thing."  [*Id.* at 9].

Notably, Montemayor neglects to acknowledge that he also declined the "'full-scale adversarial hearing in order to evaluate the government's evidence regarding the attorney's alleged' conflict" that Judge King offered him and had scheduled, because the parties jointly decided they would prefer to proceed by sworn declaration instead of live testimony.  [Doc. 253 at 2 (quoting *United States v. Register*, 182 F.3d 820, 830 (11th Cir. 1999))].  And, notably, Montemayor neglects to acknowledge that after Judge King entered her Order granting the government's motion to disqualify Rice, even Rice in his own objections did not argue that Judge King had improperly made credibility determinations or belatedly request an evidentiary hearing.  *See* [Doc. 257 at passim].

Montemayor cannot complain that Judge King made credibility determinations where he was offered and declined an evidentiary hearing.  *See* [Doc. 253 at 2–3]; *see also* [Unnmbrd. Dkt. Entries dated 1/5/2017 (postponing evidentiary hearing) & 1/23/2017 (setting schedule for filing of sworn declarations and

briefing)].  In this case, the sworn declarations were an agreed substitute for live testimony and presentation of evidence.  Courts routinely weigh conflicting sworn testimony and determine what is creditworthy.  It was no surprise to Montemayor that Judge King and Judge Duffey did that here.  And Montemayor certainly cannot complain the Judge Duffey also made credibility determinations, where Rice's objections to Judge King's order did not challenge the Court's *authority* to make credibility determinations.

"The doctrine of invited error is implicated when a party induces or invites the district court into making an error." *United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006) (quoting *United States v. Stone*, 139 F.3d 822, 838 (11th Cir. 1998)). Thus, "[i]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." *Id.* (quoting *United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997)).  The Eleventh Circuit would likely dismiss any appeal Montemayor brought that argued this Court erred in weighing Rice's credibility where Montemayor (no less than the government) waived the opportunity to have an in-person evidentiary hearing and elected to proceed only by sworn declaration.

Furthermore, even without weighing the relative credibility of Horn's sworn declaration (which recounted Rice's personal and substantial involvement in the

Valencia DTO investigation) and Rice's sworn declaration (which denied any personal and substantial involvement in the Valencia DTO investigation) it plainly appears from the record, including other sworn documents that Rice himself certified and submitted to the Court (namely, the TIII wiretap applications and pen register applications summarized above), that the Valencia DTO and Gotti DTO investigations overlapped and that Rice had personal and substantial involvement and knowledge regarding both (including when he stepped into Horn's role in the Valencia DTO investigation while Horn was on vacation). *See supra* at pp. 2–5. This Court was not required to blindly credit Rice's later declaration where it was contradicted by his own prior sworn statements.

There was no reasonable probability that Montemayor would prevail on appeal if he raised the issue of Rice's disqualification (especially on the only ground argued in his § 2255 motion).  Thus, Montemayor's counsel could not have been ineffective for having "failed" to preserve that meritless issue for appeal.

For the foregoing reasons, I **RECOMMEND** that Montemayor's § 2255 motion be **DENIED**.

I further **RECOMMEND** that a Certificate of Appealability also be **DENIED** because Montemayor does not meet the requisite standard.  *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000); 28 U.S.C. § 2253(c)(2).

I **FIND** and **CONCLUDE** that an evidentiary hearing is not required because "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," 28 U.S.C. § 2255(b), and Montemayor's allegations are affirmatively contradicted by the record, *see Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989).

I **DIRECT** the Clerk to terminate the referral of this case to me.

**SO REPORTED AND RECOMMENDED**, this 29th day of August, 2022.

REGINA D. CANNON
UNITED STATES MAGISTRATE JUDGE